UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO. 2:10-CR-71-FTM-36DNF

---

THE UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                Fort Myers, Florida
                                      May 10, 2011
HONORI ALEXANDER JOHNSON,      11:00 A.M.

        Defendant.

---

TRANSCRIPT OF BENCH TRIAL, DAY 1 OF 2

BEFORE THE HONORABLE CHARLENE EDWARDS HONEYWELL
UNITED STATES DISTRICT JUDGE

FOR THE GOVERNMENT:     Office of the United States Attorney
                         U.S. Courthouse
                         2110 First Street, Room 3-137
                         Fort Myers, Florida  33901
                         239/461-2200
                         BY:  YOLANDE VIACAVA, A.U.S.A.

FOR THE DEFENDANT:      Federal Public Defender's Office
                         1514 Broadway, Suite 300
                         Fort Myers, Florida  33901
                         239/334-0397
                         BY:  MARTIN DEROVANESIAN, A.F.P.D.

REPORTED BY:           R. JOY STANCEL, RMR-CRR
                         Federal Official Court Reporter
                         U.S. Courthouse
                         2110 First Street
                         Fort Myers, Florida  33901
                         239/461-2064

1                          I N D E X

2    WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS

3    Marcus K. Lawson              64     110      134

4    John D. Kuchta               149     168

5

6

7

8                    E X H I B I T   I N D E X

9    NUMBER                                              PAGE

10   Government's Exhibits 1 through 10                    14

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (Call to Order of the Court)
 2                THE COURT:  Good morning.  We are here in United
 3      States of America versus Honori Alexander Johnson, Case
 4      2:10-CR-71.  Counsel, please identify yourselves for the
 5      record.
 6                MS. VIACAVA:  Good morning, Yolande -- good
 7      morning, Your Honor, Yolande Viacava, representing the
 8      Government.  And with me at counsel table is --
 9                MR. BARCLIFT:  Robert Barclift.
10                MR. DEROVANESIAN:  Good morning, Your Honor,
11      Martin DerOvanesian on behalf of Mr. Johnson, and to my left
12      is --
13                MR. BADALAMENTI:  John Badalamenti, and to my left
14      is Mr. Johnson.
15                THE COURT:  All right, thank you.  Counsel, are
16      there any preliminary matters that the Court needs to take
17      up before we proceed?
18                MS. VIACAVA:  Your Honor, the Government would
19      just place on the record that the victim in this particular
20      case had been notified about today's proceeding and has
21      chosen to attend.
22                MR. DEROVANESIAN:  Your Honor, we would move to
23      invoke the rule.  We have no objection to the experts
24      remaining or potential expert on the Government's side
25      remaining.  We would ask the rule be invoked as to the
```

1    others.  Regarding the victim, if the Government does not

2    plan to have her testify, then we have no objection to her

3    being here.

4              THE COURT:  All right.  Ms. Viacava, response?

5              MS. VIACAVA:  Your Honor, since the Government

6    anticipates that this is going to be a stipulated facts

7    trial, the Government does not -- has not submitted a

8    witness list, as the Government does not intend to submit

9    witness testimony unless the defense objects to any of the

10   exhibits the Government seeks to admit into evidence.  It's

11   the Government's understanding defense does not.

12             Additionally, looking at the Crime Victims Rights

13   under Title 18, United States Code section 3771, the victim

14   would have a right --

15             THE COURT:  Let me just stop you for a moment.

16   Did we just lose power with your mic?  Because --

17             MS. VIACAVA:  I'm sorry.

18             THE COURT:  All right, it's working now.  I can

19   hear you now.  And you were saying, before I interrupted

20   you, that the victim would have a right --

21             MS. VIACAVA:  The victim would have a right to

22   attend these proceedings.  In this particular case, the

23   Government does not intend on having that -- the minor

24   testify in this case.  In addition, based on Title 18,

25   United States Code Section 3771, she would have a right to

```
 1    be present during the course of the proceedings.  The only

 2    witness the Government has present that the Government

 3    anticipates may be required to testify would be Special

 4    Agent John Kuchta, which we addressed yesterday, the Court

 5    taking it under advisement as to whether or not to allow him

 6    to testify as a potential rebuttal witness in this

 7    particular case, and as the Government would be relying upon

 8    him for his opinion, we would ask that he be allowed to

 9    remain in the courtroom as well.

10              THE COURT:  Thank you.  Mr. DerOvanesian?

11              MR. DEROVANESIAN:  Other than the objections to

12    Agent Kuchta testifying we raised yesterday, which I

13    understand the Court's reserving on, we have -- as to this

14    motion, I have no objection to him being present, as long as

15    it's not deemed to be a waiver of the objection we raised

16    yesterday filed in this case.

17              THE COURT:  All right.  With regard to the expert,

18    to the extent -- and perhaps I wasn't clear yesterday.  I

19    know we discussed a lot of matters, but to the extent that

20    the expert has been identified as a rebuttal witness, then

21    the motion will be denied.  To the extent his testimony is

22    not true rebuttal evidence, then of course the Court will

23    reconsider.  I think that's why you asked me to defer

24    ruling, or at least to see if when he's allowed to testify

25    if we get to that point, the nature of his testimony, which
```

```
 1    I agree with.  I mean, if the nature of his testimony is not
 2    true rebuttal testimony, then there are issues with the late
 3    disclosure of his testimony.  But to the extent his
 4    testimony is rebuttal testimony, then the motion will be
 5    denied.
 6              As it relates to the victim being present, is
 7    there anything further from the defense counsel?
 8              MR. DEROVANESIAN:  No, Your Honor.
 9              THE COURT:  All right, then, the victim will be
10    allowed to remain in the courtroom during these proceedings.
11              Okay, we just had a power failure, at least with
12    regard to one set of lights.  They're now back on.
13              Ms. Viacava, let me also ask, I did rule on an
14    ex parte motion that was presented to the Court last week.
15    Has the Government complied with that ruling?
16              MS. VIACAVA:  Yes, Your Honor.  The Government has
17    provided the document to defense counsel this morning.
18              THE COURT:  And Mr. DerOvanesian, have you had an
19    opportunity to review that document?
20              MR. DEROVANESIAN:  Yes, I have, Your Honor.
21              THE COURT:  And in light of that document, are
22    there any other issues the Court needs to consider at this
23    time?
24              MR. DEROVANESIAN:  With reference to that
25    document, is the Court, for purposes of this trial, going to
```

1    consider anything in that document?

2              THE COURT:  No.

3              MR. DEROVANESIAN:  Okay.

4              THE COURT:  No, it was apparently a request that

5    the Government submitted last week that we got the close of

6    business on Wednesday, and I needed to take action on it

7    before I started with this trial to at least get a ruling

8    out.  In light of the stipulated facts, there's nothing in

9    that document that the Court is going to take under

10   consideration.  I think the information in that document

11   that relates to this trial has already been acknowledged in

12   the stipulated facts.

13             MR. DEROVANESIAN:  Much of what is in that

14   document is clearly false, and that's our concern, but if

15   the Court hasn't considered it, then we're fine with it.

16             THE COURT:  I don't think the Government's going

17   to be moving it into evidence.

18             MS. VIACAVA:  No, Your Honor.  The Government

19   provided that in abundance of caution, if we went with a

20   jury trial and the victim testified, and whether it was

21   Giglio material.  The Government complied with the court

22   order regardless of the fact that we're not intending on

23   having the minor testify.

24             MR. DEROVANESIAN:  Your Honor, the only other

25   matter, my understanding, the Government was going to

```
1    dismiss the second count in this case.

2              THE COURT:  Ms. Viacava?

3              MS. VIACAVA:  Your Honor, the Government is

4    intending on going forward with the possession of child

5    pornography count, as was previously discussed.  At this

6    time, the Government agreed to dismiss Count 2 were we to

7    proceed with a stipulated fact trial.  The Government would

8    ask to be allowed to dismiss -- move to dismiss Count 2 at

9    the end of these proceedings.

10             THE COURT:  Response, Mr. DerOvanesian?

11             MR. DEROVANESIAN:  It keeps getting moved, I

12   think.

13             THE COURT:  Let me ask this question.  Why at the

14   end of the proceedings, Ms. Viacava, as opposed to at the

15   time of trial, at the commencement of trial?

16             MS. VIACAVA:  Your Honor, the Government would

17   simply ask to ensure that the stipulated facts are, in fact,

18   admitted into evidence and then the Government would be

19   happy to, at that point, move to dismiss the production of

20   child pornography count.

21             THE COURT:  All right then, let's take up that

22   issue, because as far as I'm concerned, the stipulated facts

23   have been signed by all parties who need to sign and the

24   Court is inclined to accept the stipulated facts unless

25   somebody has something, some statement to the contrary, but
```

1   I have been provided with a copy of a document that's been

2   filed that says stipulated facts which bears the signature

3   of the Assistant United States Attorneys involved in this

4   case as well as the signature of Mr. Johnson, the defendant,

5   and his defense attorneys, Mr. DerOvanesian and

6   Mr. Badalamenti.

7          MS. VIACAVA:  Your Honor, just for clarification,

8   that document has not been filed.  When we were in court

9   yesterday morning, we spoke about it.  The Court asked for a

10  courtesy copy.  That was provided as well as a copy was

11  given to defense counsel so he had a copy with all the

12  signatures on.

13         THE COURT:  It's been docketed.  It's been filed

14  with the Court, but it's not been received into evidence is

15  what you mean.  Because it has been docketed.  If you pull

16  up the Court docket, it's actually on the docket, but it has

17  not been received into evidence.  I agree with that.

18         MS. VIACAVA:  Yes, Your Honor.

19         THE COURT:  And I frequently will allow, to the

20  extent there's no objection, parties to move into evidence

21  pretrial so that we don't have to waste time debating about

22  evidentiary matters if there's no objection to the receipt

23  of that evidence.  So at this time, does the Government wish

24  to offer into evidence stipulated facts for bench trial that

25  were signed on -- well, it's not dated, but they have been

```
 1    docketed with the Court.  Does the Government wish to move
 2    into evidence the stipulated facts for bench trial?
 3              MS. VIACAVA:  Your Honor, the Government had
 4    intended on offering as one of the Government's exhibits
 5    during the course of the bench trial and the Government
 6    intended, as it references the addendum or the Appendix A,
 7    the Government intended to offer Appendix A as being a copy
 8    of the exhibit list containing the ten items, one of which
 9    is the stipulation.
10              THE COURT:  Okay.  Does the clerk have the exhibit
11    list?
12              MS. VIACAVA:  That was previously filed but the
13    Government has it marked as an extra exhibit.  So if the
14    Court at this time, prior to beginning the bench trial,
15    would like the Government to offer this into evidence, the
16    Government would be happy to do so.
17              THE COURT:  I'm going to have both sides do that.
18    To the extent there are no objections with regard to
19    exhibits, we'll move them all at this time and then we'll go
20    to opening statements.  At this time, does the Government
21    have exhibits that it wishes to move into evidence to which
22    there's no objection?
23              MS. VIACAVA:  Yes, Your Honor.
24              THE COURT:  Okay then, please identify them for
25    the record.
```

1      MS. VIACAVA:  For the record, the Government would

2  proceed by asking to move into evidence Government's Exhibit

3  Number 10, which is the stipulated facts for the bench

4  trial, and attached with that is the Appendix A which is a

5  copy of the exhibit list so it's clear what the items are.

6      THE COURT:  Is there any objection?

7      MR. DEROVANESIAN:  Your Honor, in order to speed

8  things up, the Government asked if we had any objection to

9  Exhibits Number 1 through 10 on the exhibit list.  We

10  indicated to them that we do not have any objection to

11  those.  If she wants to move them in all now, we're happy to

12  have them in.

13      THE COURT:  Then the Government's objections [SIC]

14  as well as the stipulated facts for bench trial are

15  received.  The objections -- or the exhibits are identified

16  as an attachment to the stipulated facts for bench trial and

17  they are numbered 1 through 10.

18      MS. VIACAVA:  Yes, Your Honor.  For clarification,

19  if the Government may, I'd move each one in to make it clear

20  what those items are.

21      THE COURT:  Sure.

22      MS. VIACAVA:  The Government would move Exhibits

23  2A through 2B into evidence, which is a CD containing the

24  two video files from the Samsung cellular phone which depict

25  the minor in this case completely nude.

1          THE COURT:  Okay.  You can identify all of them.

2          MS. VIACAVA:  The Government would move into

3    evidence Government's Exhibit Number 1, which is the Samsung

4    cellular telephone belonging to the defendant.  The

5    Government would move into evidence Government's Exhibit

6    Number 3A through 3E Composite which are photographs taken

7    of the residence where the videos were made depicting the

8    bathroom, specifically.  Government would move into evidence

9    Government's Exhibit Number 4 which is the sock that the

10   cellular phone was located sticking out of on February 25th,

11   2010.  The Government would move into evidence Government's

12   Exhibit Number 5, which is a certified copy of the birth

13   certificate of the minor confirming that she is, in fact,

14   under the age of 18.  The Government has the original which

15   does, in fact, identify the minor.  The Government has a

16   redacted version that takes out the minor's name for

17   publication purposes as well.

18         THE COURT:  Is there any objection to the Court

19   substituting a redacted version of Exhibit Number 5, which

20   is the birth certificate of the minor child --

21         MS. VIACAVA:  If I may have a moment I can show it

22   to defense counsel.

23         MR. DEROVANESIAN:  It's unnecessary.  None of

24   that's relevant or necessary anyway since we stipulated to

25   it.  I don't know why they want to do it.  We have no

1  objection.   They can do whatever they want with it.

2         THE COURT:   Then we will receive a substituted

3  redacted copy of Government's Exhibit Number 5.

4         MS. VIACAVA:   At this time, the Government would

5  move in Government's Exhibit Number 6A through 6D Composite,

6  which consists of pictures of the Samsung cellular phone

7  that show pictures of the phone as well as showing the phone

8  is stamped Made In Korea.

9         THE COURT:   You may continue.

10         MR. DEROVANESIAN:   Again, I have no idea why she

11  wants to do that, but we have no objection.

12         MS. VIACAVA:   The Government would move into

13  evidence Government's Exhibit Number 7A through 7E

14  Composite, which are pictures of the screen captures taken

15  from the Samsung cellular phone which depicts such things as

16  the phone number as well as the user name for the phone.   At

17  this time, the Government would move into evidence

18  Government's Exhibit Number 8A through B Composite which are

19  photographs that were taken of the sock that was utilized on

20  February 25th, 2010.   At this time, the Government would

21  move into evidence Government's Exhibit Number 9, which is

22  the memory card containing the two videos in the format that

23  the cellular phone used to produce the video recordings.

24  This memory card permits the video recordings to be viewed

25  in the cellular phone.

```
 1              Those are all of the trial exhibits that the
 2   Government intends on introducing.  We'd submit at this time
 3   to introduce into evidence.
 4              THE COURT:  I thought there was Number 10.
 5              MS. VIACAVA:  10 is the stipulation, itself.
 6              THE COURT:  All right.  With regard to the
 7   Government's Exhibits 1 through 10, the Court will receive
 8   those exhibits.  Mr. DerOvanesian, at this time my
 9   understanding was that there were no objections and that's
10   why I indicated that the Court will receive those exhibits.
11              MR. DEROVANESIAN:  That's correct.
12              (Government's Exhibits 1 through 10 admitted)
13              MR. DEROVANESIAN:  We do have a couple other
14   preliminary matters whenever the Court's ready for them.
15              THE COURT:  You may proceed.  Thank you,
16   Ms. Viacava.
17              MR. DEROVANESIAN:  Your Honor, the only other
18   matter is due to the nature of the case, the Government had
19   to take the videos in this case and they were kind enough to
20   accommodate us and they sent those to an office, I think it
21   was in Washington State, where our expert was able to view
22   them.  I would just like to make it clear for the record
23   that there be no issue regarding the videos he viewed, that
24   they are, in fact, the same ones that the Government is
25   introducing in this case.  I don't think they have any
```

```
 1    objection to that, but I think for record purposes we should
 2    make it clear.
 3              THE COURT:  Okay.  Ms. Viacava?
 4              MS. VIACAVA:  Your Honor, I don't -- to make it
 5    clear, is defense counsel offering to move those videos in
 6    or is he just simply asking us if it was an exact copy of
 7    what we have here today?
 8              THE COURT:  My understanding of the statement made
 9    by Mr. DerOvanesian is that he wants to make sure that
10    there's no issue with regard to the fact that the video that
11    his expert viewed is the same video that is the video that
12    has been admitted into evidence now.
13              MS. VIACAVA:  Your Honor, it's the Government's
14    understanding that an exact copy was made.  If it would
15    assist defense counsel and his expert if we take a short
16    break and look at the actual copies and then -- but it's the
17    Government's understanding it was an exact copy that was
18    facilitated -- that they requested be facilitated to him in
19    another state and the Government was able to comply with
20    that and sent it to law enforcement over there.  What
21    portions that he may have looked at or accessed, the
22    Government is unaware of, but the entire copy was provided.
23              THE COURT:  Okay.
24              MR. DEROVANESIAN:  May I have one moment?
25              THE COURT:  Yes, you may.
```

```
 1              (Discussion off record)

 2              MR. DEROVANESIAN:  Your Honor, I have no objection

 3    to that.  I just don't want to start to present our expert

 4    and have some issue regarding chain or regarding the video

 5    or some type of issue regarding what it is that he's going

 6    to be testifying regarding.  We have the issue regarding the

 7    demonstrative aids which I understand may not be appropriate

 8    at this time.  Perhaps the predicate will have to come

 9    through the witness.

10              THE COURT:  I think so.

11              MR. DEROVANESIAN:  Yes.  The only other matter is

12    we still have the motion in limine regarding the images of

13    the client and the frontal shots and him using the toilet

14    facility.  Regarding those images, we are mindful that you

15    are, in fact, the trier of fact and that obviously you have

16    the ability to put these aside, but it is just so offensive,

17    that is our concern regarding them.

18              The other thing that occurred --

19              THE COURT:  And the problem, Mr. DerOvanesian, is

20    that I'm going to have to look at them in order to rule

21    anyway, unfortunately, because I am the trier of fact here.

22    So --

23              MR. DEROVANESIAN:  That's -- but then --

24              THE COURT:  That's why you don't typically have

25    motions in limine made in bench trials because the trial
```

```
 1   court is the trier of fact.  I am going to have to view them
 2   in order to rule on the motion in limine.  If upon view of
 3   them the Court determines that they are not relevant to the
 4   issues before the Court, then the Court has the ability to
 5   discard the information.  And discard, I mean by not
 6   considering that information in making its determination in
 7   this particular criminal trial.
 8            MR. DEROVANESIAN:  The other thing that had
 9   occurred to us is regardless, you will ultimately have to
10   view both anyway.  So what we would ask the Court to
11   consider is reserving on the motion.  You're going to have
12   to view them anyway and then perhaps ruling on it at that
13   point, whether they should argue for any reason or not.
14            THE COURT:  I think that's fine because as I said,
15   with regard to this case, I'm going to have to view it at
16   some point in order to make a ruling and as I recall from
17   our discussion yesterday, when I -- if I view the video,
18   which I indicated I would, on the telephone, there's no way
19   to fast forward through that provision anyway.  The only
20   ability I would have to fast forward would be viewing it
21   on -- in the format that the Government wishes to provide on
22   the computer disk.  So I don't know, that was my
23   understanding from yesterday.
24            MS. VIACAVA:  Your Honor with that, the Government
25   has considered defense counsel's position and the other
```

1   option the Government could offer, when the Court is looking

2   at the cellular phone, itself, the Government can help

3   facilitate.  We do have the computer forensic person that

4   converted it to set it up and we would ask that maybe he

5   could set it to the section of just the -- the minor coming

6   in, if that's what the Court needs to see, and that way we'd

7   save some time.  The Government still wants to present a

8   majority of the video for the Court's consideration on the

9   monitors and the Government would fast forward through

10  certain portions of it in which the lights are out and

11  things of that nature and the defendant actually wiping

12  himself, but the Government would still ask the Court look

13  at the majority of that video and in the stipulated facts

14  that have now been admitted, it does refer to the videos in

15  their entireties.  The Government does not have any problems

16  to assist the defense in what they wanted the Court to look

17  at to see if we can have the computer forensic person

18  forward that cell phone to just the part where the minor is

19  coming into the bathroom so you don't have to see all the

20  preliminary setting up with the cameras twice, if the Court

21  chooses not to.

22          THE COURT:  So there is ability to fast forward

23  through the portion on the cell phone?

24          MS. VIACAVA:  What the Government was intending is

25  once the Court starts the video, we wouldn't be able to keep

 1   having you hand the phone back to us so we can try to do it.

 2   He can try to set it where it starts up at that -- at that

 3   part.

 4          THE COURT:  Okay.

 5          MS. VIACAVA:  But once the cell phone is in your

 6   hands, Your Honor, we would not have the ability to just

 7   monitor what you're seeing and forwarding it once it's in

 8   your hands.

 9          THE COURT:  Okay.

10          MR. DEROVANESIAN:  Your Honor, if I may respond,

11   my investigator reminded me that at the conclusion of

12   viewing these materials at the Sheriff's Department, he was

13   able to determine how to fast forward that phone.  It's very

14   simple.  There's a center button, you just push it and hold

15   down the right side and it will fast forward through the

16   materials.  So regardless, there shouldn't be any issue as

17   far as fast forwarding.

18          THE COURT:  Is there anything else?  Are there any

19   further matters that we need to take up?

20          MS. VIACAVA:  No, Your Honor.

21          MR. DEROVANESIAN:  No, ma'am.

22          THE COURT:  All right then, does the Government

23   wish to make an opening statement?

24          MS. VIACAVA:  Yes, Your Honor.

25          THE COURT:  You may do so at this time.

1          MS. VIACAVA:  Good morning.  The Court is here

2    today to consider the actions of this defendant, Honori

3    Johnson.  The Court is being asked to consider that on

4    February 25th, 2010, that the 13 year old minor in this

5    case, as she was getting dressed to go to middle school, was

6    in the shower, and when she came out of the shower, she had

7    undressed taken a shower, she came out.  She dropped her

8    cellular phone and as she was picking up her phone, she saw

9    a lens sticking out of a sock.  That was the first time that

10   this minor knew that anyone was filming her, that anyone was

11   seeing her after she closed the bathroom door, after she

12   disrobed, after she displayed herself naked in that bathroom

13   to get into the shower.

14          It was at that time that she pulled the cellular

15   phone out.  She recognized it as being Honori Johnson's cell

16   phone.  It was green in nature.  It was something that he

17   had with him all the time.  She realized it was recording.

18   When she realized it was recording, she stopped it and by so

19   doing, she did not save that video.  She was able to look at

20   the phone, look at the other videos on there and saw that

21   that was not the only video of her.  She looked at another

22   one, saw herself on it, saw herself in the bathroom, saw

23   herself nude, and she deleted it.

24          She realized there was more videos.  She notified

25   her mother.  She notified her grandmother who came to pick

1    her up and she showed her mother the cell phone.  That same

2    day after her mother was also able to look at those images

3    and saw her daughter nude, she turned around and they went

4    to the police department.

5           That cellular phone was turned over to law

6    enforcement and pursuant to a search warrant, they were able

7    to recover two of the videos that were still active on the

8    phone and those two videos are depicted in Government's

9    Exhibit Number 2-A through 2-B Composite.  Those videos were

10   made on January 26th, 2010, and January 27th, 2010.  And in

11   those videos, both of them, the minor can be seen walking

12   into the master bathroom, closing the door behind her,

13   taking off the clothes she slept in, appearing in front of

14   this camera completely nude.

15          The reason she is seen is on the beginning of

16   those videos, both of them, you see the defendant, Honori

17   Johnson, setting up the camera.  You see him turning the

18   angle.  You see him covering the lens and uncovering it to

19   make sure it would capture what he wants.  You see him

20   stepping back; you see him looking at it.  You see him

21   spending approximately eight to ten minutes maneuvering that

22   phone, setting it up so it captures just the area of the

23   bathroom.  The focal point is the area right in front of the

24   shower area, with the shower door, to the stall with the

25   glass doors.

1          That is what those two videos have captured, what

2     the defendant intended them to capture.  And you see this

3     minor completely naked, where her pubic area is visible,

4     where she's going in the shower, when she's coming out of

5     the shower on both of these videos.  One of the videos you

6     see her coming out at one point while the shower is running

7     to check her phone and go back in, so you actually see her

8     three different occasions on that video.

9          That is what the defendant knowingly possessed.

10    The Government would argue that after reviewing those

11    particular videos in this particular case, that the Court

12    should be able to determine that it is a lascivious

13    exhibition of the genital or pubic area of the minor, that

14    it would be an indecent exposure.  This would not have been

15    something that she would have offered to public --

16         MR. DEROVANESIAN:  Your Honor, I'm going to

17    object.  It's an improper argument, that that is not

18    appropriate and it's not part of this case.  It's not part

19    of the charges.

20         THE COURT:  Okay, response?

21         MS. VIACAVA:  Your Honor, I'm going through the

22    elements of this particular case as to what I believe the

23    evidence will show once the Court reviews the videos.  Part

24    of the elements is whether or not it's a lewd and lascivious

25    display of the genitals or pubic area of the person.  Part

1    of the standard jury instructions for the 11th Circuit talks

2    about lascivious exhibition, meaning indecent exposure of

3    the genitals or pubic area.  That is what the Government is

4    referencing, the elements in this particular case, as what

5    we believe the evidence will show.

6         THE COURT:  I certainly will allow you to address

7    what you believe the evidence in this case will show as it

8    relates to the elements of the offense, either by reference

9    to the 11th Circuit jury instruction, but I do remind you

10   that you will have an opportunity at the conclusion of these

11   proceedings to make a closing argument and/or to submit a

12   written closing argument.  I'll discuss that later, but both

13   sides will be given opportunity to make a final argument.

14   At this point, I'm really more interested in what you

15   believe the evidence will show.

16        MS. VIACAVA:  Yes, Your Honor.  The Government

17   believes that a review of the videos in this particular

18   case, Government's Exhibit Number 2-A and 2-B, and even

19   review of Government's Exhibit Number 9, which is the memory

20   card that shows the display on the telephone, is -- makes it

21   visible from the image that is captured, from the image that

22   is -- that the camera's set up to capture, that the minor is

23   depicted in those -- both of those videos in which the pubic

24   area is visible.  The Government would argue that because of

25   this, the defendant knowingly possessed child pornography.

1           The Government, looking at the elements of the

2    case, also believes, based on the stipulation as well as the

3    fact that Government's exhibit that shows the stamp on the

4    phone, the Government's Exhibit Number 6-A through 6-D

5    Composite, that the -- these images of child pornography

6    were produced using materials that had been transported in

7    interstate or foreign commerce.  That cell phone, the

8    Samsung cell phone that this defendant utilized, had been

9    produced or manufactured outside the United States.  The

10   Government would also suggest that the evidence will show

11   that the -- when the defendant possessed the cellular phone

12   with those videos, that he would -- the defendant believed

13   that those items contained child pornography.  He set up the

14   camera to capture that angle of the minor going into the

15   bathroom.  She is the only person that is depicted on those

16   videos and the video is shut off within approximately two

17   minutes of the minor leaving the bathroom.  So the

18   Government would argue that the defendant, based on the

19   evidence in this case, we would anticipate the evidence will

20   show in this case that the defendant possessed child

21   pornography by at least January 26th, 2010, through

22   February 25th, 2010, when the phone was turned over to law

23   enforcement.  That is what the Government believes that the

24   evidence in this case will show upon review of those videos.

25           THE COURT:  Okay, thank you.  Mr. DerOvanesian, do

1   you wish to make an opening statement on behalf of the

2   defendant?

3            MR. DEROVANESIAN:  Yes, ma'am.  Thank you.

4            THE COURT:  You may do so.

5            MR. DEROVANESIAN:  Good morning again, Your Honor.

6   As the Court -- well, I don't know that you're well aware.

7   I submit that we are here on the charge, the only charge

8   which is possession of child pornography.  Again, our

9   understanding is the other one will be dropped at some

10  point.  As the Court's also aware, Mr. Johnson has

11  stipulated to all of the issues in this case, with the

12  exception of whether the material which was recorded and

13  maintained on his cellular phone was, in fact, child

14  pornography.

15           Mr. Johnson, based on what the evidence is going

16  to show in this case, is guilty.  Guilty of being in

17  possession of the images and those images as they are

18  displayed on his cellular phone.  He is the one who set up

19  the phone.  He is the one that made those recordings.  He is

20  clearly guilty, but he's guilty of voyeurism.  He is not

21  guilty of the possession of child pornography.

22           The evidence is also going to show that when the

23  Court reviews these images, what they captured, none of the

24  images include any type of sex act.  None of the images

25  include any type of bestiality.  None of the images include

1    any act of masturbation.  None of the images include any

2    type of sadistic or masochistic abuse.  Also, none of the

3    images contain any type of lascivious exhibition of the

4    genitals or pubic area of the young lady involved.

5            I submit when the Court looks at the images that

6    were captured on the phone and considers the evidence that's

7    presented that what the Court will see is that the focal

8    point in this case for the capture of the images was, in

9    fact, the shower area of the bathroom.  What's important is

10   to consider while looking at that, that yes, the phone or

11   the phone camera is pointed towards the shower area, but I

12   would ask the Court to take -- to pay particular attention

13   to the direction and area that the phone is aimed towards.

14   For instance, when viewing the video, the Court will see

15   that the phone is not aimed downward to perhaps record below

16   the waist, or anything along those nature -- along that

17   nature.

18           Actually, I submit that when the Court looks at

19   the videos, the phone is just set up generally to record the

20   shower area.  And in addition to it not being set downward,

21   the image goes from pretty much I believe it's the top of

22   the tub, even lower, all the way up to the ceiling.  There's

23   no focus.  There is nothing to suggest that the phone is

24   zoomed in in any way to capture any part of the young lady

25   other than a general video of someone coming and going from

1  the shower.  And again, I would argue that there is nothing

2  sexually suggestive about that.

3          Regarding the location, we would argue to the

4  Court that the evidence is going to show that there's

5  nothing sexually suggestive about the location.  It's --

6  it's a bathroom.  It's where people take a shower.

7          Regarding whether or not the young lady is

8  displayed in an unnatural pose, I would argue to the Court

9  the evidence in this case is going to show that the young

10  lady is not displayed at all.  She doesn't even know she's

11  being filmed.  She doesn't know that this video is being

12  made.  So looking at that factor, we would argue to the

13  Court there won't be anything to suggest that the young lady

14  is being displayed in any type of unnatural pose.

15          Regarding inappropriate attire, we would argue to

16  the Court that there is nothing in this case that's going to

17  suggest to the Court that there was any type of

18  inappropriate attire.  It's a shower.  The young lady is

19  taking a shower.  Appropriate attire for the shower, we

20  would argue to the Court, is that most people bathe in the

21  nude.  There's nothing inappropriate about the attire in

22  this case.

23          We would also argue to the Court that when you

24  consider the video and the evidence that's presented in this

25  case, the Court won't see anything to suggest sexual coyness

1    or an apparent willingness to engage in sex.  Again, we

2    would argue to the Court that the evidence in the video in

3    this case is going to show that the young lady is not posed

4    at all.  She doesn't even know she's being filmed, so there

5    is no willingness to engage in sex, sexual coyness, or any

6    type of playing with the camera, so to speak.

7              I'd also argue to the Court that there will be

8    nothing in this case, no evidence to show that as a matter

9    of law the depiction was designed to elicit any type of

10   sexual response in the viewer.  The Government won't have

11   any evidence to support that either.

12             Quickly summing it up, Mr. Johnson took these

13   videos.  He's stipulated to that.  The videos do not depict

14   child pornography.  Our position is is this is a voyeurism

15   case and we would argue that the facts -- and I think the

16   Court's going to see, are nearly identical to those in U.S.

17   versus Steen, 634 F.3d 822nd, which is a Fifth Circuit case

18   from February this year and we submit to the Court that when

19   you review the evidence in this case and you consider the

20   law that you will find that Mr. Johnson is not guilty of

21   these charges.  Thank you, Judge.

22             THE COURT:  All right, thank you.  Ms. Viacava you

23   may call your witness.

24             MS. VIACAVA:  Your Honor, at this time, based on

25   the stipulated facts that have already been admitted into

 1    evidence, the Government at this time would ask to publish

 2    Government's Exhibit Number 2.

 3             THE COURT:  Okay, you may do so.

 4             MS. VIACAVA:  Your Honor, for the record, the

 5    Government will be publishing video SSPX 003, which pursuant

 6    to the stipulated facts for the bench trial was recorded on

 7    or about January 26th, 2010.

 8             THE COURT:  Okay.

 9             (Video displayed)

10             MS. VIACAVA:  Your Honor at this time, the

11    Government would forward this video from 4:42 to

12    approximately 5:27.

13             THE COURT:  Okay, thank you.

14             (Video forwarded and resumed)

15             MS. VIACAVA:  Your Honor, at this point, the

16    Government would cut it from approximately 6:05 to 6:35.

17             (Video forwarded and resumed)

18             MS. VIACAVA:  The Government would cut it from

19    approximately 7:14 till 20:09.

20             (Video forwarded and resumed)

21             MS. VIACAVA:  Your Honor, the Government would

22    advance it from approximately 28:35 to 30:11.

23             (Video forwarded and resumed)

24             MS. VIACAVA:  Your Honor, at this time the

25    Government would publish Government's Exhibit Number -- the

1  other video contained in Government's 2-A through 2-B

2  Composite, which is referred to as video SSPX 0002, which

3  according to the stipulated facts, Government's Exhibit

4  Number 10 was recorded on or about January 27, 2010.

5           THE COURT:  You may do so at this time.

6           (Video displayed)

7           MS. VIACAVA:  Your Honor, at this time the

8  Government would advance it from 6:04 to 29:05.

9           (Video forwarded and resumed)

10          MS. VIACAVA:  The Government would advance the

11  video from 35:34 to 37:21, approximately.

12          (Video forwarded and resumed)

13          MS. VIACAVA:  Your Honor, those are the two

14  exhibits, Government's Exhibit Number 2-A and 2-B, the two

15  videos.  At this time, since defense counsel has raised the

16  issue what can be seen on the cell phone, the Government

17  would ask to have the assistance of Mr. Depersia, who is the

18  Charlotte County Sheriff's Office computer forensic analyst,

19  set up the cell phone with Government's Exhibit Number 9

20  inserted in it and cued up.  If the Court would like to see

21  just the portion where the minor comes in, the Government

22  would ask for assistance with that from Mr. Depersia.

23          THE COURT:  Response?

24          MR. DEROVANESIAN:  Your Honor, I think that would

25  be an appropriate -- that's all we ask, is that you view the

 1  minor on the cell phone for purposes of this.

 2          THE COURT:  Then you may provide the Court with

 3  the cell phone with the video in it with the assistance of

 4  the Charlotte County Sheriff's officer.

 5          MS. VIACAVA:  For the record, I'm giving

 6  Government's Exhibit Number 1, which is the cellular phone

 7  and Government's Exhibit Number 9 -- Your Honor, for the

 8  record, the Government would publish to the Court video SSPX

 9  0003, which was produced on January 26th, 2010, and the

10  Government would have it cued to approximately 20:09 would

11  be the starting point.

12          THE COURT:  Okay, thank you.

13          MS. VIACAVA:  Your Honor, if I may have a moment

14  to show defense counsel?

15          THE COURT:  Actually, why don't we do this, let me

16  have the Charlotte County Sheriff's Office, Ms. Viacava, and

17  Mr. DerOvanesian come right up here, please.  And I said

18  right up here.  For the record, approach the bench, but you

19  can come closer.

20          MR. DEROVANESIAN:  Can Mr. Badalamenti join me,

21  too?

22          THE COURT:  Yes.  Can you all get through there?

23          MS. VIACAVA:  For the record, I've been told if

24  you press the center button that says "okay" that will start

25  the video.

1            THE COURT:  Okay.

2                (Court and counsel viewing video at the bench)

3            MR. DEROVANESIAN:  We have no objection to fast

4    forwarding to the part where she's getting out of it.

5                (Pause in place, cell phone video forwarded)

6            MR. DEROVANESIAN:  That's pretty good.

7            MR. DEPERSIA:  Yeah, it's touchy.

8                (Cell phone video resumed)

9            MS. VIACAVA:  And at this time, I would ask

10   Mr. Depersia to set the other video up to approximately

11   29:05.

12           THE COURT:  Okay, you may do so.  Before you do

13   that, let me see the camera for a minute.

14           MR. DEPERSIA:  It started over, oops.  That's the

15   menu.

16           THE COURT:  And I say camera, but it's actually a

17   cell phone that has video capabilities.  Where is the lens

18   on this?

19           MR. DEPERSIA:  It would be right here.

20           THE COURT:  Okay, thank you.  You may reset it.

21           MS. VIACAVA:  For the record, this would be SSPX

22   0002, which was produced on January 27th, 2010.

23           MR. DEROVANESIAN:  Your Honor may the record also

24   reflect that the agent indicated to the Court that the lens

25   is on the side of the phone opposite from the screen?

```
 1                THE COURT:  The record will so reflect.  You
 2    actually have to push the -- push part of it.  What is that,
 3    the number pad, key pad?
 4                MR. DEPERSIA:  Yeah, the key pad goes up.
 5                MR. DEROVANESIAN:  The point is, it has a lens on
 6    one side, screen on the other.
 7                THE COURT:  Yes, it does.
 8                MR. DEROVANESIAN:  Thanks, Judge.
 9                MR. DEPERSIA:  29:05?
10                MS. VIACAVA:  Yes.
11                MR. DEPERSIA:  It jumps by itself -- it jumps
12    right to three.  If you're holding it down, it pops up.
13                (Pause in place)
14                (Court and counsel viewing video at the bench)
15                THE COURT:  It went black.
16                MR. DEPERSIA:  It's touchy.  Let's see where it
17    goes.
18                (Pause in place)
19                MR. DEPERSIA:  What I'm going to do when it gets
20    there, I'll push play for you.
21                THE COURT:  Okay.
22                (Pause in place)
23                (Cell phone video displayed to the Court)
24                THE COURT:  Can you fast forward to the part that
25    is shown?
```

```
 1              MS. VIACAVA:  Your Honor, the Government would
 2    state this is the video where she does step out of the
 3    shower and then goes back in.  So it may be more difficult
 4    to fast forward through that.
 5              THE COURT:  Okay.
 6              (Video continuing)
 7              MR. DEPERSIA:  Okay.
 8              (Video concluded)
 9              THE COURT:  All right, thank you.  You all may
10    return to your seats.
11              Ms. Viacava, you may proceed.
12              MS. VIACAVA:  One moment, please, Your Honor.
13              (Discussion off record)
14              MS. VIACAVA:  Your Honor, the other exhibits that
15    the Government has had admitted into evidence are available
16    for the Court's review, unless the Court would like the
17    Government to actually publish each one of them.
18              THE COURT:  No, you don't have to.
19              MS. VIACAVA:  Then at this time -- if I may have
20    one more moment, please, Your Honor?
21              THE COURT:  Yes.
22              (Discussion off record)
23              MS. VIACAVA:  Your Honor, at this time, the
24    Government would rest.
25              THE COURT:  All right.  We are going to break for
```

```
 1    lunch now.  We will be in recess until 2:00.
 2               MR. DEROVANESIAN:  Your Honor, may we leave our
 3    materials on counsel table?
 4               THE COURT:  You may.
 5               COURT SECURITY OFFICER:  All rise.
 6               (Recess at 12:52 p.m.)
 7               THE COURT:  Ms. Viacava, is there anything else?
 8               MS. VIACAVA:  Your Honor, at this time the
 9    Government would move to dismiss Count 2 of the indictment
10    charging the defendant with production of child pornography,
11    as the Government had initially indicated we were proceeding
12    with Count 1.
13               THE COURT:  Is there any objection?
14               MR. DEROVANESIAN:  Of course not.  Thank you,
15    Judge.
16               THE COURT:  All right.  With regard to the
17    Government's motion, the Court will grant the motion.
18    Count 2 of the indictment against the defendant,
19    Mr. Johnson, is dismissed.
20               Mr. DerOvanesian, the are there any matters we
21    need to take up at this time, sir?
22               MR. DEROVANESIAN:  Yes, Your Honor, with the
23    Court's permission, I'd like to defer to Mr. Badalamenti.
24               THE COURT:  You may do so.
25               MR. BADALAMENTI:  Your Honor, may I use the
```

1    podium?

2              THE COURT:  You may.

3              MR. BADALAMENTI:  Your Honor, at this time, the

4    defense would move pursuant to Rule 29 for a motion for

5    judgment of acquittal.  It's the defense position this isn't

6    even a close case.  Your Honor has had the opportunity to

7    review the applicable portions of the videos twice, once in

8    a large format and once in the actual format that was

9    portrayed on the cell phone.  As this Court's well aware,

10   what matters in this case now that Count 2 has been dropped

11   is solely what is depicted on the videos that were found in

12   the possession of Mr. Johnson.  Nothing else matters at this

13   point.  Mere nudity and exposure is not enough, under the

14   law, to sustain a child pornography possession conviction.

15             There must be a lascivious exhibition and our

16   pattern instruction from the 11th Circuit tells us that.

17   Pattern instruction 83.4(a) says even not every exposure is

18   a lascivious exhibition, meaning you can show the pubic area

19   or genitalia and still that may not be enough.

20             As we've said from the start, Your Honor, during

21   our motions hearings, this is a voyeurism type case and as

22   Mr. DerOvanesian pointed out to you this morning, there is a

23   case that is nearly identical to the facts and circumstances

24   of this case that came out earlier this year from the Fifth

25   Circuit and that was United States versus Steen.  Again, for

1    the record, it's 634 F.3d 822.  The case involved an

2    individual that was using tanning booths.  He went into

3    tanning booths and the tanning beds were separated by these

4    partitions.  Because of the heat generated by the tanning

5    booths, they couldn't go from the ceiling to the walls.

6    He'd stand on a stool, take a video camera, reach over and

7    surreptitiously record individuals in the next tanning bed

8    area.

9            Well, he caught a minor.  He caught a minor naked.

10   He caught a minor's pubic area showing.  Went to trial on

11   production of child pornography and the defense moved for

12   Rule 29.  The Judge denied it, sent the case to the jury,

13   jury found him guilty.  The Fifth Circuit came back and

14   reversed and said as a matter of law that case should never

15   have been sent to the jury in the first instance.  The

16   Government had failed in its case in chief to prove the

17   elements of what constitutes a lascivious exhibition of the

18   pubic area or genitalia.  And it went through an analysis of

19   the Dost factors.

20           First it said that the focal point of the video as

21   we contend here is not of the pubic area.  It was, in that

22   particular case, of the tanning booth area.  It wasn't

23   focused in on it, on the pubic area.  Because she didn't

24   know, the minor did not know she was being recorded, just

25   like this case, they said that sexual coyness became

1   irrelevant as to that fact.

2   The Court went on -- and we'd like to at least

3   preserve for the record that the nudity without more is

4   protected speech under the first amendment.  That's just

5   established law from the Supreme Court.  Just for the

6   record, it's New York versus Ferber, 458 U.S. 745.  Here we

7   have the same type of circumstance.

8   For the second time today, I had the opportunity

9   to view the video.  If you -- Your Honor recalls, the video

10  depicts an image of the camera sitting in a laundry pile.

11  You can see the ceiling of the bathroom all the way down to

12  three-fourths of the shower doors.  It was not depicted in

13  the manner by which the genitalia was zoomed in on.  The

14  focal point of the video was not the genitalia, just like in

15  the Fifth Circuit's case in Steen.  It was a wide angle shot

16  there, as well.  It's just not enough.

17  The Fifth Circuit says these kinds of cases are

18  not even supposed to go to the jury unless more of these

19  Dost factors are met, and these voyeurism type cases don't

20  translate to the Dost factors test in a lot of ways.  And

21  they decided, the Fifth Circuit, that sending to it the jury

22  was improper.

23  There's also two other circuits that have

24  addressed this issue, and it's the First and the Third

25  Circuit as well, on remarkably similar facts as we have

1   here.  It's United States versus Villard, 885 F.2d 117, and

2   that's a Third Circuit 1989 case.  And there, there was a

3   picture of a boy laying in a bed posing with a partial

4   erection.  The Court held that because the picture displayed

5   from the head to the knees, that wasn't enough to zoom in,

6   even though, as I just explained, the boy was partially

7   aroused.

8         That's the turning, it seems, in many of these

9   cases, when -- in the Steen case when an individual doesn't

10  know that they're being recorded, and as in the Villard

11  case, even when the child knows that he is being recorded.

12        Finally, there's a 1st Circuit case called United

13  States versus Amirault and that's 173 F.3d 28, and there, it

14  was the same circumstance, threw out a jury verdict because

15  the photographs of a minor girl where her pubic area was

16  visible in the bottom one-fourth of the frame of the

17  photograph did not show that the central focus was the pubic

18  area.  The mere showing of it is not enough.

19        We had very, very brief displays in these videos

20  this morning of that region.  It launches federal law, in

21  this case, into a whole different realm when Congress said

22  there needs to be a focus, a lascivious exhibition, not just

23  display.  Congress knew that the states could go ahead and

24  enforce their voyeurism laws.  They needed something more to

25  take it into the purview of federal law.  And we posit that

1    there is absolutely no evidence in this case that taking it

2    into federal court was necessary.

3            As we tick down the Dost factors, as Your Honor is

4    well familiar with at this point, once again, there's no

5    focus on the pubic area.  It's a stationary camera capturing

6    the ceiling and most -- about three-fourths or so of the --

7    of the shower stall glass.  The minor does not know that she

8    is being recorded.  When she's showering, you can't see her

9    showering.  The bathroom clearly had a toilet in it and one

10   does not think of showering and a toilet area to be a

11   sexually suggestive type situation, like a bedroom, for

12   example, or on a bed or otherwise.

13           And there's no unnatural posing in the tapes.

14   Once again, the individual does not know that they're being

15   recorded.  There's nothing unnatural about an individual

16   taking a shower each day.  Just getting in and out of the

17   shower does not make this a federal offense.

18           As we've stated from the beginning, this is a

19   voyeurism case.  It should have stayed a voyeurism case at

20   best and does not constitute, on the facts -- the Court has

21   everything it needs right now to make a decision just by

22   viewing the video and stipulating facts.  However, we

23   reserve our right to move forward with our case in chief

24   should you deny the Rule 29 motion.  The sheer fact remains

25   is this, what matters in this case is what's depicted in the

```
1    video.  Your Honor has had an opportunity to review the
2    video twice.  It doesn't matter the intent or otherwise of
3    the individual.  What matters is what got depicted in this
4    case.  Doesn't matter that he may have intended to shoot a
5    lascivious action.  It doesn't matter.  What matters is what
6    we have in this case.  And the Government has failed to
7    prove Count 1 in this indictment.  It's just nude pictures
8    of a young lady in the bathroom, and we request a Rule 29
9    judgment of acquittal as to Count 1 in this indictment, Your
10   Honor.  Thank you.
11            THE COURT:  All right, thank you.  Ms. Viacava,
12   response?
13            MS. VIACAVA:  Your Honor, the Government would
14   argue that based on the stipulated facts, as well as the
15   videos that have been admitted into evidence and published
16   for the Court, that the Government has shown there's
17   sufficient evidence that this defendant, Honori Johnson,
18   knowingly possessed child pornography and that the items of
19   child pornography, the videos had been produced using
20   materials that had been transported in interstate and
21   foreign commerce and that the defendant possessed those
22   items that he believed to contain child pornography.
23            Looking at the 11th Circuit patterned jury
24   instructions, it defines sexually explicit conduct to mean
25   actual or simulated, and it goes on to say lascivious
```

1   exhibition of the genitals or pubic area of any person.  It

2   defines a lascivious exhibition to mean indecent exposure of

3   genitals or pubic area usually to incite lust.

4          Not every exposure is a lascivious exhibition.  To

5   decide whether a visual depiction is a lascivious

6   exhibition, the Court can consider the context, the setting

7   in which the genitalia or pubic area is being displayed, the

8   factors that can be considered is the overall content of the

9   material, whether the focal point of the visual depiction is

10  on the minor's genitalia or pubic area, whether the minor is

11  partially clothed or nude, whether the depiction appears to

12  have been designed to elicit a sexual response in the

13  viewer.

14         Now, the defense keeps indicating that this is

15  merely a case of voyeurism.  However, the Government would

16  argue that the standard definition available in a Webster's

17  dictionary for voyeur is one who derives sexual

18  gratification from observing the sex organs or sexual acts

19  of others, especially from a secret vantage point.  It talks

20  about being sexual in nature.

21         In this particular instance, the Government would

22  argue that the looking at this particular video, looking at

23  the facts that in the beginning of the first video that was

24  made on the 26th of January, the first shot is of the floor,

25  but that's not where the defendant left it.  He elevated

1  that camera or his cell phone, to video record higher.

2  Specifically, he aimed it so that it captured the area right

3  in front of the shower stall as well as the shower.  That is

4  the area that depicts a -- in this case, a minor, not just a

5  person, not just a young lady but a minor, someone who had

6  not reached age 18 as she was naked in front of that

7  particular space.  It captured her from the knees up.  The

8  focal point was of her body, where she was going to be

9  positioned as she went into that shower and as she came out

10 of that shower.

11        The defendant set up the camera.  The defendant

12 captured that material, and the defendant possessed and kept

13 that material.  That material was originally filmed in

14 January 26th, 2010, and January 27, 2010.  Yet he still had

15 those videos on his phone February 25th, 2010, when the

16 phone was seized.  He was in knowing possession of child

17 pornography.

18        The intent of taking so much time to set up that

19 camera was to capture that minor nude, and that's exactly

20 what happened.  She's not just nude.  It's not just her

21 breasts or her buttocks.  It's her pubic area that's

22 captured on multiple frames.  And in addition, because it is

23 a video, even the sentencing guidelines would acknowledge

24 that videos equal 75 images because there are multiple

25 images that are stacked together to create that video.  In

```
 1   this particular instance, he has two videos in which the
 2   minor can be seen on various times in that completely naked
 3   where her pubic area is visible.
 4        The Government would argue that the fact that he's
 5   also videotaping her in the bathroom, he's not -- the focal
 6   point of that is not the -- the actual toilet, although the
 7   defense has argued that you can see a portion of it.  The
 8   focal point was the shower.  The focal point of that, where
 9   it is actually set up and is focused on, is the area right
10   in front of the shower where someone is expected to walk out
11   before they can reach their towel and is expected to walk in
12   without having clothes on.  And that is what is depicted.
13        The Government would argue that the lascivious
14   exhibition that can be seen on those two videos from the
15   amount of time being used to set it up and how quickly it is
16   shut off after she comes out from her shower and has now
17   wrapped up and left the bathroom shows that the -- the
18   defendant's action shows that the videos were used to incite
19   lust.  That is the purpose of making these videos, keeping
20   these videos, possessing these videos in a place that's
21   accessible to him, on a cellular phone, something that is
22   portable, something that can be kept on him at all times.
23        So the Government would argue that considering the
24   overall content of the material that the purpose of those
25   videos is to capture that minor taking a shower, that the
```

focal point of the visual depiction is on the minor's pubic area.  He had already angled it upwards.  He had already set it to a particular stage.  On the video, the defendant himself can be seen backing up to position himself right in front of those very doors.

In addition, one of the facts to be considered is whether the minor is partially clothed or nude.  Well in this instance, the video was designed to capture her nude and that is, in fact, what both of those videos do.  And then the other thing to consider is whether the depiction appears to have been designed to elicit sexual response in the viewer, and the Government would argue that that is, in fact, why so much time was spent setting up that particular camera was what was going to be captured of the minor was designed to elicit a sexual response in the viewer.  And in this particular case, the viewer is the defendant and that is why he still had possession of those videos on his phone on February 25th, 2010, when he set up that camera again that morning to capture the minor.

The defense counsel relies on United States versus Steen, which was cited at 634 F.3d 822.  It's a February 25th, 2011, case.  The Government would point out that one of the district court cases that the Fifth Circuit seemed to rely upon, United States versus Johnson, that particular case has already been overturned by the Court of

1    Appeals more recently, as recently as April 5th, 2011.  So
2    the reasoning that the Fifth Circuit provides, part of the
3    basis that they quote on Page 828 where it discusses United
4    States versus Johnson, that particular case has already been
5    overturned.
6            Specifically, the Government would consider that
7    Steen can also be distinguished.  In this particular case,
8    besides relying upon a district court case that has now been
9    overturned, in that particular instance, the defendant was
10   videoing adult women and it was adult women who turned -- a
11   woman who saw him videotape or caught him videotaping and
12   turned it in to law enforcement, and it wasn't until law
13   enforcement went through the videos that they were able to
14   identify that one of the videos that he had captured was of
15   a 16 year old who was filmed at the time.
16           THE COURT:  But he wasn't charged -- I mean, the
17   Steen case discusses him actually being charged with
18   videotaping a minor.  So even though other videos may have
19   been of adults, they were also of minors as well.  So I
20   mean, the case back -- the case is actually an analysis of
21   videotaping of a minor in a booth in a tanning salon.
22           MS. VIACAVA:  Yes, Your Honor.  However, the
23   Government would argue the facts are different.  The
24   defendant -- in this case, the defendant set up that camera
25   to capture a minor, a 13 year old, someone that he had known

```
 1    for a number of years.  That's indicated in the stipulated
 2    set of facts.  And in this particular case, they talk
 3    about -- they found that particular case the video of the
 4    minor that was found was the one video.  Here you had a
 5    defendant that was recording a minor on multiple occasions.
 6    But in this case it talks about the focal point of visual
 7    depiction is not of the genitalia or pubic area.  It was
 8    only visible for about 1.5 seconds and it was on the far
 9    side of the images's frame.
10            In this situation, it was not the far side of the
11    image's frame.  She was seen in the area that the defendant
12    had set it up.  The defendant took his time to establish it,
13    versus in Steen they talked about him essentially having to
14    hang his hand over and video what he could.  He wasn't able
15    to set up and get the angles he necessarily wanted.  In this
16    particular case, the defendant did that repeatedly.
17            THE COURT:  Has United States v. Steen been
18    overturned?
19            MS. VIACAVA:  No, Your Honor.  That case is
20    still -- is still good, to the Government's knowledge.
21    However, the case that they do rely upon, United States
22    versus Johnson, that is again mentioned on 828, that
23    district court case that they refer to, that has since been
24    overturned by the Eighth Circuit and the Government will
25    cite to that case in just a moment.
```

1           In United States versus Johnson, which was decided

2      on April 5th, 2011, it is cited at 2011 Westlaw 1236442,

3      it's Number 10-1250 from the Eighth Circuit Court of

4      Appeals.   In this particular case, it talked about the facts

5      in the district court case in which it indicated that,

6      convinced that the videos captured only mere nudity and that

7      there was insufficient evidence that Johnson had attempted

8      or persuaded the minors to engage in lascivious exhibition

9      of the genitals or pubic area so he could produce a video

10     depiction of such conduct as opposed to attempt to persuade

11     them to be merely, nude the district court granted the

12     written post-trial motion for acquittal from the facts that

13     the Eighth Circuit was looking at.   The Eighth Circuit

14     indicated that we had purposely explained that more than

15     mere nudity is required before an image can qualify as

16     lascivious within the meaning of the statute.   We have not

17     previously defined mere nudity, although other courts have

18     suggested examples that could constitute mere nudity.   Goes

19     on further to say the lascivious images were not designed,

20     for instance, simply to provide clinical view of the

21     portions of the children's anatomy that are pictured.

22     Certainly the videos that the defendant possessed in this

23     particular case were not for a clinical view of the minor

24     completely nude.

25           The Eighth Circuit further goes on to say the

1  Third Circuit, in explaining the concept of mere nudity,

2  stated that no one seriously could think that a Renoir

3  painting of a nude woman or an innocuous family shot of a

4  naked child in the bathtub violates the child pornography

5  laws.

6         Again, we're not dealing with a small infant that

7  might be being bathed for the first time and the parent

8  might take a picture of.  In this case, the defendant

9  possessed images of this minor.  She was 13 years old at the

10 time he did this, of an age where you would not expect an

11 adult to need to assist the person in the bath or in any way

12 consider this to be a family moment that should be captured.

13        It further goes on to say, a reasonable jury could

14 conclude that these images of teenage and minor females

15 disrobing and weighing themselves in the nude cannot

16 reasonably compare to innocent family photos, clinical

17 depictions, or works of art.  In determining whether images

18 are lascivious, the Eighth Circuit indicated they refer to

19 the criteria listed in United States versus Dost.  They

20 indicated further that while we consider these criteria,

21 they are neither definitive nor exhaustive.  It goes on

22 further to say it also included the additional factor of

23 whether the picture portrays the minor as a sexual object.

24 That was something else that the Eighth Circuit indicated

25 they were able to consider.  It cites further that in

```
 1    Kemmerling we stated a picture is lascivious only if it is
 2    sexual in nature.  Thus the statute is violated, for
 3    instance, when the picture shows the child nude or partially
 4    clothed when the focus of the image is the child's genitals
 5    or pubic area and when the image is intended to elicit a
 6    sexual response in the viewer.  A reasonable jury could find
 7    from the evidence in the Johnson case that Johnson adjusted
 8    the zoom feature in attempt to tighten the focus of the
 9    camera on the area where the female genitals would be if
10    they were to face the camera and thereby determined the
11    first Dost factor was satisfied.  One of the resulting
12    videos captured up close of the minor's left buttock and it
13    would clearly have met the first Dost factor if the minor
14    would have merely turned around.  When the evidence is
15    viewed in light most favorable to the verdict, the fourth
16    factor is satisfied by the fact that the minor females
17    appeared both totally nude and partially clothed as they
18    faced the camera.  A reasonable jury could also have
19    concluded that because the video clips showed the females
20    generally from the shoulders to their calves, including
21    their naked breasts in the frontal views, that Johnson
22    attempted to obtain images portraying them as sexual objects
23    and that their facial features were apparently of little or
24    no importance.  Consequently, a reasonable jury applying the
25    Dost factors could have determined that the secretly
```

1    recorded videos were intended by the defendant to capture

2    the lascivious exhibition of the genitals or pubic area of

3    the young women and were intended to elicit a sexual

4    response in the viewer.

5            In this particular case, the fact of the case were

6    that he was a coach, and he would have the girls -- set up a

7    scale, would tell the girls to go in to strip down naked in

8    order to weigh themselves and he secretly hid a camera in

9    order to record them as they did such.  The Government would

10   argue that that is more similar to what happened here where

11   you would expect a minor to go in to get dressed for school,

12   to take a shower, and be naked in the spot where the camera

13   was set up to record.

14           It indicates the fact that the young girls in the

15   videos were not acting in obviously sexual manners

16   suggesting coyness or willingness to engage in sexual

17   activity does not necessarily indicate that the videos,

18   themselves were not intended to be lascivious.  It further

19   goes on, in Horn, we explain that the lascivious exhibition

20   may not necessarily be the work of the child whose innocence

21   is not in question but of the producer or editor of the

22   video.  Thus even images of children acting innocently can

23   be considered to be lascivious if they are intended to be

24   sexual.

25           Goes on further to say that in this instance a

1   reasonable jury could find the video clips were intended to

2   be lascivious.  The video camera was pointed at the scale

3   where the young women were certain to be standing nude and

4   the camera angle was such in many of the video clips of the

5   minors on the scale the frame encompassed the nude bodies

6   from the shoulders to below the knees.  A reasonable jury

7   could draw a reasonable inference that Johnson intended the

8   videos to be sexual in nature and to elicit a sexual

9   response in the viewer.  These images were not designed, for

10  instance, to provide a clinical view of the portions of the

11  children's anatomy that are pictured.

12          That is the most recent case the Government was

13  able to find and that is from April 5th, 2011.

14          THE COURT:  From the Eighth Circuit.

15          MS. VIACAVA:  From the Eighth Circuit.  The

16  Government would argue that the fact that the defendant

17  repeatedly set up his camera to capture this and kept those

18  images that captured the minor as she was getting into the

19  shower and he did it on the 26th, he did it on the 27th.

20  She found out about it on February 25th.  It shows that the

21  repeated attempts at capturing this information, possessing

22  this information, that it was done to elicit a response in

23  the viewer.  This was something that he was keeping.  This

24  was being added to his collection being kept on his phone.

25  The Government would argue that based upon defendant's

1    actions and the facts contained in the stipulated facts of

2    this particular case, that the defendant knowingly possessed

3    child pornography, that the depiction appeared -- appeared

4    to have been designed to elicit a sexual response in the

5    viewer.  That would be the need to repeatedly capture the

6    same minor in the same location day after day.  That would

7    be the Government's argument.

8            In addition, the Government would also refer the

9    Court to a district court case, it's a 2007 case, United

10   States versus Helton.  That's H-E-L-T-O-N, and it is cited

11   at 2007 Westlaw 1674196, in which the defendant secreted a

12   video camera in the bathroom and videotaped a 11 year old

13   girl in a manner that depicted a lascivious exhibition of

14   the genitals and pubic area of the girl.

15           THE COURT:  Is this an unpublished decision?

16           MS. VIACAVA:  It is available on Westlaw.

17           THE COURT:  Which means it's probably unpublished

18   because you don't give me a cite to a Federal Reporter.

19           MS. VIACAVA:  No, Your Honor, it does not have the

20   designation at the top as being unpublished, but it does

21   only provide me with the Westlaw cite.

22           THE COURT:  And I asked because it's 2007.

23   Usually cases that old would have a Federal Reporter

24   citation unless it was an unpublished decision.  Okay, you

25   may continue.

1          MS. VIACAVA:   In this particular case, based on

2     the evidence, the Court concludes that the exhibit of the

3     minor child's pubic area which, although clothed in

4     underpants, is the focus and subject of approximately one

5     and one and a half minutes to two minutes and approximately

6     three minutes segments of video.   It goes on further to

7     analyze the Dost factors.

8          In this one, it talked about the positioning of

9     the camcorder.   The evidence shows that the camcorder was

10    positioned in a manner designed to capture visual images of

11    the genital or pubic area.   Placed at the floor level with

12    the lens pointing upward and towards the toilet seat results

13    in a focus of those portions of the body of anyone entering

14    the bathroom and sitting on the toilet.   Here it wasn't just

15    set up for anybody.   It was set up for the minor.   She was

16    the person that was going in the shower next.   She was the

17    person that was captured on both of those days that we've

18    admitted into evidence and she is the only person that is

19    captured after the defendant sets up that camera and she is

20    the person within minutes of her leaving the camera is

21    turned off.   The defendant possessed what he wanted which

22    was her, images of her naked and going into the shower and

23    coming out of the shower.

24          In this particular case, they also talk about in

25    the context of the statute, it refers to another case.   It

```
1    says the Court held lasciviousness is not characteristic of
2    the child photograph but of the exhibition which the
3    photographer sets up for an audience that consists of
4    himself or like-minded pedophiles or presented to the
5    photographer as to arouse or satisfy the sexual cravings of
6    a voyeur.  The court noted that in this case, the defendant
7    secreted the camcorder positioned at the floor level of the
8    bathroom across from the toilet seat with the lens pointing
9    upward to capture the female genital area or pubic area and
10   he did so knowing that a minor female resided in the home.
11   And in this case, the Court concluded that evidence as a
12   whole that the six Dost factor is present, the visual
13   depiction was intended or designed to elicit a sexual
14   response in the viewer as it was planned and set up for an
15   audience consisting of the defendant and like-minded
16   individuals and it was based on the defendant's conduct as
17   shown by the evidence that the defendant was initially
18   charged in that instance with being a peeping tom, although
19   he was ultimately convicted of producing child pornography.
20           So certainly, if a defendant can be charged and
21   convicted of producing child pornography, he can be -- there
22   can be sufficient evidence to charge him with possession of
23   that child pornography, which is what the Government has
24   gone forward with, that this defendant was in possession of
25   those images.
```

1          There's also another case from the district court

2   in the Southern District of Iowa, United States versus Gool,

3   G-O-O-L.  It's a 2008 case, April 11, 2008.  It's cited as

4   2008 Westlaw 1735655.  In this case, the Court noted that

5   the defendant pointed the camera so as to capture videotape

6   of the minors as they disrobed, entered and exited the

7   shower, and dressed again.  And after making 54 videotapes

8   of this activity, he created a DVD that was a compilation of

9   many of these scenes.  It is obvious that the selection of

10  the scenes made the video objectively sexual in nature.

11  There appears to be no other reason for selecting shower

12  scenes of young girls disrobing and then dressing after a

13  shower.  So the Government would argue that there have been

14  other cases in which the positioning of a camera in a shower

15  has been found to be sexual in nature and the Government

16  would argue that is what has been shown in this particular

17  case.

18          In addition, in United States versus Cullipher,

19  C-U-L-L-I-P-H-E-R, it's a 2007 case from the district court

20  in Western District of Virginia.  It is a current cite

21  available is 2007 Westlaw 1830711, and in this particular

22  case, this defendant was, for approximately a month, in the

23  latter -- for approximately the latter months of 2005 until

24  December 2006, the defendant was an intermittent guest in

25  the home of another couple and he would videotape the

1   stepdaughters, the couple's stepdaughters.  In that case,

2   the defendant said that there were only two cameras and that

3   he admitted that he had placed the cameras in the bathrooms

4   and had videotaped activity in the bathrooms.  The videotape

5   of the girls showed them in various states of undress,

6   including being totally nude, and clearly showed the pubic

7   area including pubic hair for each of the girls.  It goes on

8   further to analyze what can be seen on the video.  The

9   footage also clearly showed the girl in various states of

10  undress including being totally nude and clearly showed the

11  pubic area.  And they talked about each -- that in each of

12  these videos that had been presented that is visible in both

13  of those videos.  And as such, the Court did acknowledge

14  that the tapes are far from the extreme in the continuum of

15  child pornography, however the Court found that the tapes in

16  question do on occasion show the pubic areas of the young

17  girls and the defendant clearly had lascivious intent in

18  making the recordings.

19          The Court found that it had not been shown the

20  defendant distributed the recordings to others or had intent

21  to do so, in fact, distinguishes his conduct from that of

22  other producers of child pornography.  However, the Court

23  noted that his intent was to satisfy his own obsessions

24  without any commercial or financial motivation.  And the

25  Government would argue that these cases are similar to what

1   has been presented before this particular Court, that the

2   Government has provided sufficient evidence that this

3   individual did, in fact, possess child pornography.  It

4   meets the definition of lascivious exhibition of the

5   genitals which falls under sexually explicit conduct.  That

6   is what the Government believes the evidence at this point

7   has shown, and we would ask that the Court deny the

8   defendant's motion for Rule 29 at this time.

9            THE COURT:  Thank you.  Final comments from the

10  moving party?

11           MR. BADALAMENTI:  Yes, Your Honor.  Thank you for

12  the rebuttal, Your Honor.  I'm going to attempt to address

13  the issues as succinctly as I can.  We have submitted to the

14  Court today three Circuit Court cases that are -- that are

15  good law right now.  I don't expect that they will be

16  overturned, particularly the ones that are 10 and 12 years

17  old on this matter.  Regarding the Steen case, the Steen

18  case relied on the district court case in Johnson as one of

19  several cases to support that sixth Dost factor.  And

20  Johnson, as the Government points out, is actually a

21  fantastic case for this Court to consider.  That case,

22  unlike what we have here -- this is no longer a sexual

23  exploitation case.  That count has been dismissed in this

24  particular case.  That was an attempted sexual exploitation

25  case in that -- in that -- in Johnson, and the Eighth

1    Circuit did what the Eighth Circuit should have done.  A

2    jury found an individual guilty of attempted sexual

3    exploitation and here's why.

4          The evidence showed this, there were zoom-in from

5    the left buttocks to the knee, from the left buttocks to the

6    knee of minor women in a locker room that was captured by

7    the coach.  Okay, and then the second -- which is the

8    primary image that they relied upon.  A reasonable jury

9    could have concluded that an individual attempted to

10   sexually exploit children.  That's the standard of review on

11   appeal.  They said it shouldn't have thrown it out because

12   it was an attempt offense.

13         That's not what we have here.  This is actual

14   possession of child pornography.  It couldn't be -- on its

15   most fundamental basis, there are two things that are very

16   different.  Unlike here where we have a shot from head

17   nearly to the knee of the minor in this case, we had a

18   zoom-in from the left buttocks to the knee.  It caught the

19   front area and zoomed in on it.  It should have been

20   reversed on that ground.  I think that the Eighth Circuit,

21   quite frankly, got it right from an appellate standpoint,

22   that is.  That's my -- as far as addressing Johnson.

23         The other issue is, the dictionary definition,

24   this Court is well aware, is -- is -- it's sometimes

25   helpful, but the canons of statutory construction say first

1    go to what Congress said voyeurism is, and Congress has

2    defined voyeurism in the statutes, and this is the first

3    place we go when we're looking for the definition of

4    something, does Congress speak first?  And Congress, in

5    Title 18, Section 1801, defines video voyeurism.  It's a

6    misdemeanor, punishable up to one year and it requires no

7    intent on what the video captured.  At best, that's what

8    this case is.  And Congress has spoken to it, not Webster's.

9         So I would say that the three cases that we have

10   cited, particularly the Steen case, is very much similar to

11   the facts and circumstances as we have here.  And this case

12   doesn't need to go any further.  The Court's seen the

13   evidence twice.  Congress has spoken as to what this case

14   should have been charged with, Mr. Johnson should have been

15   charged with.  And the defense would move for a Rule 29

16   motion for judgment of acquittal at this time, and we thank

17   you for your time, Your Honor.

18        THE COURT:  All right, thank you.  The Court is

19   going to take the motion under advisement.  The Government

20   has rested.  The defendant may proceed with its case.

21        MR. DEROVANESIAN:  Your Honor, if I might, we did

22   have I guess two other matters pending before the Court.  I

23   don't know if the Court wished to rule on those at this

24   time.

25        THE COURT:  Which matters were they?

1          MR. DEROVANESIAN:  The motion in limine regarding

2     what the Court is going to consider, whether you're going to

3     keep out the nude images of Mr. Johnson.  Additionally,

4     there was the issue regarding whether or not the Court was

5     going to consider just the thumbnail video from the cell

6     phone versus the wide screen, as far as the evidence in this

7     case.  I don't believe the Court has actually ruled on that.

8     I think you reserved on those.

9          THE COURT:  I thought I said I was going to allow

10    both of them to come into evidence, which is what I did.  I

11    viewed the thumbnail video on the phone and then I viewed

12    the larger depiction of the video on the computer.  And I

13    found that they both -- I mean, they looked like the same

14    thing; one was just larger.  But the depictions were -- were

15    there.  I did not find any distinction.  But I wasn't sure

16    at the time of the hearing as to whether there was any

17    distinction between what was on the cell phone and what was

18    on the computer screen.

19         MR. DEROVANESIAN:  In our motion in limine

20    regarding the pictures of Mr. Johnson, the frontal nudity,

21    going to the bathroom, things of that nature --

22         THE COURT:  With regard to that motion, having now

23    reviewed them, the Court -- of course I think the parties

24    agreed that the Court would not consider the testimony as

25    it -- not the testimony, the depiction of Mr. Johnson wiping

1    himself.  With regard to the other portions of the motion in

2    limine, let me just get it in front of me so I can rule

3    precisely.

4            All right, the defendant's motion basically was

5    for the Court to exclude the images of Mr. Johnson seated on

6    the toilet, apparently going to the bathroom, fully exposing

7    his genitals, pulling up his pants, and the wiping himself,

8    which is the one that apparently the Government has agreed

9    that would not be considered by the Court.

10           With regard to the video images of Mr. Johnson

11   seated on the toilet, going to the bathroom -- and it really

12   wasn't apparent to me that he went to the bathroom.  He was

13   sitting on the toilet.  I didn't get a -- you could not

14   necessarily determine from my vantage point that he actually

15   went to the bathroom.  It's not as though he was standing

16   there urinating into the toilet.  He was seated on the

17   toilet.  Whether he went to the bathroom or whether he was

18   just seated there for the mere purpose of adjusting the

19   telephone lens is really unclear.  So I view the seated on

20   the toilet and apparently going to the bathroom as one in

21   the same.  And then exposing his genitals, that was shown on

22   one and pulling up his pants was shown on the other.

23           I'm going to deny the defendant's motion in limine

24   with regard to those.  I do think that the footage here

25   basically merely reflects the entire scenario, if you will,

```
1    of what occurred on the days in question and I think that's

2    consistent, particularly when the Court considers the Dost

3    factors as they are modified to some extent to the 11th

4    Circuit's pattern instructions, and so I will deny the

5    motion in limine as it relates to A, B, D, and E of the

6    defendant's first motion in limine because I do think they

7    are relevant to the factors that the Court will be

8    considering to determine whether a visual depiction is a

9    lascivious exhibition.

10                   Anything else?

11              MR. DEROVANESIAN:  Your Honor, I believe that's

12   it, as far as the matters to be taken up before the defense

13   starts its case.

14              THE COURT:  Okay.

15              MR. DEROVANESIAN:  Your Honor, at this time we

16   would -- defense would call Marcus Lawson.  Stand in front

17   of that box and face this lady, please.

18              (The Witness is Sworn)

19              DEPUTY CLERK:  Thank you.  You may be seated in

20   the witness booth.  If you would, please state your full

21   name for the record.

22              THE WITNESS:  My name is Marcus Kenneth Lawson.

23              DEPUTY CLERK:  Thank you.

24              MR. DEROVANESIAN:  Your Honor, may I proceed?

25              THE COURT:  You may.
```

```
 1
 2                       MARCUS KENNETH LAWSON,
 3          a witness herein, after having been duly sworn,
 4          was examined and testified under oath as follows:
 5                        DIRECT EXAMINATION
 6    BY MR. DEROVANESIAN
 7    Q.      Good afternoon, Mr. Lawson.
 8    A.      Good afternoon.
 9    Q.      Could you tell us what your profession is?
10    A.      I'm the president of Global CompuSearch, a computer
11    forensics and legal consulting firm.
12    Q.      Where is that firm headquartered or located?
13    A.      Our headquarters is in Spokane Washington.  We have
14    offices in Portland, Sacramento, and Palm Springs.
15    Q.      At this time, I'd like to cover your academic
16    training and background.  Could you tell us about your
17    degrees that you hold?
18    A.      Well, bachelors degree in the administration of
19    justice from Portland State University and a Juris Doctor
20    from Pepperdine University Law School.
21    Q.      Have you ever held positions as a teacher or
22    professor as well?
23    A.      I was a -- an adjunct professor at Portland State for
24    a short time.
25    Q.      Okay.  And what type of post-academic training have
```

LAWSON - DIRECT

1    you had?

2    A.      A variety of -- of training in both law enforcement

3    at law enforcement academies and forensic training for doing

4    computer forensics, which is, in essence, what our company

5    does.

6    Q.      All right.   And have you ever had training as a

7    special agent?

8    A.      Yes.

9    Q.      And for what agency would that have been?

10   A.      I've worked for three different federal law

11   enforcement agencies.   I started right out of law school in

12   1983 with the United States Secret Service.   I worked for

13   the Secret Service until moving to the Drug Enforcement

14   Administration.   My Secret Service office of assignment was

15   Los Angeles and when I moved to the Drug Enforcement

16   Administration, that also was in the Los Angeles field

17   office.   And when I left the Drug Enforcement

18   Administration, I went to work for what was then U.S.

19   Customs.   It's now referred to as Immigration and Customs

20   Enforcement, or ICE, and I moved from Los Angeles then to

21   the Pacific Northwest where I began working in that

22   position.

23   Q.      Now, your position with these agencies, that being

24   Secret Service, Drug Enforcement Administration, and U.S.

25   Customs did you undergo training as far as your duties and

LAWSON - DIRECT

1    responsibilities with these agencies?

2    A.    Yes, each one had their own academy.  The customs

3    academy at the time was an academy that was put together for

4    incoming federal agents that had worked for other law

5    enforcement agencies and had already been to basic training

6    academies with those agencies, so it was more of an advanced

7    academy on customs laws and procedures.

8    Q.    And how about Secret Service and DEA or Drug

9    Enforcement?

10   A.    Both of those are -- it's a combination of basic

11   academy that then progresses into specialized training in

12   the particular things that those agencies do.

13   Q.    Now then, as part of your career as a law enforcement

14   officer, did you have training in the -- in the field of

15   internet crime and computer -- computer crime?

16   A.    Yes.

17   Q.    Okay.  Could you tell us about that?

18   A.    Well initially, my initial training in the field of

19   child pornography came at the U.S. Customs Academy in

20   Marana, Arizona which is the academy I was stating is a --

21   an academy that was put together for incoming agents from

22   other agencies.

23   Q.    Could you describe the curriculum and what you went

24   through, as far as your training?

25   A.    At the Customs Academy in Marana, there were -- the

LAWSON - DIRECT

 1    training was taking into account that you had already had

 2    basic law enforcement and investigative training at another

 3    agency.  It specialized in particular areas of

 4    investigative -- investigative areas that Customs worked,

 5    which included obviously drug interdiction is the big one,

 6    and various types of fraud, IPR investigations, they're

 7    called, and child pornography was one of those.

 8    Q.    All right.  In addition to training at the customs

 9    academy, did you have any other -- have you had any other

10    training during the course of your professional career

11    regarding child pornography and internet crime?

12    A.    Both received and given a lot of training in that

13    area.  I was, in the course of working for Customs, once

14    the -- I began working -- I should explain.  I began working

15    child pornography crimes at Customs before the crime had

16    migrated onto the internet.  So I began in 1989 and was

17    working those types of investigations from 1989, 1990,

18    roughly, through the mid '90s when the offense moved onto

19    the -- onto the internet as a primary means of distributing

20    it and collecting child pornography, and so my investigative

21    strategies also moved onto the internet, and there were --

22    there were trainings both before and after that.  The

23    trainings that I coordinated, that I participated in, but I

24    don't have any training in list in front of me, but there

25    were a number of them.  The first training that I went to

LAWSON - DIRECT

1    once the -- if you -- if we have sort of a demarcation line
2    in the sand, roughly the mid '90s when the investigative
3    branch moved to the internet, the first training was at the
4    Sacramento High-tech Crimes Facility where I actually do a
5    lot of our California cases now and it was training in, in
6    essence, some basic computer forensics training but online
7    investigative strategies and things like that.
8    Q.     Did your training continue after that?
9    A.     There have been a number of trainings that I've given
10   since then.  In giving those trainings, typically they're
11   law enforcement trainings that are put on, and I may have
12   been asked to come and give a -- teach a particular block
13   but was there for the training that was put on by other
14   people as well.
15   Q.     Now, what do you do as part of your profession with
16   your business, Global CompuSearch?
17   A.     I'm sorry, could you repeat the question?
18   Q.     Sure, Global CompuSearch, what do you do as part of
19   your professional background?
20   A.     We're a legal consulting firm for attorneys that have
21   issues in litigation that involve computer entities.  We
22   have a broad variety of attorneys that call us with various
23   types of cases because the -- you know, as we all know,
24   digital evidence is now part of many types of litigation,
25   not just criminal law, but family law, employment law, and

LAWSON - DIRECT

1   business litigation.  So we work a variety of types of cases
2   involving a variety of types of different sort of legal
3   entities if you will.
4   Q.    Are you actually a forensic examiner at Global or is
5   that something someone else does?
6   A.    I am, to a certain extent.  I have now six forensic
7   examiners there and I don't do quite as much of the forensic
8   examinations as I used to when I first started with the
9   company.
10  Q.    Your experience, how many have you worked over the
11  years, forensic cases involving child pornography, for
12  instance?
13  A.    Our company currently averages, on average at this
14  point, for the last eight months, we've averaged about 5,000
15  billable hours a year at this point.  At least that's what
16  it looks like it's going to come out to be.  So that divided
17  up among five of us, you know, roughly a thousand hours a
18  year, I suppose, between us, up to this point.  As I said,
19  we've hired a new forensic examiner in March, so I suspect
20  that my -- hopefully my numbers will go down.
21  Q.    Now, your firm works on criminal cases, family law,
22  employment law, and business litigation; is that correct?
23  A.    Correct.
24  Q.    And what percentage would you say that your business
25  is devoted to criminal cases?

LAWSON - DIRECT

1   A.      I'd say currently roughly 70 percent of our cases are
2   in the criminal field.
3   Q.      And do you work for defense attorneys exclusively?
4   A.      No.
5   Q.      So you work for prosecution and defense; is that
6   correct?
7   A.      Correct.
8   Q.      Can you assign a percentage to, for instance, what
9   percentage of your cases you would say is for the
10  prosecution, what percent is for the defense?
11  A.      I'd say it varies.  At times it can be -- at times we
12  can -- we've had more prosecution cases than criminal
13  defense cases, but I'd say on average over the year, it's
14  about 10 percent of our criminal case load is done for the
15  prosecution.
16  Q.      And what type of relationship do you have with the
17  prosecutors?
18  A.      Well, that began -- we have a fairly substantial
19  practice in military law.  We work cases for all branches of
20  the military, Coast Guard, Marines, Navy, Army, Air Force.
21  And initially, the attorneys that hired us were the criminal
22  defense attorneys because the prosecutors obviously have
23  NCIS and CID, and other agencies to do their side for them.
24  What happened is in the military, quite often attorneys
25  switch sides.  They may be a defense attorney for a while

LAWSON - DIRECT

1   and then become a prosecutor, vice-versa, and we've had both

2   prosecutors that were in court against us and became defense

3   attorneys and hired us once they became defense attorneys

4   and vice-versa.

5   Q.     Now if I got the math correct, you indicated

6   approximately 70 percent of your case load is criminal; is

7   that correct?

8   A.     Correct.

9   Q.     So of the 5,000 hours you spend typically a year,

10  that would be about 3500 of those would be for criminal?

11  A.     I'd say, roughly.  It can vary.

12  Q.     Okay.  Now of the 3500 that are criminal, what types

13  of criminal cases do you typically work with?

14  A.     We have worked the spectrum of criminal cases from

15  all kinds of things.  Espionage cases, we've had several

16  capital homicide cases that we've worked, arsons, but by and

17  large the largest volume is child pornography.

18  Q.     How often would you say that you've been called to

19  testify in a case as a witness?

20  A.     It's very rare.  I'd say if I were to estimate -- and

21  this is just strictly my estimation as the boss and kind of

22  keeping an eye on our case flow and what happens to it, I'd

23  say roughly ten percent of the time.  This is in criminal

24  cases.  We find -- we have findings that are more favorable

25  than not to -- more favorable in the Government's case than

LAWSON - DIRECT

1  not, and of those, it's still a fairly small percentage that
2  we get asked to actually come and put on testimony.  Maybe
3  five or six percent of the time.
4  Q.    Let me back up for a moment, for clarification.  How
5  often are -- how often are your findings favorable to the
6  defense versus the Government?
7  A.    I'd say roughly ten percent.  Typically out of the
8  rest of the 90 percent, there are oftentimes findings that
9  might be useful in terms of mitigation or something, but if
10 I were to say -- if I were to weigh those cases that come
11 out where actually our findings are more favorable in the
12 Government's case, it's fairly small, ten percent, roughly.
13 Q.    So in approximately 90 percent of your analyses, the
14 findings are unfavorable to the defense?
15 A.    Correct.  I want to correct that and say that there
16 are oftentimes things that are mitigating that might be
17 useful, but --
18 Q.    Okay.  Now, of the ten percent of the times that you
19 have findings that are favorable to the defense,
20 approximately what percentage of those are you asked to
21 testify?
22 A.    I'd say roughly five or six percent of the time.
23 It's fairly rare.
24 Q.    Now, you indicated that you have conducted training
25 as well; is that correct?

LAWSON - DIRECT

```
 1    A.      Correct.
 2    Q.      And what type of training have you conducted?
 3    A.      Since becoming a private consultant, we train -- and
 4    initially I did most of the training.  As one of the -- at
 5    first the only employee and then one of only two or three
 6    employees, I did much of the training that was given to the
 7    military and various agencies and entities that asked me to
 8    come and do that training.  I think if I were again to
 9    average, I'd say between five and ten live trainings a year
10    that my company does.  Now, I don't do them all.  I have
11    other examiners that step in and do some of that as well.
12    Q.      And have you testified as an expert witness
13    previously?
14    A.      Yes.
15    Q.      And what forums, venues?
16    A.      I would need -- I would need a list of my -- of case
17    names, but I've testified in obviously in the Eastern
18    District of Washington where my final office was with U.S.
19    Customs in the Eastern District of California.
20    Q.      You've testified in federal court; is that correct?
21    A.      Yes, yes, correct, and military court and state
22    court.
23    Q.      And then in many states?
24    A.      Yes.
25    Q.      Have you published any articles regarding your
```

1  background and training?

2  A.    Yes.

3  Q.    Okay.  And could you describe some of those for us,

4  please?

5  A.    A chapter in the manual that was published for the

6  Oregon criminal -- or not criminal, excuse me.  The Oregon

7  Legal Investigator's Association manual and published

8  training in the American Matrimonial Lawyers Association

9  manual, like a law review that comes out every year.  I have

10  a -- actually several Westlaw classes.  We were contracted

11  by Westlaw to put together classes in basic computer

12  forensics for different areas of legal expertise.  So we

13  have classes in business litigation and employment

14  litigation that are published on Westlaw's page, including

15  criminal defense.

16  Q.    Have you ever received awards or recognition in the

17  past as part of your profession?

18  A.    Yes.

19  Q.    Okay.  Could you describe some of them to us, please?

20  A.    Well, the most -- the most recent one -- you're

21  talking about when I was with the Government?

22  Q.    Yes, sir.

23  A.    The most recent award that I got when I left the

24  Government was an award from the United States Attorney's

25  Office in the Eastern District of Spokane and it was just an

LAWSON - DIRECT

1   award of appreciation for the cases that I had worked in the

2   Eastern District and the success that they had.

3   Q.     Getting back to the 3500 hours, or approximately,

4   that your firm works on criminal cases, approximately what

5   percentage of those involve an evaluation as to determine

6   what is child pornography and what is not child pornography?

7   A.     All of the child pornography cases would involve that

8   evaluation every time.

9   Q.     Why is that?

10  A.     We have a protocol for investigating our child

11  pornography cases that I, in essence, put together when I

12  formed the company and we started doing these types of

13  cases.  I knew that we needed a protocol if we were going to

14  ever proffer opinions based on our examinations.  We needed

15  to have a protocol that we could point to, and that the

16  protocol begins with the initial question of whether we're

17  looking at child pornography and -- but what is contraband,

18  in particular hard drive, looking at it, and what is not.

19  Q.     Do you use this protocol in every single case?

20  A.     Every case, yes.  All my examiners do.

21  Q.     Do you consider yourself to be highly knowledgeable

22  in the area of child pornography?

23  A.     I think so, yes.

24  Q.     And as part of that, do you study and keep up on the

25  laws regarding that as well?

LAWSON - DIRECT

```
 1   A.      I try to, yes.
 2   Q.      Of the 3500 hours, do you know approximately how many
 3   child pornography cases that is that your office handles per
 4   year?
 5   A.      It's a rough estimate, and again of course it can
 6   vary from year to year, but we average -- on average, we
 7   spend roughly 30 to 35 hours per case and if we are talking
 8   3500 hours roughly, then that would be roughly between --
 9   somewhere between 75 and a hundred cases a year that my
10   office handles.
11   Q.      All right.  During the course of your profession as a
12   private consultant, do you have an estimate on how many
13   images of child pornography or otherwise that you've been
14   asked to view?
15   A.      It would be in the millions.
16   Q.      And going back to U.S. Customs, did you have a
17   similar function there but as a -- an office of U.S. Customs
18   versus a private consultant?
19   A.      I did.
20   Q.      All right.  What did -- what were your areas of
21   responsibilities while you were at Customs?
22   A.      When I first came to Customs, I came from the Drug
23   Enforcement Administration in Los Angeles, as I said, and
24   my -- I was primarily hired because of my background in
25   narcotics investigations and I was sent to the Astoria Field
```

LAWSON - DIRECT

1    Office which was a small two-man office on the Oregon coast.

2    And to be honest, there was not a lot of drug activity going

3    on, at least not initially, that I could investigate and I

4    looked around to see what other things that the agency did

5    and obviously at the academy, they had talked about child

6    pornography.  So I looked to see about -- to see if that was

7    something that I could investigate there in Astoria and put

8    together an undercover project that was fairly successful

9    and resulted in a number of arrests and which was then

10   duplicated after that project ended, and I ended up, if you

11   will, becoming sort of the child pornography agent for -- at

12   least for my agency in the northwest and I did many of the

13   cases in Oregon, Washington, and Idaho.  Even cases that

14   were initiated by other agencies would end up coming to me

15   because I had a certain level of expertise.

16   Q.    And how many years did you do that with the

17   Immigrations Customs?

18   A.    I think I started putting together my undercover

19   project in 1989 and did that as my -- my primary area of

20   responsibility.  I certainly worked other things, worked on

21   drug cases and whatnot, but it was -- I'd say it was my

22   primary investigative area from that time until I left the

23   Government in 2000.  So 11 years, 10, 11 years.

24            MR. DEROVANESIAN:  Your Honor, at this time I

25   would proffer Mr. Lawson as an expert in the field of child

LAWSON - DIRECT

1    pornography, computer forensics.

2              MS. VIACAVA:  The Government has no objection,

3    Your Honor.

4              THE COURT:  All right.  The Court will receive the

5    witness as an expert in that area.

6              MR. DEROVANESIAN:  Thank you, Your Honor.

7    BY MR. DEROVANESIAN

8    Q.    Now, Mr. Lawson, obviously you were contacted by our

9    office in this case.  What were you asked to do?

10   A.    You asked me to -- well initially, you asked me, if I

11   recall the conversation correctly, if there were certain

12   standards in law enforcement investigations in the

13   identification of child pornography, and which we discussed.

14   And then you asked me to review two videos that were being

15   proffered, at least at the time, as being -- as the

16   manufacture of child pornography in your case.

17   Q.    Okay.

18   A.    And then proffer an opinion.

19   Q.    Were you able to view the videos in this case?

20   A.    I was.  The -- I believe the FBI here in Florida sent

21   them to the FBI office in Sacramento where we do a lot of

22   our Sacramento cases.  They have a facility there that --

23   that they've set up for us to do defense exams, and a CD

24   arrived there and it was presented to it by Agent Russ

25   Schmidt (phonetic) that I worked with there in Sacramento.

LAWSON - DIRECT

1   Q.      So the videos were played for you in Sacramento?

2   A.      He provided the CD for me and I played it in a

3   particular facility that I work at.  They have FBI computers

4   there set up for doing forensics.  So I played the CD on the

5   FBI computer.

6   Q.      Were you able to view the images that are the subject

7   of this case, U.S. versus Johnson?

8   A.      I was.

9   Q.      Now you've been seated in the back of the courtroom

10  today during the earlier proceedings; is that correct?

11  A.      Correct.

12  Q.      Were you able to see the video that was playing in

13  the courtroom?

14  A.      I was.

15  Q.      All right.  Is it the same video that you saw?

16  A.      Yes.

17  Q.      Now, what type of inquiry do you engage in in

18  determining whether or not video images, et cetera, are

19  child pornography?

20  A.      Well as I mentioned, we have a protocol that we

21  follow and that protocol includes a number of steps that go

22  down the line in terms of answering questions of who, what,

23  where, when, and why something happened on a particular

24  computer, particularly in a child pornography case.  But the

25  initial inquiry in every child pornography case is do we

LAWSON - DIRECT

1  have child pornography, and if so, how much, is typically --
2  that's the way that we start with the protocol, is to get --
3  take an inventory of the images that are in a particular
4  piece of media, typically a computer hard drive, and make a
5  determination about which images are child pornography, if
6  any, and if there are, how many and where they're located.
7  So that is -- the protocol begins with that step.  Is it a
8  child; is it pornographic.
9  Q.      Are you familiar with the case of U.S. versus Dost?
10 A.      Yes.
11 Q.      And are you familiar with what is referred to as the
12 Dost factors?
13 A.      Yes.
14 Q.      Do those play a part of your analysis or
15 determination?
16 A.      In putting together the protocol, it was -- as I
17 said, the important point of having a protocol was that if
18 we were going to proffer opinions, it had to be based on a
19 protocol that I could explain.  So the protocol, in essence,
20 in these initial stages anyway, follows -- follows the law.
21 In the possession of child pornography case, the protocol
22 involves starting with 18 U.S.C. 2252, which is, is it a
23 child, is it minor under the age of 18, and then secondly,
24 is it pornographic or a -- oh, the -- the language of the
25 statute is -- escapes me at the moment -- a child engaged in

LAWSON - DIRECT

1    sexually explicit behavior.  So that's our initial inquiry.

2    And then once we have decided that a child is under 18, then

3    the next question is, is the child engaged in sexually

4    explicit activity.  That involves, as we already talked

5    about, her testimony, it involves, paraphrasing, sexual

6    interaction of some kind, the child with an adult or other

7    children, bestiality, masturbation, or lascivious exhibition

8    or lascivious exhibition of the genitals.

9            When we're doing these evaluations to determine

10   what is or isn't child pornography on the hard drive,

11   obviously the sexual interaction, bestiality, and

12   masturbation are easy.  We know those when we see them.  The

13   question becomes stickier, if you will, when it comes to

14   lascivious exhibition.  So there then needs to be a protocol

15   for deciding what images are lascivious exhibitions or not,

16   and in the course of doing our exams, we often find images

17   that we decide are lascivious exhibitions and we bookmark

18   those as images that we're going to need to be concerned

19   about in terms of defining where they came from and who they

20   belong to, and we have some them that we don't.  And

21   those -- in making that decision about what is and what

22   isn't is based on the six Dost factors.

23   Q.    All right.  Now, did you apply those to the video

24   that Mr. Johnson took in this case?

25   A.    Yes.

LAWSON - DIRECT

1   Q.     And what were you able to determine?

2   A.     Well, of the -- of the six factors, the only -- the

3   only factor that was apparent to me was number four, which

4   is that she was nude or partially clothed.

5   Q.     Did -- in your opinion, were any of the other factors

6   met?

7   A.     No.

8   Q.     Now in analyzing a picture and going through the Dost

9   factors, obviously you look at the picture and there are

10  certain things that you're looking for; is that correct?

11  A.     Yes.

12  Q.     Now, in explaining that to the trier of fact, would

13  it assist you to have a diagram or aid or perhaps a sample

14  picture to explain your testimony?

15  A.     I think it would be -- if we're going to compare and

16  contrast, I think it would be, it would be helpful.

17  Q.     You think that would substantially aid the

18  presentation of the evidence you bring in this case?

19  A.     I think so.  I think having a visual aid like that is

20  always helpful.

21         MR. DEROVANESIAN:  Your Honor, at this time, I

22  would ask the Court's permission to use Defense Exhibit A,

23  which is The Last Day of Summer, a book by Jock Sturges.

24         THE COURT:  For demonstrative purposes or moving

25  it into evidence?

LAWSON - DIRECT

1          MR. DEROVANESIAN:  Your Honor, at this time for

2     demonstrative purposes.

3          THE COURT:  Is there any objection?

4          MS. VIACAVA:  Your Honor, at this time, the

5     Government would renew its objection as to relevance.  The

6     witness has already talked about the images in this

7     particular case as compared to what can be found elsewhere.

8     This is not a obscenities trial; this is child pornography,

9     and the Government would object as to relevance.

10         THE COURT:  Would you like to voir dire the

11    witness?

12         MS. VIACAVA:  Your Honor, the fact that this

13    witness has indicated that he would be -- it would help him

14    in comparing it indicates the purpose of what these

15    particular exhibits are going to be used for, and the

16    Government would object as to relevance in this particular

17    case.  There's no testimony, there's been nothing that's

18    been elicited indicating that this particular defendant

19    possessed any of these materials or were collecting any of

20    these particular books or movies.

21         THE COURT:  I understand that that's your

22    objection.  My question to you, however, which remains

23    unanswered is, would you like to voir dire the witness?

24         MS. VIACAVA:  One moment, please, Your Honor.

25         (Discussion off record)

LAWSON - DIRECT

1              MS. VIACAVA:  No, Your Honor.

2              THE COURT:  I have some questions of you, sir.

3              THE WITNESS:  Yes, ma'am.

4              THE COURT:  With regard to this -- which exhibit

5  is it?

6              MR. DEROVANESIAN:  The first one I would like to

7  use is Last Day of Summer by Jock Sturges, Defense A.  Would

8  the Court like to -- I have the materials here if the Court

9  would like to look at them.

10             THE COURT:  I would like to see them.  My concern

11  is it's difficult to rule when I've not reviewed the

12  material.  I need to look at it and I have some questions

13  with regard to the document.

14             MR. DEROVANESIAN:  You want all three of them?

15             THE COURT:  Yes.

16             MR. DEROVANESIAN:  Well, Blue Lagoon is just the

17  empty case.  We have it cued up to play, with the Court's

18  permission.

19          (Two books provided to the Court)

20             THE COURT:  Okay, and the one that I'm reviewing

21  now is The Last Day of Summer and were there certain pages

22  in here or just the entire document?

23             MR. DEROVANESIAN:  Your Honor, there are certain

24  pages.  I have a paperclip at the top of the page.

25             THE COURT:  All right.  I do see the paperclipped

LAWSON - DIRECT

1    pages.

2            MR. DEROVANESIAN:  But not all of them, I might

3    add, just a few of them.

4            THE COURT:  All right.  Mr. Lawson, I have had an

5    opportunity to review the pages from The Last Day of Summer,

6    and sir, explain for the Court, what is your purpose in

7    utilizing these photographs in your testimony today?

8            THE WITNESS:  I believe that the defense attorney

9    wants to do, in essence, a comparison, a contrast to how

10   images in the magazine or, excuse me, in the book compare as

11   evaluated against the Dost factors and compare and contrast

12   that with the video in question, the two videos in question.

13           THE COURT:  And is this something that you

14   commonly do as a part of your protocol with regard to your

15   testimony in child pornography, with regard to the

16   determination of child pornography?

17           THE WITNESS:  In regards to the determination on

18   a -- on an ongoing case by case daily basis, no, I don't use

19   the books.  I have used the books in previous testimony when

20   I was -- along the same lines as a compare and contrast.

21   Not against the video like we've seen, but against other

22   images that have been charged that -- that I didn't feel met

23   the standards of lascivious exhibition, and we've used those

24   books.  It's something that I've done on occasion but does

25   not happen every time I testify.

LAWSON - DIRECT

1          THE COURT:  Anything further, Mr. DerOvanesian?

2          MR. DEROVANESIAN:  No, ma'am.

3          THE COURT:  Anything, any additional matters with

4    regard to the testimony, Ms. Viacava?

5          MS. VIACAVA:  Your Honor, the Government would

6    just again reiterate its objection as to relevance.

7          THE COURT:  Okay.  Actually, Mr. DerOvanesian, let

8    me have you respond on the record to the objection as to

9    relevancy.

10          MR. DEROVANESIAN:  Your Honor, our response is

11   just as the witness has indicated.  The witness has

12   testified that his testimony as an expert in the area of

13   child pornography and computer analyst, his testimony would

14   be substantially assisted by the use of these demonstrative

15   aids.  It will speed up his presentation, make the

16   explanation of the factors, what he looks for, and what is

17   contained in these materials in contrast to the materials of

18   our case, that is the video from the phone in the sock in

19   Mr. Johnson's case, just to compare it and contrast.  I

20   would argue to the Court that, clearly, it's something that

21   the witness has indicated will assist him in his explanation

22   of presenting his testimony.  I would ask the Court to allow

23   it and I would argue it would speed up the process and make

24   his testimony much, much easier to understand.

25          THE COURT:  Okay.  I will allow it, then, for

1  demonstrative purposes at this time to aid in the

2  presentation of his testimony.  Madam Clerk, you may pass

3  this back to the defense.

4          MR. DEROVANESIAN:  May I approach?

5          (Two books returned to defense counsel)

6  BY MR. DEROVANESIAN

7  Q.    Now Mr. Lawson, let me go to Defense Exhibit A, which

8  has been admitted only for demonstrative aid, Last Day of

9  Summer by Jock Sturges, ask you to take a look at Page 20,

10  if I might.

11          DEPUTY CLERK:  Do you need the projector on?

12          MR. DEROVANESIAN:  Actually, I think it is

13  working.

14          THE WITNESS:  Mine is not.

15          MR. DEROVANESIAN:  Yours is not?  The Court's is

16  working?

17          THE COURT:  I'm thinking it's going to up here in

18  just a moment.  My screen has --

19          DEPUTY CLERK:  Is that one on?

20          MR. BADALAMENTI:  No.

21          MR. DEROVANESIAN:  It was on originally.

22          MS. VIACAVA:  Your Honor, it may need to be

23  switched from the computer access to --

24          THE COURT:  That's what I'm thinking because we

25  did utilize it for purposes of viewing a video on a

LAWSON - DIRECT

1   computer, that there may be a need to switch there.  Can we

2   get our IT person up?

3           DEPUTY CLERK:  Yes, I'm calling him.

4           MR. BADALAMENTI:  It's on now.

5           THE COURT:  Okay, it's there.

6           MR. DEROVANESIAN:  You have the image there?

7           THE WITNESS:  Yes, I do.

8           MR. DEROVANESIAN:  Okay.  This is Page 20 of the

9   Jock Sturges book.

10  BY MR. DEROVANESIAN

11  Q.    Could you explain to us what this image -- what's

12  depicted in this image?

13  A.    A female who appears to be prepubescent standing in

14  a -- looks like a waterfall setting in probably a stream or

15  river and she's nude.

16  Q.    All right.  Now, as far as analyzing this picture to

17  determine if this is child pornography, what factors do you

18  look at, as far as your analysis?

19  A.    Well, the -- obviously the first factor is that the

20  image is focused on her pubic region, her genitalia, which

21  at least to me does not appear to be the case for this

22  photo.  The next is whether the pose is -- is unnatural,

23  which again, in this setting does not appear to be

24  unnatural.  This setting is outdoors and a natural setting.

25  It's not unnatural.  She certainly is nude and so that the

LAWSON - DIRECT

1    fourth factor is there.

2              I don't see a coyness or willingness to engage in

3    sexual activity in this picture, and finally, I -- I have no

4    idea what the -- the intent of the person who took the

5    picture is, what they were thinking.

6    Q.    That's really not relevant; is it?

7    A.    I don't think so.

8    Q.    If I may, then, I'd go to Page 21.  Is this fairly

9    similar, as far as your analysis?

10   A.    It is, another prepubescent girl.  Her genitalia are

11   not quite as exposed because her legs are clinched together

12   but in essence, similar sort of pose.  Looks like the beach,

13   which again would be not an unnatural location.  She is

14   nude, so factor four is there.

15   Q.    Let me go to Page 37.  Could you describe what's

16   depicted in this image?

17   A.    One looks like an adult woman in the background and

18   then we have a possibly pubescent -- I don't think she's

19   pre-pubescent at this point -- naked female.  Again, as with

20   the other images, that the setting appears to be natural.

21   It's the beach.  The pose is not unnatural.  I don't see a

22   willingness to engage in sexual activity or coyness, and

23   again, I have no idea what the subjective intent of the

24   photographer is.

25   Q.    Now, you're familiar with the images in the case that

LAWSON - DIRECT

1  you're here to testify in; is that correct?

2  A.    Yes.

3  Q.    Now, could you describe those images -- well, let me

4  back up.  Let me show you one further picture and ask your

5  opinion on this one.

6  A.    It's similar to the others.  We have two prepubescent

7  girls standing side by side.  The vernacular setting looks

8  like a lake or stream, and again, the pose is not -- not an

9  unnatural pose.  Looks like two little girls are friends,

10 perhaps.  There's nothing to suggest sexual coyness about

11 their expressions or how they're posed.

12 Q.    All right.  So in your opinion in analyzing these,

13 the only factor you see is the nudity?

14 A.    That they're nude, correct.  And you can see -- in

15 this particular one, you can see their genitalia.

16 Q.    Now, it's Page 72 in The Last Day of Summer by --

17 photographs by Jock Sturges.  Okay, could you describe, for

18 instance, how this picture compares to the video or images

19 that Mr. Johnson took in this case?

20 A.    Well, the movies that we observed earlier in court,

21 the young lady is obviously not pre-pubescent anymore.

22 Q.    In federal criminal settings, is there a difference

23 as far as punishment, pre-pubescent versus pubescent?

24 A.    Correct.  There's a enhancement for pre-pubescent

25 pornography.

LAWSON - DIRECT

1   Q.      So would it be that the pubescent is more offensive
2   to lawmakers?
3   A.      It would be closer to the line, I would think,
4   because of that if nothing else.  Their genital region is,
5   at least from my perspective, clearly more visible than the
6   brief view that we see in the movies that were played.
7   Q.      All right.  In the video Mr. Johnson made, you see
8   nudity; is that correct?
9   A.      Correct.
10  Q.      Anything else?  Any of the other factors?
11  A.      In the movie?
12  Q.      Yes.
13  A.      No.
14          MR. DEROVANESIAN:  Okay.  If I may have a moment?
15          (Pause in place)
16          MR. DEROVANESIAN:  Your Honor, at this time I
17  would ask to use Defense Exhibit C.  This is Immediate
18  Family, by Sally Mann.
19          THE COURT:  And for what purpose would you like to
20  use it?
21          MR. DEROVANESIAN:  Demonstrative aid.  Again, it's
22  another material that we have used with this witness and he
23  has reviewed for -- to aid him in presenting his testimony
24  to the trier of fact.
25          THE COURT:  Why don't you show to it the

LAWSON - DIRECT

 1  Government and then to the Court.  I didn't look at that
 2  one.  I only looked at the prior one.
 3          MR. DEROVANESIAN:  I'm sorry, if I may approach?
 4          THE COURT:  Yes.
 5          (Document provided to the Court)
 6          THE COURT:  I am reviewing what has been marked
 7  for identification as Defense Exhibit C, Sally Mann
 8  apparently the writer of Immediate Family, and are you
 9  seeking to use as a demonstrative aid the paperclipped pages
10  or the tabbed pages?
11          MR. DEROVANESIAN:  Your Honor, the tabbed pages
12  are -- I definitely want to use, maybe one or two of the
13  paperclip pages.
14          THE COURT:  Is there any objection to the
15  defendant's request to use photographs from this book as a
16  demonstrative aid to assist the witness in his testimony?
17          MS. VIACAVA:  Your Honor, for the record, the
18  Government would object again as to relevance.
19          THE COURT:  Okay.  Mr. DerOvanesian, would you
20  respond to the Government's relevance objection?
21          MR. DEROVANESIAN:  Your Honor, again, it's our
22  position that Mr. Lawson is an expert witness.  He is
23  providing testimony in a -- it's a complex area.  He's
24  indicated that the use of a demonstrative aid would assist
25  him in presenting his testimony here today to the trier of

LAWSON - DIRECT

1    fact.  We would ask the Court to allow its introduction just

2    as a demonstrative aid to assist the witness in his

3    testimony.

4           THE COURT:  All right.  The Court will overrule

5    the objection and allow the witness to utilize the

6    photographs as a demonstrative aid.

7    BY MR. DEROVANESIAN

8    Q.    Mr. Lawson, again, going to Immediate Family by Sally

9    Mann, this photograph, if I may display it now, this one --

10   this book does not have page numbers.  They have names in

11   lieu of page numbers.  This one is entitled Winter Squash

12   1988.  If you could, take a look at what's depicted here.

13   How would you characterize this picture and how would you

14   analyze this one?

15   A.    Well, similar to the other pictures we just looked

16   at, we have a pre-pubescent girl who's nude.  Her genital

17   region is not exposed because her arm is in the way.  The

18   pose is -- she's certainly posed, but I would not

19   necessarily think that that was a particular provocative

20   pose.  It's just that she is posed in the picture, and she's

21   nude.

22   Q.    In your opinion, does this picture depict child

23   pornography?

24   A.    No.

25   Q.    For clarification, have any of the other pictures

LAWSON - DIRECT

```
 1    I've shown you out of the Jock Sturges book, in your
 2    opinion?
 3    A.      No.
 4    Q.      Now, this picture is a little different.  She's
 5    standing eyes open and she's facing the camera; is that
 6    correct?  This is called Virginia at Four, 1989.  Could you
 7    describe that picture, please?
 8    A.      She's, again, a pre-pubescent little girl.  She's
 9    entirely nude in this picture.  You can see her pubic
10    region.  It would appear to be a posed picture, although the
11    pose is not -- I wouldn't describe it as a provocative pose
12    but she's certainly posed.  The focus of the picture, to me,
13    is her -- is her face.  Her eyes are the first thing that my
14    eyes are drawn to.  And in the training that I received
15    from -- initially, the training I received from Customs back
16    in, gosh, 1989, I think was when we went to that academy, we
17    had classes on how to identify child pornography, and
18    obviously this is an issue when you have a picture of a
19    child, is it pornographic or not, and the instructor who
20    taught -- I don't remember his name.  He was somebody in
21    Customs that had worked child pornography crimes for many,
22    many years, and he -- his -- what he taught, which is what I
23    still use in terms of what is the focal point of the image
24    is what is your eye initially drawn to when you see the
25    image?  Is it drawn immediately to the genital region?  Then
```

LAWSON - DIRECT

1    maybe that's more of an indication that that's what the

2    focus of the -- of the picture is.

3              And in this case, I think this is a prime example

4    of looking at an image of a naked little girl and the first

5    thing that my eye was drawn to are her eyes.  And then as --

6    then your eye moves around the picture and you take in the

7    other.  You see the little girl in the back and I see that

8    she's naked, but my initial -- the initial draw of my eye is

9    her eyes.

10   Q.     Now, there's a difference between the type of picture

11   depicted in this book that I'm using as a demonstrative aid

12   versus the video that Mr. Johnson took; is that correct?

13   A.     Correct.

14   Q.     Because here, presumably, the photographer is looking

15   through the lens and he knows what he's capturing; correct?

16   A.     Correct.

17   Q.     And the images that Mr. Johnson took, it's whatever

18   the cell phone camera records when it's set up; is that a

19   fair statement?

20   A.     Correct.

21   Q.     Now, you looked through this book previously; is that

22   correct?

23   A.     Yes.

24   Q.     Let me go to another image that was previously

25   discussed.  This one appropriately is entitled Wet Bed 1987?

LAWSON - DIRECT

1   A.      Yes.

2   Q.      Okay.  Could you analyze this case for us and tell us

3   what your opinion is regarding this and what factors would

4   apply?

5   A.      You showed me this image in -- in this book in your

6   office, and as we discussed, there are elements of it that

7   are -- that have some Dost factors that might apply.  She's

8   obviously a pre-pubescent girl.  She's obviously naked.

9   Her -- the display of her genitals is more profound because

10  her legs are apart.  What I explained to you and what I

11  think about this picture is that, again, when you first

12  showed me this picture, my eye was not drawn to her genital

13  region.  My eye was initially drawn to sort of the mess on

14  the bed to the right, the pillow and the overall picture.  I

15  eventually -- my eye did eventually notice that she was

16  naked and that I could see her genitalia, but that wasn't

17  what I initially observed when I looked at this picture.

18  Q.      In your opinion, is what's depicted here, is this

19  child pornography?

20  A.      I don't think so.  It certainly has more elements of

21  the Dost factors than the others that we've looked at coming

22  up to this picture, but I don't think so.

23  Q.      How would this compare to any of the material that

24  Mr. Johnson recorded with his phone camera?

25  A.      Well, if we're going to use the word graphic, I'd say

LAWSON - DIRECT

1    this one certainly is more graphic.  There's certainly more

2    visible to the viewer of this picture than what's visible in

3    the videos.

4    Q.     Finally, let me show you a photograph that is -- this

5    one is captioned Hay Hook, H-A-Y-H-O-O-K, 1989, and ask you

6    to take a look at this one.

7    A.     Yes.

8    Q.     Could you tell us what your analysis is of this

9    photograph?

10   A.     It's -- I'm not sure the -- I'm not sure the age of

11   the child because the -- and assuming that it is an

12   underaged person because of the slight build, I can't

13   determine an age in terms of pubescent or pre-pubescent.

14   She's obviously hanging from something.  Looks like she --

15   it doesn't appear that she's hanging involuntarily.  It

16   looks like she's holding onto something and hanging by her

17   hands, stretched out.  The -- the image, again though, is --

18   I think if we were to crop just the image of her and we had

19   nothing else surrounding the picture, the other people

20   looking in other directions and the sunlight and things like

21   that, I think it would be -- it would probably be a pretty

22   close call in terms of being child pornography, if all we

23   were looking at was a cropped image of that.  Although even

24   then, I'm not sure that the display of her -- of her pubic

25   region is necessarily graphic.  It's more, I think, what

LAWSON - DIRECT

1    catches your eye with this is the fact that she's apparently

2    hanging from something.

3    Q.    All right.  Now, the circumstance -- now, let me back

4    up.  She's obviously nude?

5    A.    Correct.

6    Q.    And could you describe what is exposed -- excuse me,

7    what is exposed of her?

8    A.    I don't know if I am not seeing it quite as well as

9    you are in the -- in the book, itself, because she's -- it's

10   pretty white.  She appears to be nude.  So if she's nude

11   then her breasts would be exposed and her genital region

12   would be exposed.

13   Q.    Now, in reviewing this picture called Hay Hook,

14   clearly she is not engaged in any type of sexual conduct; is

15   that correct?

16   A.    No.

17   Q.    Bestiality, masturbation, or any of that, doesn't

18   seem to apply?

19   A.    Correct.

20   Q.    Sadistic or masochistic abuse?

21   A.    I don't think so.  If -- if there were other elements

22   surrounding her hanging, such as somebody -- such as a male

23   standing there looking at her or with some sort of apparatus

24   in his hands, like a whip or something, then I would say

25   yes.  But just as it is, it's close, but no.

LAWSON - DIRECT

1   Q.     Okay.  And regarding lascivious exhibition of the

2   genitals or pubic area, let me go through those factors with

3   you, if I might.  The overall content of this picture, Hay

4   Hook 1989, what comments would you have regarding that?

5   A.     The focus in this image isn't -- the focus is not her

6   genital region.  The -- the setting is -- is an interesting

7   setting.  It's not -- I wouldn't say it's necessarily

8   inappropriate because it's -- it's not -- when we think of

9   an inappropriate setting, traditionally we're trying to

10  evaluate a lascivious exhibition, you'd think of things

11  like -- like the bedroom.  That's the common theme with web

12  sites that deal with sort of lascivious exhibition type

13  child pornography.  LS Models is one that we see over and

14  over and over in cases.  And when the young girls would

15  pose, it may not be posed necessarily Hustler style but they

16  will be posed, for instance, in negliges and in a bed that's

17  unkempt so it gives a suggestion that there's some sort of

18  sexual interaction that's been going on either before or

19  after the picture.  That's not present here.

20  Q.     Is there anything about that picture that you would

21  consider to be sexually inviting or suggestive?

22  A.     Not to me.

23  Q.     Or the pose?

24  A.     Not to me.

25  Q.     Now, as far as the factor whether or not that is an

1    unnatural pose or inappropriate attire, could you address

2    that, please?

3    A.     It's a hard one because obviously the pose is

4    unnatural.  I don't know if it's unnatural in a sexual way.

5    It's unnatural in an artistic way.  I can imagine that I've

6    seen many photos similar to this that were -- where someone

7    is hanging and the picture is provided in a sexual way, but

8    typically, the woman's legs are somehow splayed apart or

9    there's some other aspect of it than somebody just hanging

10   by their hands with their legs -- oops pardon me, with their

11   legs straight down.

12   Q.     Is there anything about this picture, Hay Hook 1989,

13   that suggests sexual coyness or apparent willingness to

14   engage in sexual activity?

15   A.     That I don't see, no.

16   Q.     All right.  Can you tell whether that photograph is

17   designed to elicit a sexual response in the viewer?

18   A.     Well, I don't know what the intent of the person that

19   took the picture is.  It's Sally Mann; I doubt it.  But I

20   would have no idea what her intent was when she took the

21   picture.

22   Q.     Now, we go back to the video, and if I may, Your

23   Honor, let me go back to the video and Mr. Johnson's case.

24   How would you -- obviously, it's a shower scene; is that

25   correct?

LAWSON - DIRECT

1   A.      Correct.

2   Q.      And she goes in, disrobes, and takes a shower and

3   comes out; is that correct?

4   A.      Correct.

5   Q.      And at one point, she looks like she goes for a cell

6   phone and then goes back; is that correct?

7   A.      Correct.

8   Q.      Now, do you know approximately how many seconds she

9   appears in all of that footage unclothed?

10          THE COURT:  I'm sorry, I'm sorry, in which?  In

11  the first one or the second one or the combined footage?

12          MR. DEROVANESIAN:  Thank you, Your Honor.

13  BY MR. DEROVANESIAN

14  Q.      Did you time how long she appeared unclothed in

15  either of those videos?

16  A.      I did when I initially reviewed the videos, but I

17  don't recall.  It's a matter of a few seconds altogether.

18  Q.      All right.  I would ask you to consider the images

19  that are on that video and when she appears unclothed, okay?

20  At any point did you see any -- any image that shows sexual

21  intercourse of any type?

22  A.      No.

23  Q.      Bestiality?

24  A.      Obviously not.

25  Q.      Masturbation?

LAWSON - DIRECT

1   A.      No.

2   Q.      Sadistic or masochistic abuse?

3   A.      No.

4   Q.      And as far as lascivious exhibition of the genitals

5   or pubic area, let me go through those specifically with

6   you.  The overall content of that material, was there

7   anything about it that suggested to you that it was a

8   lascivious exhibition of the genitals or pubic area?

9   A.      No.

10  Q.      From the images, did it look like the young lady even

11  knew that these pictures were being taken?

12  A.      It appeared that she did not know.

13  Q.      It didn't look like she was posing or anything along

14  those lines?

15  A.      No.

16  Q.      Was there a focal point in the video?  Was anything

17  zoomed in on or anything along those lines?

18  A.      No.

19  Q.      Anything about the setting of the video in

20  Mr. Johnson's case that's sexually inviting or suggestive?

21  A.      No.  I think the bathroom or the shower is typically

22  where people take their clothes off to take a shower.

23  Q.      So that was the next one I was going to get to was

24  unnatural pose.  She's obviously nude; correct?

25  A.      Correct.

LAWSON - DIRECT

1  Q.    In your opinion, is that anything that's unusual for

2  someone taking a shower?

3  A.    No.

4  Q.    Is there anything about the video that Mr. Johnson

5  took that, in your opinion, looks like it was designed to

6  elicit a sexual response in the viewer?

7  A.    Well, I don't know what Mr. Johnson's intent was.

8  Q.    Not as to him, but as to the viewer in general; not

9  subjective but objectively?

10  A.    No.

11        MR. DEROVANESIAN:  Now your Honor, I have one more

12  exhibit I would like to play, with the Court's approval.  It

13  is Defense Exhibit B.  It's a brief excerpt from the movie

14  Blue Lagoon, and again, I would offer it for -- as a

15  demonstrative aid only.

16        THE COURT:  Does it depict photos similar to those

17  that have just been shown in the past two demonstrative

18  exhibits?

19        MR. DEROVANESIAN:  I could tell the Court exactly

20  what we would like to present --

21        THE COURT:  In other words, I'm trying to see if

22  it's anything different.  If it's something different

23  perhaps the Court will view it.  If it's just more of the

24  same, I really don't need to view that.  I mean, again, this

25  is a bench trial not a jury trial.

LAWSON - DIRECT

1    MR. DEROVANESIAN:  Your Honor, what it is is it is

2  two children, they look to be under the age of ten years.

3  That's the estimate from the expert.  They're swimming nude

4  and they're doing summersaults in front of a camera, both

5  male and both female, and they are completely nude, and it's

6  part of this movie and it's filmed, and you can see all of

7  the young man's genitalia and you can see the female's pubic

8  area as -- I mean, they're both completely nude in front of

9  the camera and they look to be under the age of ten years.

10    THE COURT:  Is there any objection from the

11  Government?

12    MS. VIACAVA:  Again, Your Honor, the Government

13  would argue or object that this is not relevant.  What was

14  produced in evidence here today was not a Hollywood movie.

15  There's no plot line.  There's no story line.  There were no

16  lines for the actors.  The -- the Government would just

17  object as to relevance.

18    THE COURT:  Response to the Government's

19  objection?

20    MR. DEROVANESIAN:  I think that might go to

21  obscenity but as far as child pornography, I don't think

22  Hollywood is permitted to produce child pornography.  And

23  it's a demonstrative aid, and our position is it will assist

24  the witness in his presentation of his testimony here today

25  and we'd ask the Court to consider it.

LAWSON - DIRECT

1          THE COURT:  All right.  I'll overrule the

2   objection and allow you to present the final demonstrative

3   aid to this witness.

4          MR. DEROVANESIAN:  Yes, Your Honor.  This would be

5   Defense Exhibit B, excerpts from the movie Blue Lagoon.

6   Might my investigator Mr. Vasile assist in the presentation?

7          THE COURT:  Yes, he may.

8          (Pause in place)

9          (Video clip displayed, then stopped)

10          MR. DEROVANESIAN:  Your Honor, that's all I need

11   of the video.

12          THE COURT:  Okay.

13   BY MR. DEROVANESIAN

14   Q.    Mr. Lawson, we have just played a segment from the

15   movie Blue Lagoon and on a VLC media player, it is at 28

16   minutes 25 seconds, approximately, the portion that we have

17   just seen.  Could you characterize what you just saw, as far

18   as the video of the Blue Lagoon?

19   A.    Well, so much of the pictures that we looked at in

20   the books, they are pre-pubescent children swimming in the

21   ocean.  Both of them appear to have been directed to do a

22   summersault, which you could clearly see both of their pubic

23   regions and genitalia was clearly visible.  The little boy,

24   couple other scenes looked like he was swimming with a

25   turtle but nothing -- you could definitely see his genitalia

LAWSON - DIRECT

1   in the picture as well.

2   Q.      And the young lady as well?

3   A.      Correct.

4   Q.      And they were doing a summersault in front of a

5   camera; is that correct?

6   A.      That's correct.

7   Q.      How would you analyze this footage from the movie

8   Blue Lagoon as far as Dost factors as far as whether or not

9   this is child pornography?

10  A.      Well, I don't think that the focus was -- was the --

11  was the genitalia of either of the children.  It just

12  happened to be part of the picture as you watch it.

13  Q.      Let me back up a moment.  The first section,

14  obviously there's no sex or any of those.  So if there's --

15  A.      No.

16  Q.      So if there's a violation, it would be as to

17  lascivious exhibition; is that correct?

18  A.      Correct.

19  Q.      I'm sorry, go ahead, sir.

20  A.      The focus of the -- of the image was not -- did not

21  appear to be the genitalia.  That appeared to be a secondary

22  issue -- or not issue, but secondary thing that occurs as

23  you watch the video.  The setting is not -- at least I would

24  not necessarily think that that was an inappropriate or a

25  suggestive setting to be swimming in the ocean.  There was

LAWSON - DIRECT

1   nothing to suggest, at least in this particular interaction,
2   this part of the movie, there's nothing to suggest sexual
3   coyness on the part of either participant in the movie.
4   Q.     Now, would you consider these material from Blue
5   Lagoon to be child pornography?
6   A.     No.
7   Q.     Anything unusual or unnatural about the posing?
8   A.     No.
9   Q.     Now, how would you compare this to the video of the
10  young lady taking the shower in Mr. Johnson's case?
11  A.     Well again, the video in Mr. Johnson's case is not --
12  the focus is not on -- on the genitalia.  The focus, if
13  there is one, is the bathroom, itself, and her, and her
14  entirety.  And the focus is not on the genitalia.  The
15  setting is certainly appropriate; the attire is appropriate.
16  The fact that she's nude is definitely a factor in the Dost
17  factors, number four.  There's certainly no sexual coyness
18  in undressing to take a shower and toweling off afterward.
19  And as we've said, I'm not going to speculate on what the
20  intent of Mr. Johnson was in taking the picture.
21  Q.     The fact that the Blue Lagoon footage you have two
22  nude children doing a summersault in front of the camera
23  exposing themselves completely, does that cause any concern
24  as far as your analysis of the video?
25  A.     Well, concern would imply that I thought it was

LAWSON - DIRECT

1    getting closer to the line of child pornography.  What I

2    would do is distinguish it very differently from the images

3    that we looked at from Mr. Johnson's camera phone because in

4    that movie, clearly those children were directed to do that.

5    Somebody told them, "When you're under water, do a

6    summersault," knowing that that was going to be part of the

7    film and that doesn't occur in our videos that we viewed

8    from Mr. Johnson.

9    Q.    Now, I'm going to refer to the typical child

10   pornography case that you're hired to -- to examine.  What

11   is normally depicted?  What do you normally see, as far as

12   those individuals in the pictures?

13   A.    I don't know if there is a normal.  They are all over

14   the board.  I just came back from working one in Portland

15   that was just -- it's probably one of the most extreme

16   incidences of child abuse I've ever seen and --

17   Q.    Do you normally see sexual intercourse, for instance?

18   A.    I'd say typically, that's for people who collect

19   child pornography, that is typically what -- what they want

20   to see is actual sexual interaction with children.  That's

21   not the case all the time.  Some people prefer to collect

22   the lascivious exhibitions.  But generally speaking, I --

23   I'd say in most cases, probably at least 75 percent of the

24   time there are going to be images and videos involving

25   sexual interaction of some kind.

LAWSON - DIRECT

1   Q.    All right.  You indicated earlier that the focus of

2   the camera is also something that's taken into

3   consideration; is that correct?

4   A.    Correct.

5   Q.    What types of focus have you seen or ability to

6   manipulate the image?  What is typical in your analysis and

7   what types of concerns do you have regarding that?

8   A.    The focus is typically going to be the genitalia or

9   the sexual act of the genitalia interacting with male

10  penises or something like that.  The focus is definitely

11  that.  It's the sexual interaction and the sexual

12  interaction of the genitalia, either male's genitalia

13  somehow involving the child or vice-versa.

14  Q.    All right.  And the typical image you see is -- would

15  it be the image or picture would be centered on that; is

16  that a fair statement?

17  A.    Yes.

18  Q.    Now finally, regarding the images that Mr. Johnson

19  took, except for nudity, in your opinion, do any of those

20  images even come close to meeting the factors that you

21  consider child pornography?

22  A.    No, I don't think so.

23  Q.    This is based on all your experience?

24  A.    Yes.

25        MR. DEROVANESIAN:  Nothing further at this time.

LAWSON - CROSS

1           THE COURT:  All right.  We're going to take a

2    short ten minute break and we'll come back with cross

3    examination.

4           COURT SECURITY OFFICER:  All rise.

5           (Recess from 4:05 p.m. to 4:21 p.m.)

6           THE COURT:  Ms. Viacava, you may proceed with your

7    cross examination.

8           MS. VIACAVA:  Thank you.  Good afternoon,

9    Mr. Lawson.

10           THE WITNESS:  Hello.

11                    CROSS EXAMINATION

12   BY MS. VIACAVA:

13   Q.    If at any time while I'm asking you questions you

14   have any difficulty hearing me, please let me know and I'll

15   make sure to speak up.  Now, you had an opportunity to

16   review the videos in this particular case; correct?

17   A.     Correct.

18   Q.     And looking at the two videos, would you agree that

19   they appear to be a collection that the defendant possessed?

20           MR. DEROVANESIAN:  Objection to the word

21   "collection".

22           THE COURT:  Response?

23           MS. VIACAVA:  Your Honor, this witness has already

24   been qualified as an expert.  He's talked about looking at

25   collections of child pornography.  I'm simply asking him a

LAWSON - CROSS

1    question as to whether or not he classified what the

2    defendant possessed as being a collection of videos.

3            THE COURT:  You may answer the question,

4    Mr. Lawson.  The objection's overruled.

5    A.    It's a good question, and I'm not being evasive.  I

6    don't know if I would categorize two movies as a collection.

7    I typically would think of a collection being five or more.

8    BY MS. VIACAVA

9    Q.    So in this particular case, with the stipulated facts

10   that on February 25th, 2010, a video was running and another

11   video was cleated, which would make four videos of the same

12   person, would you classify four videos as being a

13   collection?

14   A.    Well, I don't know what the other videos of are of,

15   so not necessarily, not without knowing more what was --

16   what were those videos of.  If they were just a girl

17   brushing her hair, then no.

18   Q.    Would you agree that the two videos that you saw were

19   of the same minor?

20   A.    Yes.

21   Q.    Would you agree that the two videos you saw appeared

22   to depict the same bathroom?

23   A.    Yes.

24   Q.    Now, you've indicated that you've been involved in

25   numerous child exploitation or child pornography

LAWSON - CROSS

1    investigations; correct?

2    A.      Correct.

3    Q.      And would you agree that based on what you have seen

4    that people, individuals hold onto -- when it comes to child

5    pornography, people tend to keep a collection?

6    A.      I would agree with that, yes, ma'am.

7    Q.      And would you agree that individuals who collect

8    child pornography tend to want to keep the materials close

9    to them?  They may keep it on the home computer, they might

10   keep it on a thumb drive, they might keep it in various

11   formats in order to keep it where they want to have access

12   to it?

13   A.      I would agree with you.  Generally speaking, ma'am, I

14   would.  The proliferation of online storage facilities and

15   the knowledge that people have now of being able to still

16   have ready access but not have it in close physical

17   proximity has kind of changed that game, but in essence, I

18   would agree with you.

19   Q.      And would you agree that individuals are able to now

20   collect child pornography on cellular phones?

21   A.      Yes, yes.

22   Q.      And that cellular phones are portable?

23   A.      Yes, ma'am.

24   Q.      And it's a -- it's an object that an individual can

25   keep with them, travel with it or keep it close to them?

LAWSON - CROSS

1   A.      Correct.

2   Q.      And would you agree that in the two videos that you

3   saw in this particular case that depicted the same minor,

4   that in both of those videos you were able to see the pubic

5   area of that minor?

6   A.      Yes, ma'am.

7   Q.      Would you agree as well that in making a video, that

8   a video is comprised of multiple or numerous images packed

9   together in order to make that video?

10  A.      Yes, ma'am.  Individual frames, is that what you're

11  asking?

12  Q.      Yes.

13  A.      Yes, ma'am.

14  Q.      So although I believe you testified that what you saw

15  were several seconds of the minor between the two videos

16  where she could be seen completely nude, those several

17  seconds, would you agree, were made up of multiple frames?

18  A.      Yes, ma'am, I would.

19  Q.      And would you agree that in those two videos, that

20  you were able to see the same man setting up the video?

21  A.      Yes, ma'am, I would.

22  Q.      Would you agree that the video is not of the ground

23  but it's of higher up, focused in the bathroom, focused in

24  the area from the shower and the shower stall?

25  A.      Yes, ma'am, I would agree with that.

LAWSON - CROSS

1   Q.      And would you agree that when the minor is visible in
2   the images, that from approximately the minor's knees, up,
3   are visible?
4   A.      To the top of her head and above, yes.  Yes, I would
5   agree with you.
6   Q.      And would you agree that there are several minutes
7   that are depicted in both of those videos in which the man
8   is seen, and here it's been stipulated is the defendant, is
9   seen setting up that video camera?
10  A.      Yes, ma'am, I would agree with you.
11  Q.      That cell phone with the video capability?
12  A.      Yes, ma'am.
13  Q.      And were you able to see that the lens is covered and
14  uncovered and the camera is positioned and re-adjusted?
15  A.      Yes, ma'am.
16  Q.      You agree with that?
17  A.      Yes, ma'am.
18  Q.      Would you agree as well as in several of the frames
19  while this cell phone is being set up that the defendant can
20  be seen stepping back and looking at the camera?
21  A.      Yes, ma'am.
22  Q.      And the defendant appears to be stepping back in
23  the -- what appears to be the focal point of the picture,
24  the area right in front of the shower and the shower
25  entrance to the shower?

LAWSON - CROSS

1    A.      Yes, ma'am.

2    Q.      Would you agree that after the defendant steps back

3    and looks towards the cellular phone that the defendant is

4    then seen approaching and readjusting further?

5    A.      I believe in one of the videos.  I don't recall if

6    it's in both.  I remember seeing that in at least one.

7    Q.      And would you agree that in the videos, aside from

8    the defendant setting up the video, the only other person

9    captured in the videos is the minor?

10   A.      Yes, ma'am.

11   Q.      And would you agree that what is seen on the video is

12   after -- both videos is after the minor completes her shower

13   and exits, within a couple of minutes, the defendant

14   reenters and shuts off the video camera?

15   A.      Yes, ma'am.

16   Q.      Or the cell phone with the video capability?

17   A.      Yes, ma'am.

18   Q.      So would you agree that the individual that's being

19   focused on in both of those videos would be the minor?

20          MR. DEROVANESIAN:  Your Honor, I'm going to object

21   to the term "focused".  It's misleading.

22          THE COURT:  Response?

23          MS. VIACAVA:  Your Honor, this is cross

24   examination.  The Government is simply asking the witness a

25   question and I'm asking whether or not the individual that

116

LAWSON - CROSS

1    is -- appears to be the subject of the video is the minor.

2            THE COURT:  I think it's an appropriate question.

3    The objection is as to the form of the question.  Why don't

4    you rephrase the question.

5            MS. VIACAVA:  Yes, Your Honor.

6    BY MS. VIACAVA

7    Q.    Would you agree that looking at those two videos,

8    that the person that that video appears to be designed to

9    capture is, in fact, the minor?

10   A.    Yes, ma'am.

11   Q.    And would you agree that the two videos are taken on

12   separate days?

13   A.    Yes, ma'am.

14   Q.    So at least from what you saw, on two occasions, the

15   defendant set up a video camera to record that same minor as

16   she would be nude in the bathroom; would you agree?

17   A.    Yes, ma'am.

18   Q.    Now, looking at the contents of the two videos in

19   this particular case, would you agree that the contents of

20   the videos do not appear to be for a clinical purpose?

21   A.    I would agree with you.

22   Q.    Would you agree that the contents of those two videos

23   do not appear to be related to a momentous family moment

24   that one wants to be captured?

25   A.    I would agree with you.

LAWSON - CROSS

1   Q.      Does it appear that when the minor enters into the
2   bathroom that she closes the door?
3   A.      Yes, ma'am.
4   Q.      Would that seem to indicate that the minor was
5   seeking privacy?
6   A.      Yes, ma'am.
7   Q.      Is there anything on the videos that seem to indicate
8   that this minor knew or had any clue that she was being
9   videotaped?
10  A.      Not at all.
11  Q.      Is she seen posing for the cellular phone?
12  A.      No, ma'am.
13  Q.      Now, you've used many photographs today as being
14  demonstrative in comparison -- comparing what was seen on
15  this particular cell phone and what can be found in other
16  books?
17  A.      Yes, ma'am.
18  Q.      Correct?  And in those images that you've utilized
19  here today, the images from Sturges as well as the images
20  from Sally Mann, I believe it was, would it be fair to say
21  that the minors that are depicted in those images appear to
22  be looking into the camera, appear to be aware that they're
23  being photographed?
24  A.      Yes, ma'am.  I'm sure that they're aware they're
25  being photographed.  Not all of them are looking directly

```
 1    into the camera, but yes, I would assume that all of those

 2    photos are posed by the photographer.

 3    Q.     And in fact, one of them, Sally Mann, doesn't she

 4    indicate that these are all works that she collected of her

 5    family?  This is her collection of them growing up,

 6    essentially?

 7    A.     I believe so, yes, ma'am.

 8    Q.     And you also utilized a clip from the Blue Lagoon.

 9    Would you agree that that is a movie produced by Hollywood?

10    A.     Yes, ma'am.

11    Q.     Would you agree that that is a movie that offered a

12    story line, so to speak?

13    A.     Yes, ma'am.

14    Q.     In the two videos that you saw in this particular

15    case that Mr. Johnson possessed in this case, did you see

16    any evidence of a story line?

17    A.     No, no, ma'am.

18    Q.     Did there appear to be any indication that the --

19                MR. DEROVANESIAN:  Objection to relevance.

20                THE COURT:  Response?

21                MS. VIACAVA:  Your Honor, defense counsel was

22    allowed to use those movie clips as being -- as being a

23    demonstration to the Court as to why the images in the

24    videos in this particular case are not considered to be

25    child pornography.  The Government is simply eliciting from
```

1    the same witness some of the factors of what he saw, what he

2    considered, and is cross examining some of the opinions he

3    provided.

4              THE COURT:  The objection's overruled.

5              MR. DEROVANESIAN:  Your Honor, may I respond?

6              THE COURT:  No.

7              MR. DEROVANESIAN:  Thank you.

8              THE WITNESS:  Can you repeat the question, ma'am?

9              MS. VIACAVA:  If I can recall the question at this

10   stage.

11   BY MS. VIACAVA

12   Q.     My recollection is I asked you if it appeared that

13   the two videos you saw in this particular case, if there

14   appeared to be any story line?

15   A.     No, there -- there did not, in Mr. Johnson's videos.

16   Q.     Now, you've indicated that you have, in your

17   experience, been able to look at collections of child

18   pornography that individuals kept; is that correct?

19   A.     Yes, ma'am.

20   Q.     And I believe you made a statement that to the effect

21   of every collector appears to be a little different, they're

22   not all the same; correct?  Would you agree with that?

23   A.      If I stated it in that way, that's probably a little

24   misleading because I think generally speaking, a lot of --

25   we see a lot of the same case types over and over.  It can

LAWSON - CROSS

1    vary in terms of the type of collection that people have.

2    Some people prefer to collect very hard core child

3    pornography and people not such hard core child pornography.

4    So I don't -- there isn't like a standard cross the board

5    type of case.  They are -- they are different, but they do

6    generally fall into certain categories, if you will, if that

7    makes sense.  You'd have to be me and have looked at all

8    these cases to --

9    Q.    Would you agree that what you tend to see is

10   collectors will have a theme, so to speak?  If they want

11   images of boys, they'll collect images of boys.  If they

12   want images of girls, they'll collect images of girls.

13   Would you agree?

14   A.    That I would agree with, yes.

15   Q.    Would you agree that individuals who collect child

16   pornography also tend to -- the child pornography ranges

17   from sexually explicit conduct in terms of actually seeing

18   sexual intercourse, to lascivious display of genitalia?

19   A.    Would I say that that's the case all the time?  No.

20   Because we do -- I do have cases, and I made reference to

21   one that's just stuck in my mind because it's particularly

22   horrific and all the person collects is hard core toddler

23   and baby child pornography.  It's horrendous, and that's all

24   he collects.  Generally speaking, they'll stick with one

25   particular sex, usually like one particular age group, but

1    not necessarily will they only collect one or the other.

2    It's -- there's sometimes a spectrum of both.

3              The lascivious type exhibitions which may cross

4    the line and there may be a collection of non-lascivious

5    modeling type pictures as well, going all the way up to hard

6    core child pornography, and there isn't -- you can't just

7    say they all do one particular thing.

8    Q.    Would you agree that some individuals collect images

9    of a particular minor, they might collect all of one group

10   that they can get their hands on, the images?

11   A.    Like you're talking about the series.

12   Q.    Yes.

13   A.    Yes, ma'am, I would agree with that.  You don't see

14   that, again, every time because it's -- I think it's getting

15   a little harder and more dangerous to collect just randomly

16   as you would like to, if you will, on the internet.  But I

17   do see cases where people collect, like for instance, the

18   Ashley series, and they will look for all the pictures in

19   that particular series.  I would agree with you there.

20   Q.    So some people tend to have the sexual interest in a

21   particular minor and try to collect those images; would you

22   agree?

23   A.    I'd say some people.  Not necessarily all of them,

24   obviously, but some do.

25   Q.    So in this particular case, looking at both videos,

LAWSON - CROSS

1   the defendant stuck with the same minor; correct?

2   A.      Yes, ma'am.

3   Q.      And these were not images that were downloaded from

4   the internet.   These were images that, on a video the

5   defendant himself was captured setting up the camera;

6   correct?

7   A.      Yes, ma'am.

8   Q.      And would you agree that in your experience, some

9   individuals go to the internet, other people look to minors

10  they have access to or close to?

11  A.      Let me think about it for a minute.   Is your

12  question, generally speaking, do they do one or the other?

13  Q.      In your experience, have there been individuals that

14  have downloaded images from the internet to create their

15  collections?

16  A.      Yes, ma'am.

17  Q.      In your experience, have there been other individuals

18  that knew the minor and collected images of that particular

19  minor?

20  A.      Yes, ma'am.

21  Q.      So in this particular instance, due to the fact that

22  on the two videos you can see the defendant setting it up

23  and he leaves and the minor comes in, would you agree that

24  he appears to know this minor?

25  A.      Yes, ma'am, he obviously does.

LAWSON - CROSS

1   Q.      Now, defense counsel asked you about the Dost factors
2   and you went through them.   Would you agree that -- I
3   believe you testified that you agree that the minor was nude
4   in these particular videos, correct?
5   A.      Yes, ma'am.
6   Q.      So that factor you would agree would be met by Dost
7   as to whether the minor is partially clothed or -- clothed
8   or nude; correct?
9   A.      Yes, ma'am.
10  Q.      That's one factor you agree with; correct?
11  A.      Yes, ma'am.
12  Q.      And the other factor, the overall content of the
13  material.   Looking at the overall content of the material,
14  when the minor comes into the bathroom area, from looking at
15  it and looking at the scene of it being the bathroom, would
16  you agree that the content of the material would be to have
17  a minor nude going into the shower?
18  A.      I would assume that that was the intent.
19  Q.      And would you agree that, looking at those two
20  videos, when you did see the minor outside of the shower
21  before she either went in or when she's coming out or on one
22  of the videos when she steps out to check her phone and goes
23  back in, would you agree that you're able to see the pubic
24  area?
25  A.      Yes, ma'am.

LAWSON - CROSS

1   Q.     Would you agree that the -- her pubic area at that

2   point that is being displayed is part of the -- the actual

3   videos, it's not to the side, it's not an accidental

4   glancing, is -- she is clearly seen; correct?

5            MR. DEROVANESIAN:  Objection, calls for

6   speculation.

7            THE COURT:  Response?

8            MS. VIACAVA:  Your Honor, I'm asking for his

9   opinion, what he saw, what he observed.  He already

10  testified he reviewed the contents he's given his opinion on

11  direct examination that he didn't think it was child

12  pornography.  I'm just simply eliciting what he saw and then

13  seeking to ask him questions about his opinion.

14           THE COURT:  The objection is sustained as to

15  speculation.  It's also very confusing and broad.  You may

16  restate the question.  It's an appropriate area of inquiry

17  but the question included several different options.  You

18  need to ask the question and let him answer.

19           MS. VIACAVA:  Yes, Your Honor.

20  BY MS. VIACAVA

21  Q.     When you reviewed the video, did you see the pubic

22  area of the minor?

23  A.     Yes, ma'am.

24  Q.     On both videos?

25  A.     Yes, ma'am.

LAWSON - CROSS

```
 1   Q.     When you looked at those particular frames that
 2   showed the pubic area of the minor, was that in the center
 3   of the image?
 4   A.     I don't recall it being in the center.  I'd say it
 5   was lower.  My recollection was, without -- we could play it
 6   again, but my recollection was the center would be more --
 7   was higher, more like -- if we were to talk about the center
 8   of the video, itself, as we watched it, the center seemed to
 9   be higher, more around her chest area, and her pubic region
10   is lower in the frame.
11   Q.     Would you agree that the frames seemed to encompass
12   mostly from her knees up?
13   A.     Yes, ma'am, yes.
14   Q.     So when you saw the frames that contained a depiction
15   of her pubic area that it was not at the very bottom of the
16   frame?
17   A.     Yes, I would agree.  The frame goes from roughly her
18   knees, just slightly below her knees actually, to the
19   ceiling.  You can see the ceiling.  So when I say it's not
20   in the center, she's not even in the center.  Her center of
21   mass is not even in the center of the video, I guess is what
22   I'm saying.
23   Q.     Now, defense counsel asked you one of the other Dost
24   factors whether the picture appears to be designed to elicit
25   a sexual response in the viewer.
```

LAWSON - CROSS

1    A.      Yes, ma'am.

2    Q.      You indicated you were unable to answer that; is that

3    correct?

4    A.      If the question is what was he thinking at the time,

5    what was his -- his subjective intent, I don't know.  It

6    would be speculating.

7    Q.      Now specifically, what I'm asking you is does the

8    depiction appear to be designed, meaning the video, itself,

9    the video that was taken and kept, designed to elicit a

10   sexual response in the viewer?

11            MR. DEROVANESIAN:  Your Honor, I'm going to

12   object.  She's asking objectively instead of subjectively.

13            THE COURT:  I think that's what you were

14   explaining, is that you're asking it objectively; is that

15   right?

16            MS. VIACAVA:  Yes, Your Honor.

17            THE COURT:  All right, objectively.

18            MR. DEROVANESIAN:  As the average person would

19   view this?

20            THE COURT:  Right.  Not necessarily with regard to

21   what the intent of Mr. Johnson was but objectively as a

22   viewer.

23            MR. DEROVANESIAN:  Thank you, Judge.

24            THE WITNESS:  Can you ask it again?  I'm sorry, I

25   want to make sure I get the question right.

LAWSON - CROSS

1    BY MS. VIACAVA

2    Q.      Whether the depiction, which here would be the

3    videos, appears to be designed to elicit a sexual response

4    in the viewer?

5    A.      Objectively speaking, would taking a -- an image or a

6    videotape of someone naked in the -- getting in and out of

7    the bath -- I don't know if I can answer that.  I really

8    don't.  It certainly could be.  I will grant you that it

9    could be, but it also could not be.  I don't think I can

10   answer it.

11   Q.      So you're saying it's possible?

12   A.      Yes.  Yes, ma'am, I would say it's certainly

13   possible.

14   Q.      Okay.  So in forming your opinion as to whether or

15   not -- the opinion you gave to the defense on your direct

16   examination whether or not these videos depict child

17   pornography in your opinion, you gave that opinion without

18   considering one of the Dost factors, which is whether the

19   depiction appears to be designed to elicit a sexual response

20   in the viewer; is that correct?

21   A.      No, I don't -- I don't think so.  It's a question of

22   whether we're talking about his subjective intent, which I

23   said I would be speculating.  I have no idea what was in his

24   mind.  And objectively, I'm saying that I -- I would grant

25   you that it is a possibility.  I don't know.

LAWSON - CROSS

1    Q.    But you would agree that the two videos were set up

2    to focus or display that particular area of the bathroom;

3    correct?

4    A.    Yes, ma'am.

5          MR. DEROVANESIAN:  Your Honor, I object to the

6    word "focus".

7          THE COURT:  I'm going to overrule the objection.

8    I think it was clarified when it said focus or display.

9          MR. DEROVANESIAN:  I object as to the ambiguity.

10          THE COURT:  All right, I'll sustain the objection.

11    Rephrase the question.

12    BY MS. VIACAVA

13    Q.    Would you agree that the videos, these two videos

14    that were done on January 26th and January 27th, 2010, were

15    set up to capture a particular area, in both videos, of the

16    bathroom?

17    A.    Yes, ma'am.  I would agree with that.

18    Q.    And they were both set up to capture the same area of

19    the bathroom?

20    A.    Yes, ma'am.

21    Q.    And that would be the area in front of the shower and

22    the shower door?

23    A.    Yes, ma'am.

24          MS. VIACAVA:  One moment, please, Your Honor.

25          (Discussion off record)

LAWSON - CROSS

1    BY MS. VIACAVA

2    Q.    Would you agree that individuals that tend to collect

3    child pornography, in those collections -- strike the

4    question.  I'm sorry, strike the question.

5           Are you aware that individuals tend to collect

6    videos or pictures that were taken without the subject's

7    knowledge?

8           MR. DEROVANESIAN:  Objection.  The question's

9    confusing.

10          THE COURT:  Response?

11          MS. VIACAVA:  Your Honor, I'm asking based on his

12   training and experience.  In this particular case, the

13   allegation is the victim is unaware that she was being

14   videotaped.  He already testified that it did not appear

15   that she was aware that she was being recorded at the time.

16   I'm simply asking as part of the factors are designed to

17   elicit a sexual response, I'm asking him based on his

18   training and experience whether or not people tend to

19   collect such material.

20          THE COURT:  People in general, certain types of

21   people, all individuals?  I mean, I think you need to narrow

22   the question to fit the circumstances or facts, so the

23   objection is sustained.

24   BY MS. VIACAVA

25   Q.    Are you aware of individuals who collect child

LAWSON - CROSS

```
 1    pornography as to whether or not they -- some of these
 2    individuals tend to collect images captured of children,
 3    maybe images of underneath girl's skirts, things of that
 4    nature?
 5    A.     Are there people that do that and that is the primary
 6    area of interest in their collection?
 7    Q.     Yes.
 8    A.     Yes.
 9    Q.     And in this particular case, the minor that's being
10    recorded -- strike that.
11           Based on your training and experience, are you
12    also aware that individuals who collect child pornography
13    sometimes tend to like new materials rather than what's just
14    available?
15    A.     I --
16           MR. DEROVANESIAN:  I'm going to object to the
17    relevance.  There's been nothing to establish that anything
18    in this case exists other than these images.
19           THE COURT:  Response?
20           MS. VIACAVA:  Your Honor, I'm simply -- part of it
21    is whether or not these depictions appeared to be designed
22    to elicit a sexual response.  The question that is being
23    asked of this witness is whether some individuals like to
24    have newer materials, meaning they may create their own,
25    have their collection so they can keep it for themselves.
```

LAWSON - CROSS

```
 1            THE COURT:  All right.  I'm going to sustain the
 2    objection to the question as phrased but allow you to
 3    rephrase the question.
 4    BY MS. VIACAVA
 5    Q.     Would you agree that the two videos that were
 6    captured by Mr. Johnson's cell phone would be new material,
 7    material that would not be available on the internet?
 8    A.     Yes, ma'am.
 9    Q.     That he was able to record a minor as she was nude
10    and taking her shower, that you could not find any place
11    else?
12    A.     If I understand your question, would he have been
13    able to find a similar video online?  Is that --
14    Q.     No, would he have been able to find that video, that
15    video of that minor?
16    A.     Oh, no.
17    Q.     And based on your training and experience, do
18    individuals who collect child pornography tend to thrive --
19    or want new materials?
20    A.     I'd say that that's generally true, yes, ma'am.
21    Q.     So in this case, having two videos on his cell phone
22    where it was portable and only he had access to in the sense
23    of it was brand new, wasn't available anyplace else, would
24    that tend to suggest to you that these particular videos
25    were designed to elicit a sexual response in the viewer?
```

LAWSON - CROSS

1   A.     Well, I think my answer to your question was I think
2   it's certainly possible, but I don't have an opinion about
3   that.  I will grant you that that is certainly a
4   possibility, but I don't know if that is what he's doing in
5   having these two videos or not.
6   Q.     Well, based on your training and experience, what
7   other purpose other than a sexual response would there be in
8   collecting these types of videos?  You previously testified
9   it was not clinical and it was not any kind of story line.
10  So what would these materials, these two videos be
11  designed --
12          MR. DEROVANESIAN:  Your Honor, at this time I'm
13  going to object.  Our position is that the purpose is not a
14  factor under the child pornography law.  We think it's an
15  inappropriate question.
16          THE COURT:  Response?
17          MS. VIACAVA:  Your Honor, part of the
18  consideration is whether the depiction appears to have been
19  designed to elicit a sexual response in the viewer.
20  Although the Government does not need to prove the
21  defendant's purpose, certainly in considering the Dost
22  factor and the fact that the defendant is visible in these
23  particular videos setting up and the fact that he kept and
24  maintained them on his cell phone, this -- this witness has
25  testified that he is not certain what the person's -- what

LAWSON - CROSS

1    these images were designed to elicit.  The Government is

2    simply asking what other purpose could there be?  If he's

3    not sure, what else, based on his training and experience

4    would the purpose of these particular videos be designed if

5    it was not for eliciting a sexual response.

6              MR. DEROVANESIAN:  I'd also add that it's been

7    asked and answered.

8              THE COURT:  I'm going to overrule the objection on

9    both grounds.  I don't think it's been asked and answered.

10   I will allow the question, although I will certainly agree

11   that the purpose is not one of the factors to be considered

12   by Dost or in the 11th Circuit's pattern instructions.  But

13   this is cross examination so I'm giving you some latitude

14   and if the witness is able to answer the question, he may do

15   so.

16   A.    While you were talking, I was just thinking about

17   what other -- what other reasons could there be, and like I

18   said, I'm not a forensic psychiatrist so I'm not offering

19   this as a professional medical opinion, but I do --

20   BY MS. VIACAVA

21   Q.    Before you answer that --

22             MR. DEROVANESIAN:  Your Honor, I object to her

23   cutting the witness off.  He's responding to her question.

24             THE COURT:  Well, what -- what is your concern,

25   Ms. Viacava?

LAWSON - REDIRECT

1          MS. VIACAVA:  Your Honor, when he started talking

2     about psychological information, the Government --

3          THE COURT:  I think you opened the door.  You

4     asked him.  Your question was, well, what other purpose.

5     That's really broad and general.

6          MS. VIACAVA:  Yes, Your Honor, and the Government

7     shut the door before he provided his answer.

8          THE COURT:  So are you now withdrawing that

9     question?

10         MS. VIACAVA:  Yes, Your Honor.

11         THE COURT:  All right, the question's withdrawn.

12         MS. VIACAVA:  One moment, please, Your Honor.

13         (Discussion off record)

14         MS. VIACAVA:  No further questions for this

15    witness.

16         THE COURT:  All right, thank you.  Is there any

17    redirect examination?

18         MR. DEROVANESIAN:  Please, Your Honor.  I'd like

19    to take this opportunity to cover some of the questions and

20    responses that you gave via the Government's questioning.

21                    REDIRECT EXAMINATION

22    BY MR. DEROVANESIAN

23    Q.    Now, regarding the Government's questions regarding

24    collections and collectors, you recall those questions from

25    the Government?

LAWSON - REDIRECT

```
 1   A.      Yes, sir.

 2   Q.      What does a collection normally consist of?

 3   A.      Well as I told her, it's an interesting question

 4   because, generally speaking, I would characterize a

 5   collection as a series of pictures.

 6   Q.      It would include photos, perhaps?

 7   A.      Correct, photos and videos.

 8   Q.      Videos?

 9   A.      Typically in criminal cases, you're talking about a

10   fairly significant number.  Usually --

11   Q.      Still images?

12   A.      Yes, yes.

13   Q.      Books, similar materials?

14   A.      In the digital age, probably not so many books, but

15   certainly --

16   Q.      Pornographic magazines are common?

17   A.      Yes.

18   Q.      Additionally, individuals who are collectors, to be a

19   collector of something indicates that you received it from

20   somebody; isn't that correct?

21   A.      That's a good way to put it, yes.

22   Q.      You have to get it from somewhere; isn't that

23   correct?

24   A.      Yes.  I suppose you could collect it, yourself, as

25   well.
```

LAWSON - REDIRECT

1   Q.      Someone who collects child pornography, in your
2   expert opinion, frequently will exchange materials with
3   someone else; isn't that correct?
4   A.      Oftentimes.  I would say more often than not, that's
5   the case, yes.
6   Q.      They'll download something from the internet and in
7   exchange you have to provide something to the person they
8   get it from; isn't that correct?
9   A.      In a -- in typical like peer to peer file sharing
10  cases and things like that, that's obviously the case.  In
11  web based cases where people are accessing internet web
12  pages and they buy a membership to them, they give money or
13  their credit card in exchange.
14  Q.      The evidence in this case shows that no such thing
15  happened in this case.  Is that significant as far as your
16  analysis?
17  A.      Well, the fact that there's no, quote, collection of
18  child pornography on any of his other computer media, no
19  access to those types of cites or apparently no attempting
20  to locate them, then yes, that would, I think, speak to his
21  intent.
22  Q.      The Government asked questions about someone sticking
23  to one sex, one age group, et cetera.  Do you remember those
24  questions?
25  A.      Yes, sir.

LAWSON - REDIRECT

1    Q.     Are you aware that there was only one person under
2    the age of 18 in this video?
3    A.     Yes, sir.
4    Q.     So he was essentially stuck with one person; is that
5    correct?
6    A.     Yes, sir.
7    Q.     So the fact that the pictures are of this one person,
8    not particularly surprising or shocking; is that correct?
9    A.     I would say not.
10   Q.     Now, let me go back to some other questions that you
11   were asked.  The Government asked you about Mr. Johnson's
12   video being composed of several frames; is that correct?
13   A.     Yes, sir.
14   Q.     And you testified that the video showing the young
15   lady in the nude lasted a matter of seconds; is that
16   correct?
17   A.     Yes.
18   Q.     But the Government got you to admit that even though
19   it was just several seconds, there would be a number of
20   frames to compose those several seconds; is that correct?
21   A.     Yes, sir.
22   Q.     Now let's go back to Defense Exhibit C -- excuse me,
23   Defense Exhibit B, the demonstrative aid which would be the
24   footage from the Blue Lagoon.  Now, you recall that footage;
25   is that correct?

LAWSON - REDIRECT

1    A.      Yes.

2    Q.      And that footage showed those two individuals

3    completely in the nude; correct?

4    A.      Yes.

5    Q.      Doing a summersault in front of the camera?

6    A.      Yes.

7    Q.      And wouldn't it be fair to say that that image lasted

8    substantially longer than the combination of the two images

9    that Mr. Johnson took?

10   A.      I think that would be fair to say.

11   Q.      Now, let me go to another line of questioning.   The

12   Government was making a reference to the demonstrative aids

13   that were used to present your testimony, perhaps

14   specifically one of those books or the other.   Do you recall

15   that?

16   A.      Yes, sir.

17   Q.      And she made some reference to a family purpose in

18   taking pictures of nude children.   Do you remember that?

19   A.      Yes.

20   Q.      And you're familiar with the child pornography laws;

21   correct?

22   A.      Yes, sir.

23   Q.      Are you aware of any family exclusion to the

24   production of child pornography?

25   A.      Not in the statute, no.

LAWSON - REDIRECT

1   Q.    All right.  Is -- as a matter of fact, not only is
2   the fact that you're producing child pornography of your own
3   family not protected, isn't it true that much of the child
4   pornography out there is produced by people taking photos of
5   their own children?
6   A.    Most of the series, the known series of images that
7   are commonly circulated are, indeed, from familial.
8   Q.    So when the Government's trying to strike some type
9   of contrast between the materials in these books and the
10  materials in this case, you're not aware of any family
11  exclusion that would somehow cloak the materials in these
12  books with some type of protection or illegitimacy; correct?
13  A.    Not legally.
14  Q.    All right.  So the materials in these books cannot be
15  child pornography either, or it's illegal to print and
16  distribute these materials; correct?
17  A.    That's correct.  There would be a lot of people in
18  prison.
19  Q.    Now, let's go back to Blue Lagoon for a moment.  The
20  prosecutor asked you whether or not there was a Hollywood
21  story line, I believe she said, in the materials or the
22  video that Mr. Johnson took.  Do you recall those questions?
23  A.    Yes.
24  Q.    Are you aware of any type of Hollywood story line
25  exception for child pornography?

LAWSON - REDIRECT

1    A.      No.

2    Q.      So the fact that something is child pornography, the

3    fact that it's in a Hollywood movie would make no -- there's

4    no exception when you look at the law for a Hollywood movie;

5    correct?

6    A.      No.

7    Q.      And in your opinion, the material depicted in Blue

8    Lagoon is, in fact, not child pornography?

9    A.      Correct.

10   Q.      Is there anything particularly sexual or sexually

11   enticing about someone taking a shower?

12   A.      Not to me.  I don't think to most people.  Possibly

13   to some, but not on its face.

14   Q.      Now, do you know what a voyeur is?

15   A.      Yes.

16   Q.      The Government asked you if there's some reason

17   why -- some other reasons why somebody might take pictures

18   of someone.  Could you tell us what a voyeur is?

19   A.      Well legally, a voyeur is a person who

20   surreptitiously takes pictures of someone in a state of

21   undress without their awareness.

22   Q.      Now, that's obviously a crime; is that correct?

23   A.      Yes, sir.

24   Q.      And you heard Mr. Badalamenti make an argument

25   regarding that earlier; is that correct?

LAWSON - REDIRECT

1   A.      Yes.

2   Q.      Now, that's also a reason why someone would take --

3   well obviously, it's a surreptitious recording; correct?

4   A.      Yes.

5   Q.      And that could also be the reason why somebody takes

6   pictures of someone, it's for their voyeuristic intent;

7   correct?

8   A.      Yes, sir.

9   Q.      And it does not necessarily have to have some type of

10  sexual component; correct?

11  A.      The act of the surreptitious photography and getting

12  away with it, if you will, lack of a better way to put that,

13  is the exciting part of it as opposed to what you would

14  normally refer to as a sexual response.

15  Q.      Secretly recording someone in the nude is the

16  excitement, so to speak; correct?

17  A.      Correct.  And I'm not saying that that is --

18  generally that's going to be true about every person who's a

19  voyeur.  Some I'm sure do it for a sexual purpose; some may

20  not.  I think -- in fact, I know from interviews with the

21  people, with defendants that -- that can be exactly what the

22  thrill is, is getting away with taking the surreptitious

23  pictures.

24  Q.      Now, the images that you've seen in this case, it

25  would be fair to characterize them as you can see the camera

LAWSON - REDIRECT

1    being set up; correct?

2    A.    Yes, sir.

3    Q.    You can then see a long period of black where there's

4    nothing, nothing on the tape; correct?

5    A.    Yes, sir.

6    Q.    And you can see the young lady in various states of

7    undress; is that correct?

8    A.    Yes, sir.

9    Q.    And there were two videos that you viewed; correct?

10   A.    Yes, sir.

11   Q.    Now, neither of these videos was ever shortened in

12   any way; is that correct?

13   A.    Was -- I'm sorry, was ever --

14   Q.    Neither video looks like they were edited in any way;

15   is that correct?

16   A.    It doesn't appear to be.

17   Q.    As a matter of fact, in one or the other of them, you

18   can see Mr. Johnson not only in the pictures, he's going to

19   the bathroom; is that correct?

20   A.    Yes, sir.

21   Q.    Some fairly embarrassing footage, so to speak?

22   A.    Yes, sir.

23   Q.    Now, as far as using these materials or disseminating

24   them, wouldn't it be fair to say that someone would edit

25   them and take the material out that would be embarrassing?

LAWSON - REDIRECT

1   A.      That would be -- that's what I would think is likely,

2   but I would -- I wouldn't know.  I'd be speculating.

3   Q.      If the purpose in maintaining or having these videos

4   was to focus on the young lady as she got in and out of the

5   shower, you described that footage as constituting a matter

6   of seconds in each video; correct?

7   A.      Yes.

8   Q.      There's an extended period or extensive period of

9   blackness; correct?

10  A.      Correct.

11  Q.      And then there's an extensive period where she's in

12  the shower and you can't really see anything; isn't that

13  correct?

14  A.      Correct.

15  Q.      And in neither video does it appear that there is any

16  attempt to edit any of that out; is that correct?

17  A.      Correct.

18  Q.      And as a matter of fact, it would be fair to say that

19  in both videos, if you look just at the amount of time,

20  probably the longest period of time on both videos is a

21  period of darkness; correct?

22  A.      Correct.

23  Q.      Second longest period of time would be the period of

24  time where she's in the shower in each video; is that

25  correct?

LAWSON - REDIRECT

```
 1   A.      Correct.
 2   Q.      And the video, the portion where she is in the nude
 3   would constitute probably the shortest period of time on
 4   those videos?
 5   A.      Correct.
 6   Q.      Now, you've had a chance to reflect on your analysis,
 7   your testimony, and the Government's asked you a bunch of
 8   questions here, and I've asked you some follow-up.  Does any
 9   of this change your opinion regarding Mr. Johnson and these
10   images?
11   A.      And whether they're child pornography?
12   Q.      Yes.
13   A.      No.
14           MR. DEROVANESIAN:  Thank you, sir.
15           THE COURT:  All right, you may call your next
16   witness.
17           (Witness excused)
18           MR. DEROVANESIAN:  May I have a moment?
19           THE COURT:  Yes.
20           (Discussion off record)
21           MR. DEROVANESIAN:  Your Honor, may we have a brief
22   recess, perhaps five minutes?
23           THE COURT:  For what purpose?
24           MR. DEROVANESIAN:  May I approach the bench?
25           THE COURT:  Yes.
```

LAWSON - REDIRECT

```
 1              MR. DEROVANESIAN:  Could we do it ex parte?

 2              THE COURT:  Yes.

 3              (At sidebar, Court and defense counsel present,

 4    off record)

 5              THE COURT:  Court will be in recess for five

 6    minutes.

 7              (Recess from 5:05 p.m. to 5:20 p.m., witness

 8    excused)

 9              COURT SECURITY OFFICER:  All rise, please.

10              THE COURT:  Mr. DerOvanesian, you may call your

11    next witness.

12              MR. DEROVANESIAN:  Your Honor, we have no further

13    witnesses to present.  However, I would ask to move Defense

14    Exhibits A, B, and C into evidence.  They were the

15    demonstrative aids I used with Mr. Lawson.

16              THE COURT:  Response?

17              MS. VIACAVA:  Again, the Government would object

18    as to relevance of those materials in this particular case.

19              THE COURT:  All right.  I'm going to sustain the

20    objection as to the relevancy of those documents.  They were

21    used as demonstrative aids to aid the witness in the

22    presentation of his testimony, but with regard to their --

23    well, let me have you respond first to the relevancy

24    objection.

25              MR. DEROVANESIAN:  I think the Court has heard all
```

```
 1    the arguments on it.  I would ask in light of the Court's
 2    ruling that they be made part of the record and that they be
 3    included with the materials if this case proceeds any
 4    further.
 5              THE COURT:  Absolutely.  You may tender them, the
 6    documents to the clerk so that they are part of the record
 7    for appellate purposes, but otherwise, I will sustain the
 8    objection on relevance and just consider the documents for
 9    what they were offered, and that is as demonstrative aids.
10              MR. DEROVANESIAN:  Your Honor, we have no further
11    witnesses to present and we would like to renew all of our
12    motions at this time.
13              THE COURT:  Response?
14              MS. VIACAVA:  I'm sorry, response to his motion
15    for --
16              THE COURT:  They're renewing their motion for
17    judgment of acquittal.
18              MS. VIACAVA:  Your Honor, the Government would
19    still reiterate that the Government has -- the evidence in
20    this particular case is sufficient for the trier of fact to
21    make a determination as to that these two videos depict and
22    contain child pornography that the defendant possessed.  The
23    Government would reiterate all its original arguments
24    regarding the case law that was previously argued for the
25    motion, the Rule 29.
```

1          In addition, the Government would point out that

2     the only additional testimony that the Court has heard was

3     from the defense expert who acknowledged that one of the

4     Dost, whether the depiction appears to have been designed to

5     elicit a sexual response from the viewer was something that

6     he could not answer.  Therefore, that was a factor that he

7     didn't offer his opinion based on that particular factor.

8     So the Government would argue that -- that there has been

9     sufficient evidence present in this particular case for the

10    trier of fact to determine whether or not this defendant

11    possessed child pornography.

12          THE COURT:  Anything else, Mr. DerOvanesian?

13          MR. DEROVANESIAN:  No further argument, just like

14    to adopt the arguments Mr. Badalamenti made previously.

15          THE COURT:  All right.  With regard to the motion

16    for judgment of acquittal made pursuant to Rule 29 of the

17    Federal Rules of Criminal Procedure, the Court is going to

18    deny the motion.  The Court is of the opinion that the

19    evidence at this time is sufficient for the case to proceed

20    to the trier of fact in that it would be error for the Court

21    to enter a judgment as a matter of law in favor of the

22    defendant.

23          Does the Government intend to present any rebuttal

24    testimony?

25          MS. VIACAVA:  May I have one brief moment, Your

```
 1   Honor?
 2              THE COURT:  Yes.
 3              (Discussion off record)
 4              MS. VIACAVA:  Your Honor, at this time, as a
 5   rebuttal witness, the Government would call Special Agent
 6   John Kuchta to the stand.
 7              THE COURT:  How long do you anticipate his
 8   testimony to be?
 9              MS. VIACAVA:  I would anticipate that my direct of
10   him would probably be about 15 to 20 minutes.
11              THE COURT:  Mr. DerOvanesian, can you anticipate
12   or estimate if you can, your cross examination of this
13   witness?
14              MR. DEROVANESIAN:  I would say that 15 to 20
15   minutes would be fair.
16              THE COURT:  All right, then, you can call the
17   witness.
18              (The Witness is Sworn)
19              DEPUTY CLERK:  Thank you.  You may be seated.  If
20   you'll please state your name for the record?
21              THE WITNESS:  My name is John David Kuchta,
22   K-U-C-H-T-A.  I'm a special agent with the Federal Bureau of
23   Investigation in Fort Myers, Florida.
24              DEPUTY CLERK:  Thank you.
25
```

1                          JOHN D. KUCHTA,

2          a witness herein, after having been duly sworn,

3          was examined and testified under oath as follows:

4                        DIRECT EXAMINATION

5    BY MS. VIACAVA

6    Q.      Good afternoon.

7    A.      Good afternoon.

8    Q.      How long have you worked with the Federal Bureau of

9    Investigation?

10   A.      Over 20 years.

11   Q.      And have you received any particularized training

12   regarding in working with law enforcement?

13   A.      Yes.

14   Q.      Have you received any particularized training

15   regarding child exploitation investigations?

16   A.      Yes.

17   Q.      What type of training have you received?

18   A.      Starting in 1993, I attended a course, sex offender

19   investigator course which was offered by the Fairfax County

20   Police -- Police Department in Fairfax County, Virginia,

21   along with co-sponsored by the FBI.  At that time, it was

22   the Behavioral Science Unit, which has since become the

23   National Center for the Analysis of Violent Crime.  I

24   received basic and advanced undercover school for online

25   undercover investigations regarding what we term the

KUCHTA - DIRECT

1    Innocent Images National Initiative, which is the online

2    exploitation, the investigation of online child

3    exploitation.

4           I have attended, as well as lectured at the Dallas

5    Crimes Against Children conference, which is the premier --

6    considered the premier crimes against children conference in

7    the country.  It's held every year and there are various

8    blocks of instruction that it focuses on online child

9    exploitation, investigations, advanced investigative

10   techniques, various computer forensic type and type blocks

11   of instruction as well as behavioral aspects of child sex

12   offenders.

13          I'm also in a -- what's considered an NCAVC

14   coordinator for the Tampa Division of the FBI, which I

15   attended basic and advanced as well as various regional

16   conferences through the years.

17   Q.    Can you briefly explain what that is?

18   A.    Yeah, I was going to get to that.  The National

19   Center for the Analysis of Online Crime is formally known as

20   the Behavioral Science Unit.  It is the -- the mind hunters.

21   It deals with -- as an NCAVC coordinator, after you receive

22   the training, you consult with the Behavioral Science Unit

23   on local cases or cases throughout the region regarding

24   serial sex type crimes, serial homicides, serial sexual

25   homicides, and as well as crimes against children.

KUCHTA - DIRECT

1          I have lectured at the Judge Advocate General

2     officer school on behavioral -- well, on the behavioral

3     aspects of child sex offenders.  I have lectured in Canada

4     on the behavioral aspects of child sex offenders.  I have

5     lectured to local, state and local law enforcement as well

6     as I went over to the nation of Kurdistan and conducted

7     lectures on the same type -- typologies and various

8     behavioral aspects of child sex offenders and persons with a

9     sexual interest in children.

10         Throughout, I've -- I was appointed as a Special

11    Assistant United States Attorney where during that period of

12    time, while still an FBI agent, I was detailed over to their

13    office for a year and a half.  I primarily was the

14    prosecutor on child pornography cases back in 1995 and 1996.

15    It's when the internet was in its infancy.

16         At that time, most individuals were using 14k or

17    56k dial-up modems.  It was when our Instant Images National

18    Initiative was just getting off.  At that time also, it was

19    pre Patriot Act, so America On Line at that time was the

20    number one online service provider.  All search warrant

21    applications prior to the Patriot Act would go through the

22    Eastern District of Virginia U.S. Attorney's Office for

23    review, and I was primarily responsible for reviewing the

24    search warrant applications from different law enforcement

25    agencies throughout the country that would be presented to

KUCHTA - DIRECT

1    America On Line for probable cause to get -- search online

2    accounts, online storage, email accounts, things of that

3    nature.

4         I attended training at the National Advocacy

5    Center regarding child prostitution and child sex crimes and

6    have had various homicide investigator courses, have always

7    dealt with serial aspects of child sex crimes.

8    Q.    And during your course of employment with the Federal

9    Bureau of Investigation, have you had occasions to become

10   involved in the investigation of child exploitation?

11   A.    Yes.

12   Q.    Approximately how many times?

13   A.    Oh, I was the task force coordinator from 2001 until

14   2010, ran the Innocent Images Task Force in Fort Myers which

15   was a task force of FBI.  Varying times I was at the Lee

16   County Sheriff's Office, Collier County Sheriff's Office,

17   and various times throughout that task force we had

18   Immigration and Customs Service assigned to the task force

19   as well as Florida Department of Law Enforcement.

20        As task force coordinator, I oversaw all

21   investigations that were worked by various task force agents

22   as well as the lead agent on numerous child pornography

23   investigations that occurred online.  I would -- I was

24   involved in well over a hundred investigations in which I

25   was a lead investigator on.  I've testified in the federal

KUCHTA - DIRECT

1   grand jury as well as at federal court in presentencing

2   hearings on those matters.  I've been responsible for

3   conviction of over 50 defendants here in the Middle District

4   of Florida, either on the state level or in the federal

5   court.

6          I've also, as part of that function as the

7   Innocent Images Task Force coordinator, as well as lead

8   investigator in those cases, I would review the hard drives

9   of various subjects who were under investigation.  I would

10  determine other people that were in communication with that

11  individual, may have put evidence on those hard drives.  I

12  would package up individual investigations and send them off

13  and forward them off to our other offices for follow-up

14  investigation.

15  Q.     Regarding those particular investigations, have you

16  had an occasion to review the forensic findings of these

17  many investigations?

18  A.     Yes, routinely.  I mean, I've had training, basic

19  data recovery and analysis training.  I've had forensic

20  toolkit training.  I've had various triage training on

21  forensics and I've reviewed hundreds of thousands of images

22  of child pornography in my career.  It's probably a modest

23  estimate.  I've never actually counted, but I mean, I know

24  I've had cases with easily, you know, over 25,000 images on

25  the hard drive.

KUCHTA - DIRECT

1   Q.      You also had occasion to review video materials that

2   were found in these investigations?

3   A.      Yes.

4   Q.      Have you had occasion to be involved in

5   investigations of individuals that collected child

6   pornography as well as individuals who produced child

7   pornography?

8   A.      Yes.  I've interviewed numerous persons with a sexual

9   interest in children involved in child pornography

10  distribution, collection, and production.  I've spent hours

11  interviewing them from a behavioral aspect as well as, you

12  know, in order to elicit incriminating information from

13  them.

14  Q.      And based on -- in this particular case, have you had

15  an opportunity to review the video that was involved in this

16  particular case?

17  A.      Yes, I have.

18          MS. VIACAVA:  Your Honor, the Government -- one

19  moment, please, Your Honor.

20          (Discussion off record)

21          MS. VIACAVA:  Your Honor, at this time, based on

22  the witness' testimony regarding his training and

23  experience, the Government would ask to have this witness

24  declared to be an expert in the field of child exploitation,

25  particularly child pornography investigations.

KUCHTA - DIRECT

```
1              THE COURT:  Is there any objection?

2              MR. DEROVANESIAN:  Yes, Your Honor.  May I

3    voir dire?

4              THE COURT:  Yes.

5              MR. DEROVANESIAN:  Good afternoon.

6              THE WITNESS:  Good afternoon, Mr. DerOvanesian.

7                   VOIR DIRE EXAMINATION

8    BY MR. DEROVANESIAN

9    Q.    Now, have you ever previously been designated as an

10   expert witness?

11   A.    No.

12   Q.    So any matter that you've testified previously, it

13   was not as an expert; is that correct?

14   A.    I was always testifying as an FBI agent as a witness.

15   Q.    All right.  My next question was when you testified

16   as an expert.  You answered that one.  My next question is

17   for the Government or the defense, which I guess you just

18   answered that one as well.  So you were an FBI agent so

19   you've never testified for anyone other than the Government;

20   is that --

21   A.    That's correct.

22   Q.    Now, is the Government -- let me back up a moment.

23   So you've -- so it's your testimony here today that you've

24   never been designated as an expert.  Have you testified

25   during a pornography trial as to whether something is
```

KUCHTA - DIRECT

1    pornography or not?

2    A.     I don't recall if I've ever been asked on direct or

3    cross examination if in my training and experience if I

4    believed it was child pornography.  However, I have, under

5    oath, on numerous occasions, testified in front of the grand

6    jury to that conclusion.  I have on -- in probable cause

7    hearings would have testified to that, as well as in

8    affidavits.

9    Q.     But as to trials, you have no testimony?

10   A.     Trial, I don't believe -- I don't recall.

11          MR. DEROVANESIAN:  Your Honor, we would object to

12   the designation.  The objections, let me start off with the

13   first part.  Regarding child exploitation, I would argue to

14   the Court that that's irrelevant.  I don't know what child

15   exploitation is.  Regarding child pornography, we would

16   argue that the gentleman, his credentials don't meet the

17   standard to be designated as an expert witness and we would

18   object to it.

19          THE COURT:  In what respect don't they meet the

20   standards?

21          MR. DEROVANESIAN:  He's never been sworn as a

22   witness before.  He's an FBI agent.  The experience of his

23   experience and testimony is testifying for the Government as

24   an expert -- excuse me as an FBI agent.  As such, it doesn't

25   make him an expert witness.  We object to it.

KUCHTA - DIRECT

1          THE COURT:  Thank you.  Response?

2          MS. VIACAVA:  Your Honor, this witness has

3   indicated that he has received a multitude of training since

4   1993.  He testified that specifically up until as recently

5   as 2010 he was employed as the task force coordinator.  He's

6   testified that he's seen hundreds of thousands of images of

7   child pornography.  He's indicated he's lectured on the

8   subject of child pornography.  He's indicated he has

9   reviewed affidavits in which people -- other law enforcement

10  officers were seeking search warrant in order to obtain

11  information regarding child pornography.  The Government

12  would argue that this individual, based on his training as

13  well as based on his experience would be considered an

14  expert in terms of child pornography.

15         THE COURT:  All right.  So it's child pornography

16  and not child exploitation?

17         MS. VIACAVA:  Yes, Your Honor.

18         THE COURT:  I am going to overrule the objection

19  and allow the witness to testify as an expert in the area of

20  child pornography investigations.

21         MS. VIACAVA:  Thank you, Your Honor.

22  BY MS. VIACAVA

23  Q.    Special Agent Kuchta, have you had an opportunity to

24  review the videos in this particular case?

25  A.    Yes, I have.

KUCHTA - DIRECT

```
1    Q.      When were you able to review those videos?

2    A.      Thursday evening and Friday of last week, both days.

3    Q.      So that would be May 5th and 6th, if I have the days

4    correct?

5    A.      I believe that's correct.

6    Q.      Of 2011?

7    A.      Yes.

8    Q.      And were you able to review the videos in their

9    entirety?

10   A.      Yes.  And I parsed them out as far as I would stop

11   and start the video and look at various frames of that

12   video.

13   Q.      And as you reviewed -- let's start with Video SX --

14   I'm sorry, SSPX 003, the video that was dated January 26th,

15   2010.  What did you observe when you reviewed that

16   particular video?

17           MR. DEROVANESIAN:  Your Honor, at this time I'm

18   going to object.  The Government indicated that this was

19   going to be a rebuttal witness.  I would argue to the Court

20   that what she's trying to present is not rebuttal.  It's --

21   it's direct testimony and she's trying to revert it over to

22   rebuttal, and we object.

23           THE COURT:  Response?

24           MS. VIACAVA:  Your Honor, the defense witness,

25   Mr. Lawson, testified that he reviewed it and it's his
```

1    opinion it was not child pornography.  I'm simply eliciting

2    from this witness that has now been deemed by the Court to

3    be an expert in the field of child pornography whether he's

4    been able to review it, what he saw when he observed it, and

5    then the Government intends to elicit his opinion as to

6    whether or not it is child pornography.

7              THE COURT:  So is this a predicate question?

8              MS. VIACAVA:  Yes, Your Honor.

9              THE COURT:  All right, the objection's overruled.

10             THE WITNESS:  Can you restate the question, ma'am?

11             MS. VIACAVA:  Yes.

12   BY MS. VIACAVA

13   Q.    At the time that you reviewed Video SSPX 003, the

14   video that was dated January 26th, 2010, what did you

15   observe when you reviewed that particular video?

16   A.    I observed the video started with what appeared to be

17   a pile of clothes.  It then transitioned to adjustments.

18   The person depicted in the video, a black male, was

19   adjusting the camera.  It appeared that the angle of the

20   camera or the video, I'll use the terms interchangeably, was

21   positioned from a floor level, you know, or close to floor

22   level, positioned upward --

23             MR. DEROVANESIAN:  Your Honor, object to the

24   narrative.

25             MS. VIACAVA:  Your Honor, I asked the question as

KUCHTA - DIRECT

1    to -- this is direct.  I can't lead the witness.  I've asked

2    him what he observed.

3           THE COURT:  No, but can you ask him if he observed

4    the same video that we saw in court today, and that would

5    short circuit all of this, given the fact that it's 5:38.

6           MS. VIACAVA:  Yes, Your Honor.

7    BY MS. VIACAVA

8    Q.    Were you able to see the videos that were played in

9    the courtroom today?

10   A.    Yes, I did.

11   Q.    Did those appear to be the same videos that you

12   observed?

13   A.    Yes.

14   Q.    In reviewing the two videos, in order to speed things

15   along, the video dated January 26th, 2010, the 003, when you

16   observed the contents of those videos, did you see a minor

17   that was depicted in the nude?

18   A.    I was informed that it was a minor.  And yes, the

19   person -- the female was depicted in the nude.

20          MR. DEROVANESIAN:  Your Honor, we would ask for a

21   continuing objection to all of his testimony.  Again, our

22   position is this is not rebuttal.

23          THE COURT:  I don't understand the objection that

24   it's not rebuttal.  Why is it your position that it's not

25   rebuttal?  Explain that to me, please.

KUCHTA - DIRECT

1          MR. DEROVANESIAN:  Your Honor, the Government is
2    presenting this witness.  Obviously he's reviewed all the
3    evidence.  He's covering the entire case.  He's not
4    responding to testimony from our expert.  They're just
5    presenting their case through this witness, agent.
6          THE COURT:  That's not my understanding.  My
7    understanding is that they're getting to that point.  In
8    other words, they're not going to put him on the stand just
9    to say did you hear the testimony of Mr. Lawson and do
10   you -- and what is your opinion regarding that.  I think my
11   understanding is that these are predicate questions to get
12   to that point.  They're laying a foundation to get to the
13   point where they will then ask him about his testimony, and
14   I think it is relevant to get there that they lay a
15   predicate that indeed he did view the video that's now been
16   received in evidence by the Court, and that's why I'm
17   allowing the testimony for that purpose.  Not for
18   substantive evidence but only as a predicate to their
19   ability to present then rebuttal questions of this witness.
20         MR. DEROVANESIAN:  Thank you, Judge.
21   BY MS. VIACAVA
22   Q.    Were you present in the courtroom when the defense
23   witness, Mr. Lawson, was able to testify?
24   A.    Yes.
25   Q.    Were you able to hear his entire testimony?

KUCHTA - DIRECT

1    A.      Yes.

2    Q.      Were you able to hear his opinions as to the --

3    whether the videos met the factors listed out in the Dost

4    case?

5    A.      Yes.

6    Q.      Are you familiar with the Dost case?

7    A.      Yes.

8    Q.      Are you familiar with the factors that the Court

9    established for whether or not an image or video depicts the

10   lascivious display of the genitals or pubic area?

11   A.      Yes, I am.

12   Q.      In listening to Mr. Lawson's testimony regarding each

13   of those factors, do you agree with Mr. Lawson's findings as

14   to those factors?

15   A.      No, I do not.

16   Q.      Which factors do you disagree with?

17   A.      Several.  The Dost standards are five -- a five-part

18   test, not all of which need to be met.  The child depicted

19   in the video is nude, frontally nude.  The focus of the

20   camera, when I looked at that video frame by frame by frame,

21   the focus of that camera looking up on various frames within

22   that video, the focus of the camera, the center of the

23   picture, if you break it down frame by frame, is of the

24   child's pubic or vaginal area at various parts within that

25   video.

1          The way I believe when you're reviewing the Dost

2     standard you have -- what is critical to that analysis is to

3     look at how much time was spent on the front end of that

4     video with him setting -- with the black male setting up

5     that video, readjusting, looking at, standing in front of

6     it.  At one point, in one of the videos, he pulls his shirt

7     up as if -- and he goes back and he recenters the video to a

8     different angle until he gets that angle to a certain point,

9     leaves, then the lights go on, the girl comes in later.

10          Looking at the overall aspect of the situation, I

11    believe it's of a sexual nature.

12          MR. DEROVANESIAN:  Your Honor, I'm going to object

13    to the narrative and unresponsive.

14          THE COURT:  Sustained.  You may direct the

15    witness, Ms. Viacava.

16    BY MS. VIACAVA

17    Q.    Did you hear the testimony offered by Mr. Lawson when

18    he was asked whether the depiction appears to be designed to

19    elicit a sexual response in the viewer?

20    A.    Yes, I did.

21    Q.    Were you able -- do you agree with Mr. Lawson's

22    testimony that the -- what the video was designed to elicit

23    is not clear?

24    A.    I disagree with his conclusions.

25    Q.    Did you form your own opinion after reviewing the

KUCHTA - DIRECT

1    contents of those videos?

2    A.    Yes, I did.

3    Q.    What is your opinion?

4    A.    My opinion is that it is elicited to provoke a sexual

5    type response.  It is sexual in nature by the very

6    voyeuristic nature of that video.

7    Q.    And did you have that same opinion when reviewing

8    both of the videos?

9    A.    Yes.

10   Q.    And were you able to see the minor female depicted

11   completely nude as to both videos?

12   A.    Yes.

13   Q.    In your opinion, based on your training and

14   experience, the two videos that were of the same minor, do

15   they appear to be part of a collection?

16   A.    Yes, they are of the same minor.  Broken frame by

17   frame, it would be a collection, in my opinion.

18          MS. VIACAVA:  One moment, please, Your Honor.

19          (Discussion off record)

20   BY MS. VIACAVA

21   Q.    So considering the Dosts, did you -- have you formed

22   an opinion as to whether or not those two videos depict lewd

23   and lascivious or lascivious display of the genitalia and

24   pubic area?

25   A.    Yes.

KUCHTA - DIRECT

1   Q.     What is that opinion?

2   A.     It is that they depict a lascivious display of the

3   general area -- genital area.

4   Q.     And your opinion as to whether or not the videos

5   appear to be designed to elicit a sexual response in the

6   viewer, does that also take into account that the videos

7   were still kept, if they were produced in January and still

8   kept in February?

9           MR. DEROVANESIAN:  Objection, leading.

10          THE COURT:  Sustained.

11          MS. VIACAVA:  One more moment, please, Your Honor.

12          (Discussion off record)

13  BY MS. VIACAVA

14  Q.     Is there any other factors that you looked at or

15  considered in reviewing those two videos in this particular

16  case in reaching your opinion that they depict the

17  lascivious display of the genitals or pubic area that you

18  have not previously testified to?

19  A.     Yes.

20  Q.     And what other factors did you look at?

21  A.     The fact that it's of a sexual nature because it is a

22  voyeuristic video.  It's done in secret.  It takes innocent

23  otherwise private behavior outside the realm of that.

24          MR. DEROVANESIAN:  Objection, nonresponsive.  He's

25  continuing on with a narrative.

KUCHTA - DIRECT

```
1              MS. VIACAVA:  The Government would be happy to ask
2    a question.
3              THE COURT:  You may proceed, Ms. Viacava, with the
4    question.
5    BY MS. VIACAVA
6    Q.    Can you please explain what you mean when you
7    indicate it seems to be of a voyeuristic nature?
8    A.    It's unbeknownst to the female that's depicted in the
9    video, the underage female.  Otherwise innocent behavior,
10   taking a shower, getting undressed, in and of itself would
11   not be of a sexual nature, would not necessarily elicit a
12   sexual response.  Once you do that in secret unbeknownst to
13   the person, it takes it out of that innocent realm of simply
14   getting undressed in private, to a matter that is of a
15   sexual nature.  That to the viewer, like minded individuals
16   with a sexual interest in children, they view -- they would
17   view that, based on my training and experience, to elicit a
18   sexual response.
19   Q.    And in determining or reaching your opinion in this
20   particular case as to whether those two videos appear to
21   depict the lascivious display of genitalia and/or pubic
22   area, did you have to compare it with any other materials?
23   A.    I compared it with my -- well, I compared it to the
24   legal standard that I'm aware of and I compared it to what I
25   know to be determined to be child pornography in the past.
```

KUCHTA - DIRECT

1   Q.      Did you reach that opinion primarily from looking at

2   the videos, themselves, rather than comparing it to other

3   materials that are available?

4               MR. DEROVANESIAN:  Objection, leading.

5               MS. VIACAVA:  I can rephrase the question, Your

6   Honor.

7               THE COURT:  All right.  Thank you.

8   BY MS. VIACAVA

9   Q.      Did you hear the testimony of Mr. Lawson?

10  A.      Yes.

11  Q.      Did you see the materials that were used as

12  demonstrative aid?

13  A.      Yes.

14  Q.      In reaching your opinion as to whether or not the two

15  videos in this particular case, the two videos that this

16  defendant has on the cell phone, did you have to compare it

17  to the materials that Mr. Lawson utilized or were you able

18  to form your opinion based on the videos?

19  A.      I formed my opinion based on the videos.

20  Q.      Why is that?

21  A.      Because I applied a -- I applied the legal standard

22  as known to me under the Dost standard and Wiegand and Knox,

23  and various other cases and the progeny.  Based on my

24  training and experience, you look at each one of these cases

25  as to the facts on a case by case basis and you have to look

KUCHTA - CROSS

1   at the totality of the circumstances, under the

2   circumstances, of how it was taken and what the purpose of

3   that video was.

4   Q.    Is that what you did in forming your opinion?

5   A.    Yes.

6         MS. VIACAVA:  One moment, please, Your Honor.

7         (Discussion off record)

8         MS. VIACAVA:  No further questions of this

9   witness, Your Honor.

10        THE COURT:  All right, thank you.  Cross

11  examination?

12        MR. DEROVANESIAN:  May I have a moment, please?

13        THE COURT:  Yes.

14        MR. DEROVANESIAN:  Okay.

15        (Pause in place, discussion off record)

16        MR. DEROVANESIAN:  Good afternoon, again.

17        THE WITNESS:  Good afternoon, sir.

18                    CROSS EXAMINATION

19  BY MR. DEROVANESIAN

20  Q.    I think you summarized the value of your testimony or

21  the weight to be given it by saying you applied the legal

22  standards known to me; is that what you said?

23  A.    That's correct.

24  Q.    And you started off your testimony talking about Dost

25  and the five factors; is that correct?

KUCHTA - CROSS

```
1   A.      That's correct.
2   Q.      And in fact, Dost has six factors and you didn't get
3   that right; isn't that a fair statement?
4   A.      I believe Dost has five factors.
5              MR. DEROVANESIAN:  May I approach the witness?
6              THE COURT:  Yes.
7   BY MR. DEROVANESIAN
8   Q.      Would you take a look at the jury instructions where
9   we refer to Dost?  Start with one and continues on the next
10  page.  I'll ask you if that refreshes your recollection.
11  A.      Yes, sir.
12  Q.      And in fact, Dost, there are six factors; is that
13  correct?
14  A.      There's six factors -- in various cases they break it
15  down into five.  They combine --
16  Q.      Dost has six factors; correct?
17  A.      Correct.
18  Q.      So when you said Dost has five factors, you were
19  incorrect when you were testifying under oath earlier?
20  A.      If Dost -- if the case, itself, the various case law
21  I've read which cited Dost has listed five factors at time.
22  Q.      But Dost, itself, they list six; correct?  There are
23  six factors under Dost?  A fair --
24  A.      In your jury instructions, it has six, and I agree.
25  Q.      And it comes out of the Dost case; correct?
```

KUCHTA - CROSS

```
 1   A.      Correct.
 2   Q.      So when you said five factors, you were wrong about
 3   that?
 4   A.      Correct.
 5   Q.      So when you apply the legal standard known to me, you
 6   missed one of the Dost factors; correct?
 7   A.      I applied all the standards, just summarized under
 8   five instead of six.
 9   Q.      But you didn't say that during your testimony; fair?
10   A.      Correct.
11   Q.      Now, back up one moment.  Now, in your background,
12   are you a licensed psychiatrist?
13   A.      No.
14   Q.      Do you have any training in psychiatry?  Have you
15   ever been to medical school?
16   A.      No.
17   Q.      Licensed psychologist?
18   A.      No.
19   Q.      Any training in psychology?
20   A.      Training in psychology, no.  Behavioral sciences,
21   yes.
22   Q.      Now, your comments and statements regarding voyeurism
23   and voyeuristic conduct, now, you got the definition for
24   voyeurism out of the dictionary; isn't that correct?
25   A.      There's various common definitions for voyeurism.
```

KUCHTA - CROSS

1    Q.      My question to you, sir, is didn't you get the

2    definition for voyeurism out of the dictionary?

3    A.      For definitional purposes, I've used a Webster's

4    dictionary for the definition of voyeurism.

5    Q.      Let me back up a moment.  You were asked to become

6    involved in this case obviously.  When did that first occur?

7    A.      Wednesday of last week.

8    Q.      And you wrote up a report regarding your involvement

9    in this case; isn't that correct?

10   A.      That is correct.

11   Q.      Now, when did you view the images for the first time?

12   A.      Thursday.

13   Q.      Now, you reached conclusions in that report regarding

14   this case; is that correct?

15   A.      Opinions, conclusions based on my opinion, correct.

16   Q.      And you did that based on the materials that were

17   presented to you last week prior to hearing any testimony

18   here; is that correct?

19   A.      That is correct.

20   Q.      Now, there were two matters that, in your opinion,

21   made this case -- in your opinion, that you thought that

22   made this a lascivious exhibition; is that correct?

23   A.      That is correct.

24   Q.      And one of them involved the -- the adjustment of the

25   camera to capture an upward image; is that correct?

KUCHTA - CROSS

1   A.      The focus of the camera adjusted upward captured the

2   genital area, the pubic area.

3   Q.      My question, sir, is one of the matters was the --

4   the adjustment of the camera to capture an upward image;

5   isn't that correct?

6   A.      One of the factors, yes.

7   Q.      And the other one is the Merriam Webster dictionary

8   definition of voyeurism; isn't that correct?  Isn't that

9   what you had in your report?

10  A.      Correct.

11  Q.      And the Merriam Webster dictionary definition, your

12  problem with that is it included a reference to sexual acts;

13  is that correct?

14  A.      My basis and my opinion is also based on my

15  experience where I've been to numerous voyeur sites.

16  Q.      Did you go and use the Merriam Webster dictionary and

17  put in your report the definition of voyeur and the fact

18  that it contained a reference to sexual gratification in the

19  dictionary?

20  A.      I used the definition of voyeur in my report, yes.

21  Q.      From the dictionary?

22  A.      For definitional purposes.

23  Q.      From the dictionary?

24  A.      Correct.

25  Q.      And one of the reasons that you believe suddenly this

KUCHTA - CROSS

1    becomes child pornography, or excuse me, a lascivious
2    exhibition is because of the dictionary definition; is that
3    correct?
4    A.    It's based on my experience of what voyeurs do,
5    speaking with people in the past who have, you know, had
6    voyeuristic collections on their computers.  There's a host
7    of reasons.  But for definitional purposes, I used the
8    dictionary.
9    Q.    Well, in writing up your report, you don't make a
10   reference to your experience.  You make a reference to the
11   Merriam Webster dictionary; isn't that correct?
12   A.    I -- also part of that report was I was to prepare a
13   curriculum vitae which was also supplied to the United
14   States Attorney's Office.  So it's in conjunction with both.
15   Q.    What does making reference to the Merriam Webster
16   dictionary have to do with your CV?
17   A.    My CV lists my experience.
18   Q.    So when you write your report and you have a
19   narrative outlining why you believe these images are
20   lascivious, we, the reader is referred to your CV for your
21   experience?
22   A.    No.  I also -- I say in my report that it's based on
23   my training and experience.  It's in the first paragraph; it
24   states throughout that report.
25   Q.    When you were applying your legal standards known to

KUCHTA - CROSS

1   you in this case, did you think to look to federal law for

2   the definition of voyeurism?

3   A.      I used -- no.  I used that for -- the dictionary for

4   definitional purposes, but no.

5   Q.      In addition to being an FBI agent for, what -- what

6   did you say, 20 years?

7   A.      Yes.

8   Q.      You've been working on these cases all that time?

9   A.      No.

10  Q.      How long have you been working on child porn cases?

11  A.      Let's see.  I've been -- primarily have been

12  investigating child porn cases for nine years, and prior to

13  that I was involved in child pornography investigations and

14  as a Special Assistant U.S. Attorney, I primarily prosecuted

15  child pornography cases.

16  Q.      All right.  And so as a Special Assistant United

17  States Attorney, obviously you're a lawyer, you have a law

18  degree?

19  A.      Yes.

20  Q.      And notwithstanding the fact that you're a lawyer,

21  former Assistant U.S. Attorney and all these matters, when

22  you need a definition of voyeurism, even though the forum

23  here is federal court, you go to the dictionary instead of

24  18 U.S.C. 1802 -- 1801; is that correct?

25  A.      For common definitional purposes, I used that.

KUCHTA - CROSS

1    Q.     That's half the reason that you determined for the

2    Government here that these materials were lascivious;

3    correct?

4    A.     Not completely, no.

5    Q.     The other half is the placement of the camera -- if I

6    may approach the exhibits?

7              THE COURT:  Yes.

8    BY MR. DEROVANESIAN

9    Q.     Let me show you what have been marked or not marked,

10   admitted as Government's Composite Exhibits A, B, D, and E.

11   Can you tell us what's depicted in those pictures?

12   A.     It appears to be -- Exhibit Number 36 appears to be a

13   door, Exhibit 3A appears to be a bathroom focusing on the

14   toilet, Exhibit 3D appears to be a shower stall, and

15   Exhibit 3E appears to be a bathroom sink.

16   Q.     Now in looking at those exhibits, can you tell what

17   those pictures depict specifically, what bathroom, what

18   door, where these pictures were taken?

19   A.     No.

20   Q.     And why is that?

21   A.     Because I have no knowledge of these pictures.

22   Q.     Well, you testified regarding the placement of the

23   camera; is that correct?

24   A.     Placement of the angle of the camera.

25   Q.     Okay.  Were you present when the camera was placed

KUCHTA - CROSS

1    and angled?

2    A.      No, but just based on common experience, you could

3    tell by viewing that video that the camera was placed close

4    to the floor, looking up.

5    Q.      Right.  And did you ask to see the scene photos

6    regarding this incident?

7    A.      No, I did not.

8    Q.      Did you ask why the camera was placed on the floor as

9    part of your investigation into this case?

10   A.      No, I did not.

11   Q.      Were you told why the camera was placed on the floor

12   and why the videos were facing upward?

13   A.      No.

14   Q.      You just assumed?  You made an assumption regarding

15   the placement of the camera; is that correct?

16   A.      I formed an opinion based on the overall totality of

17   that video.

18   Q.      Without -- without asking why the camera was placed

19   where it was?

20   A.      My answer is I formed the opinion based on my viewing

21   of that video --

22   Q.      Take a look --

23   A.      -- what the focus was.

24          THE COURT:  Mr. DerOvanesian, let the witness

25   finish his answer.

KUCHTA - CROSS

1            MR. DEROVANESIAN:  I apologize.

2    BY MR. DEROVANESIAN

3    Q.     Take a look at the photographs, please.  Do you see a

4    bathroom depicted in both of them?

5    A.     Yes.

6    Q.     And it's a different bathroom depicted in both; is

7    that correct?

8    A.     Appears to be, yes.

9    Q.     And there's something in common in both bathrooms in

10   the photographs depicted; is that correct?  Do you see dirty

11   clothes on the floor?

12   A.     Yes.

13   Q.     You see a pile of dirty clothes in each bathroom on

14   the floor; correct?

15   A.     Correct.

16   Q.     Now, when you viewed the video in this case, you got

17   an idea of the set-up of the bathroom, the toilet and the

18   shower; is that correct?

19   A.     Yes.

20   Q.     Are you able to look at those pictures and determine

21   which of those two bathrooms was the one depicted in the

22   video that was shown?

23   A.     It would be the one with the walk-in shower.

24   Q.     All right.  So that one has just a toilet and a

25   shower in a separate room with a door that separates that

1    from the rest of the bathroom; correct?

2    A.     Based on these photographs, I cannot tell if this

3    shower stall in 3D is connected to the bathroom depicted in

4    3E, which has the separate bathroom stall.

5            MR. DEROVANESIAN:  May I have a moment?

6            THE COURT:  Yes.

7            (Pause in place)

8    BY MR. DEROVANESIAN

9    Q.     Take a look at picture 3D then.

10   A.     Yes, sir.

11   Q.     Does that look like the bathroom that's depicted in

12   the videos?

13   A.     The video is focused on the bathroom stall, so I

14   can't tell based on this picture, no.

15   Q.     All right.  So you have no idea, as you sit here and

16   testify, that it is alleged that -- well, let me back up.

17   Do you know what the recording device was in this case?

18   A.     I have found out through the trial, but at the time,

19   I don't believe I was aware.  All I was -- all I was looking

20   at was the video.

21   Q.     You weren't told at the time you were doing your

22   investigation that this was filmed on a cell phone camera?

23   They didn't tell you that?

24   A.     No.

25   Q.     They didn't tell you that in addition to it being

KUCHTA - CROSS

1   filmed on a cell phone camera that the camera was hidden in

2   a sock with a hole in it?

3   A.      I was aware of that, yes.

4   Q.      So you didn't know what the recording device was, but

5   you knew whatever it was, it was hidden in a sock with a

6   hole in it; is that your testimony?

7   A.      Correct.

8   Q.      Now, you didn't know it was hidden in a pile of

9   clothes; is that correct?

10  A.      Yes, I believe I was told that.

11  Q.      So you didn't realize that a few moments ago, but now

12  it's coming back to you?  Is that a fair statement?

13  A.      No, it appears when you -- when you watch the

14  video --

15  Q.      I am talking about what you were told --

16          THE COURT:  Mr. DerOvanesian, Mr. DerOvanesian --

17          MR. DEROVANESIAN:  I'm sorry.

18          THE COURT:  I need you to let the witness finish

19  his response and then you may ask your question.

20          MR. DEROVANESIAN:  I apologize.

21  A.      When you watch the video, you can tell that it starts

22  with a video of the pile of clothes.  The video is then

23  turned around and there were clothes being put on top of it.

24  BY MR. DEROVANESIAN

25  Q.      Who did you meet with prior to writing your report

KUCHTA - CROSS

1   and coming to your conclusions that are contained in the

2   report, your testimony here?

3   A.      Who did I meet with?

4   Q.      Yes.  Do you know this lady here, Yolande Viacava?

5   A.      Yes.

6   Q.      Did you meet with her?

7   A.      Yes.

8   Q.      Did you discuss the evidence in this case?

9   A.      I was shown a video.

10  Q.      Who showed you the video?

11  A.      A.U.S.A. Barclift.

12  Q.      Okay.

13  A.      And at various times A.U.S.A. Viacava came in the

14  room.

15  Q.      At what point were you made aware that it was --

16  okay.  You testified you didn't know it was being recorded

17  on a cell phone until you were here today; is that correct?

18  A.      No, I was aware that evidence -- I was aware of the

19  evidence, seeing the evidence that there was a cell phone

20  involved in the case, but no one ever actually told me this

21  is what was videoed on.

22  Q.      So you found out for the first time during trial;

23  correct?  Didn't you just testify to this a few moments ago?

24  A.      The actual recording device ...

25  Q.      Do you recall testifying a few moments ago you did

KUCHTA - CROSS

1  not know what the actual recording device was, you didn't

2  know it was a cell phone until you heard the testimony in

3  this case?

4  A.    When I was reviewing the evidence.

5  Q.    Okay.  Then when I went up there and made reference

6  to the sock, you remembered the sock; is that correct?

7  A.    Correct.

8  Q.    But you didn't know what was put in the sock to make

9  the recordings, wasn't that your testimony?

10  A.    That is correct; that is correct.

11  Q.    Now, but half of the reason that you find this

12  lascivious is because the angle is directed upward; is that

13  correct?

14  A.    That's not half the reason.  A part --

15  Q.    Well, the other half was the Merriam Webster

16  definition of voyeurism?

17  A.    That's not correct, either.  That's not correct,

18  either.  Applying the case law standard that is out there,

19  the focus of the camera is on the genitalia.  When you break

20  down the video and you go in slow -- if you break it down

21  and you stop and go frame by frame on Windows Media Viewer

22  or whatever viewer you use, you can break it down in second

23  frame.  That's what I did.  I broke it down second by second

24  looking at that.

25         When you see the way it's positioned, when you

KUCHTA - CROSS

1    look at the totality of the video where he sets it up, where

2    he adjusts it, he readjusts it, he manipulates the video

3    media and the way he has it angled and he tests it and

4    retests it, then the girl comes in, and it's perfectly

5    centered on where she would be entering, would most likely

6    be nude on that video.  That's the basis of my opinion.  The

7    fact that it is done surreptitiously, my opinion is that it

8    takes it out of the realm of just videoing innocent conduct

9    and turns it into a sexual nature.

10   Q.    You obviously know what a camera is, a video camera;

11   is that correct?

12   A.    Absolutely.

13   Q.    And you've used them before; correct?

14   A.    Yes.

15   Q.    And you're aware -- you know what a tripod is?

16   A.    Yes.

17   Q.    And you've used those before; is that correct?

18   A.    Yes.

19   Q.    Have you ever filmed from a pile of dirty clothes in

20   a bathroom?

21   A.    No.

22   Q.    Do you know what it's like or what the dynamics are

23   from filming from a pile of dirty clothes?

24   A.    No.

25   Q.    Now, this is the sock that's been admitted into

KUCHTA - CROSS

1    evidence.  You want to take a look at that?

2    A.    Okay.

3    Q.    It's got a hole in it?

4    A.    Yes.

5    Q.    Now, the testimony and the evidence in this case is

6    that the phone was placed in the sock.  Would you take a

7    look at the phone, please?  That's Exhibit 1, I believe.

8    A.    Okay.

9    Q.    Are you familiar with that phone?  Have you ever seen

10    one like it?

11    A.    Similar type cell phones.

12    Q.    All right.  That phone, the recording capabilities,

13    it has a lens on one side; is that correct?

14    A.    It appears to.

15    Q.    And the screen is on the other side; is that correct?

16    A.    It appears to.

17    Q.    All right.  Now, if the phone --

18         MS. VIACAVA:  Your Honor, the Government would

19    object to this demonstration by defense counsel.  There

20    has -- in the stipulated facts, it indicates on

21    February 25th, 2010, that the camera cell phone was found in

22    the sock.  There has been no testimony as to what the

23    video -- whether the video was concealed in a sock on

24    January 26th or January 27th.  In fact, the video, itself,

25    speaks for itself with seeing the defendant placing articles

KUCHTA - CROSS

1   of clothing over the cell phone.  So a month later it was

2   found in the sock.

3           THE COURT:  So the legal basis for your objection

4   is what?

5           MS. VIACAVA:  At this point, the legal basis would

6   be relevance.  There has not been any testimony regarding on

7   the videos that this witness viewed of being -- of the cell

8   phone being contained in a sock.  It assumes facts not in

9   evidence, Your Honor.

10          THE COURT:  Response?

11          MR. DEROVANESIAN:  Your Honor, our understanding

12  is that the Government's recitation of the fact that she put

13  all these documents into evidence and these exhibits is

14  that, in fact, it's their theory that this was recorded in a

15  sock.  It's my understanding that that's what we stipulated

16  to here.  They're claiming it was a pattern of conduct.

17          THE COURT:  Well the stipulated facts do indicate

18  that on February 25th, 2010, the 13 year old minor

19  discovered that she was being videotaped when she noticed

20  the defendant's cellular telephone concealed in a sock with

21  a hole which allowed the lens to be visible and to view the

22  room.  The objection's overruled.

23  BY MR. DEROVANESIAN

24  Q.    Take a look at Government's -- the phone in the sock,

25  sir.

KUCHTA - CROSS

```
1    A.      Yes, sir.
2    Q.      Does that have a tripod, sir?
3    A.      No.
4    Q.      Does it have any way of holding it up?
5    A.      No.
6    Q.      Is there any way to remotely focus or aim that --
7    that recording device?
8    A.      I'm not familiar if it does or doesn't.
9    Q.      Oh, so as you sit there, you might be able to push a
10   remote control somewhere and be able to --
11   A.      Remote, I thought you meant digitally.  I don't see
12   any remote.  I really don't know how it works.
13   Q.      Okay.  Now, the photographs that depict the piles of
14   dirty clothes, they're on the floor; is that correct?
15   A.      That's correct.
16   Q.      And if you wanted to conceal that phone in a pile of
17   dirty clothes, then necessarily, the phone would have to be
18   on the floor; is that correct?
19   A.      That would be an assumption on my part, but yes.
20   Q.      Well, let's analyze it.  The dirty clothes are on the
21   floor; correct?
22   A.      Correct.
23   Q.      And if you want to conceal the phone in the dirty
24   clothes, then the phone would be on the floor.  It's not
25   really an assumption; is it?
```

KUCHTA - CROSS

1    A.      That's correct.

2    Q.      Now you have the phone on the floor and you're trying

3    to film something higher than the phone.  Necessarily, it's

4    going to film upward; is that correct?

5    A.      Correct.

6    Q.      So if you have the phone concealed in the dirty

7    clothes, the angle is going to be upward?

8    A.      That's correct.

9    Q.      Now, there's testimony in reference to adjusting it

10   or adjusting the focus, adjusting the angle of it; correct?

11   A.      Correct.

12   Q.      Now, look at the exhibit before you there.  Can you

13   tell what part of you that's recording from looking at the

14   screen?

15            THE COURT:  By exhibit, are you referring to the

16   camera in the sock?

17            MR. DEROVANESIAN:  I'm sorry, Your Honor.  Thank

18   you.  Yes, I'm referring to -- if I may have a moment --

19   referring to Government's Exhibit 1 which is the cellular

20   phone and Number 4, Government's Exhibit 4 which is the

21   white sock with the hole utilized to conceal the cellular

22   phone.

23   BY MR. DEROVANESIAN

24   Q.      Now looking at that, can you tell, if it were on

25   right now, what it's recording?

KUCHTA - CROSS

1   A.      If it was -- I wouldn't know exactly, but I would
2   have a rough idea of the way the -- maybe if I had some
3   experience with prior use of this cell phone device and this
4   camera device, I would have a rough idea of, you know, the
5   angle, trajectory of which way it's coming.
6   Q.      But you can't see the screen; is that correct?
7   A.      No, you cannot.
8   Q.      It's on the back of the phone?
9   A.      That's correct.
10  Q.      And it's in a sock?
11  A.      That's correct.
12  Q.      Now, the video where you made these comments, your
13  testimony that you can see the focus or whatever, what's
14  really happening is it looks like that, the exhibit, the
15  phone and the sock, that's being buried in dirty clothes;
16  isn't that correct?
17  A.      There is -- the one video, it appears that he puts
18  the phone down and he puts clothing over it.  There's
19  another video in which it's more narrowed on the -- on the
20  other video.  So it's more narrowed almost as it would
21  appear could be through a sock or -- I don't know.  I can't
22  tell that from the video.
23  Q.      But you have no reason to believe that there's any
24  way to adjust the angle of that phone other than being
25  placed in a pile of dirty clothes; correct?

KUCHTA - CROSS

1   A.      What appears to me, looking at the video, is that he

2   takes the phone, he puts it down, he turns it, he adjusts it

3   manually with his hands, he stands up in front of it at

4   varying times, he goes back and readjusts the angle.  And

5   what -- what is being viewed through that video is what you

6   see on the tape is that the shower stall and the doorway

7   where someone would walk in.

8   Q.      But you viewed the video.  He could not view that

9   video while he was setting it up; correct?

10  A.      I don't know the answer to that.

11  Q.      Well, you have the exhibit in front of you.  If that

12  were being set up in a corner, buried in a sock with a hole

13  in it and you were adjusting the angle of that in a pile of

14  clothes, is there any way to view the image on that screen?

15  A.      As it stands now, no.

16  Q.      Now were you present when Mr. Lawson testified

17  regarding the demonstrative exhibits, Defense A, B, and C?

18  A.      Yes.

19  Q.      Now, did you get a chance to look at those?

20  A.      Yes -- not before this hearing.  I could partially

21  see most of it on the video display.

22  Q.      Okay.  And Blue Lagoon, you saw the video of two

23  underaged -- what were they, ten years old?

24  A.      I couldn't tell from my angle.  I mean, I was sitting

25  behind Ms. Viacava in the first bench looking, you know,

KUCHTA - CROSS

1    onto a small screen.  I -- I could see two children

2    swimming, what appeared to be two children swimming, but

3    most of it looked dark to me.

4    Q.    You couldn't see the fact that both of them are

5    clearly under the age of ten years?

6    A.    Not from where I was sitting, no.

7    Q.    You couldn't see the fact that both of them were

8    completely nude and appeared to be doing summersaults in the

9    camera?

10   A.    They appeared nude and I could see summersaults but I

11   didn't have a closeup to whether you could see the genitalia

12   or not.

13   Q.    And may I approach, if I might, with Sally Mann's

14   book, Immediate Family, the photograph entitled Hay Hook.

15   Did you get a chance to see that when Mr. Lawson was

16   testifying?

17   A.    Yes.

18   Q.    Mr. Lawson testified that that is not child

19   pornography.  Do you agree with that?

20   A.    I believe that a finder of fact applying the legal

21   standards could come to another conclusion.

22   Q.    And you're aware that that book and the other one

23   present here, Mr. Sturges' book, these are available in the

24   local books store, Barnes & Noble; correct?

25   A.    I'm well aware of both these issues and I -- I don't

1   know if these have ever been tested legally, whether this

2   specific Hay Hook 1989 was ever -- you know, was ever

3   charged or was ever tried.

4   Q.      You made a reference earlier to your CV that was

5   prepared; is that correct?

6   A.      Yes, sir.

7   Q.      Who prepared that?

8   A.      I did.

9   Q.      Now in there, you have a reference to what you call

10  significant child pornography investigations and

11  prosecutions; is that correct?

12  A.      Correct.

13  Q.      And you listed a number of such prosecutions; is that

14  correct?

15  A.      That's correct.

16  Q.      Essentially, you listed all of them; didn't you?

17  A.      I don't believe that's completely inclusive, but

18  that's -- I mean, that's not every single investigation I've

19  ever worked, but that's a pretty much all-inclusive list

20  from the Middle District of Florida that I've charged

21  through the years, yes.

22  Q.      Excuse me, those are the ones in the Middle District

23  of Florida?

24  A.      Here in Fort Myers, yes.

25  Q.      So they are not significant child pornography

KUCHTA - CROSS

1    investigations and prosecutions?

2    A.     I don't understand your question.

3    Q.     You list them as being significant cases.

4    A.     Yes.

5    Q.     U.S.A. versus Weispfennig, sentence 27 months.   Do

6    you consider that a significant prosecution?

7    A.     That was under the old guidelines and at the time,

8    that was a significant sentence.

9          MS. VIACAVA:  Your Honor, the Government would

10   object as to the relevance of what someone else may have

11   been sentenced to.

12         THE COURT:  Response?

13         MR. DEROVANESIAN:  Your Honor, I believe it goes

14   to his credibility.  This gentleman clearly has been

15   prepared by the Government to appear here today to testify,

16   and quite frankly, if his CV is -- also contains

17   inaccuracies and misrepresentations, I think the trier of

18   fact is entitled to know that.

19         THE COURT:  The objection is sustained to the

20   extent you asked a question about the person being sentenced

21   to 27 months.  Apparently, there's nothing inaccurate about

22   that, so the objection is sustained.

23   BY MR. DEROVANESIAN

24   Q.     Could you tell us what was significant about U.S.A.

25   versus Weispfennig?

KUCHTA - CROSS

1    A.    He was a police officer.  He had an extensive amount

2    of child pornography.  He had -- he was currently working on

3    the Charlotte County Sheriff's Office as a police officer at

4    the time.

5    Q.    All right.  How about U.S.A. versus Sikorski?

6    A.    Sikorski was a father, had a small child in the

7    house, and again, he was under -- that was under the old

8    guidelines, that sentence.  But you know, he was secreting

9    child pornography.  We got him on an online sting.

10   Q.    And how is that case significant?  Because he's a

11   father with a small child in the household?

12   A.    At the time, I mean, it was a -- it was a child

13   pornography investigation and it was significant in that,

14   you know, resulted in a conviction.

15   Q.    So when you say significant child pornography

16   investigations, anything that resulted in a conviction is

17   significant?

18   A.    Yes.  Impact on the community.

19        THE COURT:  Mr. DerOvanesian, about how much

20   longer do you think you'll be, sir?  Your 15 minute estimate

21   has been woefully exceeded.

22        MR. DEROVANESIAN:  Perhaps 15 minutes, 10 minutes

23   tops.

24        THE COURT:  Okay.  You know what, we're going to

25   stop and come back tomorrow.  It's already 6:25.  I was

1   really trying to get through this today but we've been here
2   an awfully long time and I really don't want to go beyond
3   6:30 if we can avoid it.  So if you think you're going to
4   take that much longer -- and I remind you again, this is a
5   bench trial not a jury trial.  I think that perhaps that's
6   gotten lost somewhere during the course of this trial.  But
7   if you think you're going to need that much more and you
8   want to finish this area of inquiry and we'll recess these
9   proceedings and come back tomorrow.
10          MR. DEROVANESIAN:  Your Honor, one matter if I
11  might.  Since the Court is breaking during the middle of the
12  presentation of the witness, I would ask that the Government
13  not be permitted to talk to him between now and tomorrow
14  when we resume.
15          THE COURT:  All right.  Ms. Viacava, do you wish
16  to be heard on that, ma'am?
17          MS. VIACAVA:  No, Your Honor.  It's late in the
18  evening.  The Government has no intention to speaking to
19  this witness again until tomorrow morning.
20          THE COURT:  You may finish the area of inquiry.  I
21  said you may finish the area that you were inquiring about.
22  Apparently you were discussing substantial prosecutions from
23  his CV.  Did you finish that area?
24          MR. DEROVANESIAN:  Yes, ma'am.  I was finished and
25  I was going to move on to a different area.

 1            THE COURT:  Great.  This is an appropriate time to

 2    stop.  Ms. Viacava, does the Government anticipate calling

 3    any other rebuttal witnesses?

 4            MS. VIACAVA:  Not at this time, Your Honor, no.

 5            THE COURT:  Okay.  Then I'll see you all tomorrow

 6    at 10 a.m.  We're adjourned for today.

 7            COURT SECURITY OFFICER:  All rise, please.

 8            (Recess at 6:28 p.m.)

 9

10                         CERTIFICATE

11    I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND

12    ACCURATE TRANSCRIPT FROM THE ORIGINAL STENOGRAPHIC RECORD IN

13    THE ABOVE-ENTITLED MATTER.

14

15        Dated this 2nd day of February, 2012.

16

17                         /s/ R. Joy Stancel
                          _____
18                          R. JOY STANCEL, RMR-CRR
                          FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25