UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO. 2:10-CR-71-FTM-36DNF

---

THE UNITED STATES OF AMERICA,

        Plaintiff,

vs.

HONORI ALEXANDER JOHNSON,

        Defendant.

Fort Myers, Florida
May 11, 2011
10:00 A.M.

---

TRANSCRIPT OF BENCH TRIAL, DAY 2 OF 2

BEFORE THE HONORABLE CHARLENE EDWARDS HONEYWELL
UNITED STATES DISTRICT JUDGE

FOR THE GOVERNMENT:     Office of the United States Attorney
U.S. Courthouse
2110 First Street, Room 3-137
Fort Myers, Florida  33901
239/461-2200
BY:  YOLANDE VIACAVA, A.U.S.A.

FOR THE DEFENDANT:     Federal Public Defender's Office
1514 Broadway, Suite 300
Fort Myers, Florida  33901
239/334-0397
BY:  MARTIN DEROVANESIAN, A.F.P.D.

REPORTED BY:        R. JOY STANCEL, RMR-CRR
Federal Official Court Reporter
U.S. Courthouse
2110 First Street
Fort Myers, Florida  33901
239/461-2064

```
 1                        I N D E X
 2   WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS
 3   John D. Kuchta                   198     205
 4
 5
 6
 7                  E X H I B I T   I N D E X
 8   NUMBER                                            PAGE
 9            (No Exhibits Identified in this Volume)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    (Call to Order of the Court)
 2               THE COURT:  Good morning.  We are here to resume
 3      the trial in the case of U.S.A. versus Honori Johnson.
 4      Counsel, are you all ready to proceed?
 5               MS. VIACAVA:  Yes, Your Honor.
 6               MR. DEROVANESIAN:  Yes, ma'am.
 7               THE COURT:  And why don't you all go on and
 8      identify yourselves for the record, too.
 9               MS. VIACAVA:  Good morning, Your Honor, Yolande
10      Viacava representing the Government, and with me at counsel
11      table is --
12               MR. BARCLIFT:  Robert Barclift.
13               MR. DEROVANESIAN:  Good morning, again, Martin
14      DerOvanesian on behalf of Mr. Johnson.
15               MR. BADALAMENTI:  John Badalamenti, and to my left
16      is Mr. Johnson.
17               THE COURT:  Great, thank you.  Mr. Kuchta, you may
18      come back to the stand.
19               THE WITNESS:  Thank you, Your Honor.
20               THE COURT:  And let me just remind you that you
21      have previously been sworn.  I am not going to have the
22      clerk place you under oath again.
23               THE WITNESS:  Yes, Your Honor.
24               THE COURT:  You may resume your cross examination.
25               MR. DEROVANESIAN:  Thank you, Your Honor.  Good
```

1    morning, Mr. Kuchta.

2                THE WITNESS:  Good morning, Mr. DerOvanesian.

3                CROSS EXAMINATION (Cont'd)

4    BY MR. DEROVANESIAN

5    Q.    Getting back to about probably where I left off last

6    night, we were talking about some of the cases that you have

7    prosecuted.  I would ask you to reflect back on those cases

8    and ask you, how many of the cases did you prosecute -- how

9    many of those actually involved no depiction of a sex act?

10   A.    Comes to mind, there is -- there are many images that

11   were collected on hard drives that are posing and would

12   otherwise be lewd and lascivious display of genitalia or the

13   pubic area, or in the case of male victims, there are

14   numerous images located on hard drives as well as -- that

15   are also mixed in with what would be more, I would consider,

16   hard core images of child pornography, which actually

17   depicts sadomasochism and sex acts, and things of that

18   nature.

19   Q.    Getting back to my question, do you recall ever

20   prosecuting anyone where the collection of materials they

21   had did not include a sex act?

22   A.    I prosecuted Mr. Stark in the Middle District of

23   Florida.  The substantive count of production of child

24   pornography were images of a -- his girlfriend's daughter.

25   On the production, he was charged for multiple counts.  So

1    on the possession of child pornography counts, that included

2    his computer which had hard core images of child pornography

3    as well as received distribution counts within that

4    indictment were of sex acts.  However, the substantive count

5    of production of child pornography, the pictures he took of

6    his stepdaughter were not -- were pictures of her displaying

7    her genitals in a lewd and lascivious nature.  So it did not

8    include a sex act with him or anyone else involved with her.

9    Q.    So the answer to my question would be you don't

10   recall prosecuting anyone that wasn't at least in possession

11   of child pornography that depicted sex acts; fair statement?

12   A.    I believe that would be a fair statement.

13   Q.    All right.  Now again, you're still with the FBI; is

14   that correct?

15   A.    Yes.

16   Q.    And what are your current duties?

17   A.    I'm currently assigned to investigate white collar

18   crime matters.

19   Q.    Are you still a member of the task force that relates

20   to children and exploitation of children?

21   A.    I'm on a national child abduction response team with

22   the FBI.  However, I'm not the task force coordinator for

23   the Innocent Images Task Force any longer here in Fort

24   Myers.

25   Q.    Let me ask you to glance over the prosecution table.

KUCHTA - CROSS

1   The gentleman on the far end there in the greenish colored

2   suit, do you know him?

3   A.    Yes.

4   Q.    And who is that?

5   A.    A.U.S.A. Robert Barclift.

6   Q.    How long would you say you've known Mr. Barclift?

7   A.    1997.

8   Q.    1997?  So you've known him all those years; is that

9   correct?

10  A.    Yes.

11  Q.    And what's the nature of your relationship with

12  Mr. Barclift?

13  A.    I've been involved in numerous cases with him --

14  Q.    All right.  Do you also --

15  A.    -- through the years.

16  Q.    I'm sorry?

17  A.    Through the years.

18  Q.    Do you also socialize with him?

19  A.    Occasionally.  You know, not on a regular basis, but

20  I have socialized with him in the past.

21  Q.    And when you say you've had cases with him, what type

22  of cases have you had with Mr. Barclift?

23  A.    White collar cases as well as interstate

24  transportation of stolen property, and I believe -- I can't

25  say for sure if -- I believe early on I might have had a

1    child pornography case with him years back, or been

2    involved.  Maybe I wasn't the lead on it, but I've been

3    involved in child pornography investigations with him a long

4    time ago, but nothing recently.

5    Q.    Are you currently involved in any cases with

6    Mr. Barclift?

7    A.    Yes.

8    Q.    And how many cases are you involved with with

9    Mr. Barclift?

10   A.    At least three.

11   Q.    So you're working three cases right now with

12   Mr. Barclift and you've worked with him in the past?

13   A.    Yes.

14   Q.    Socialized with him?

15   A.    Yes.

16   Q.    Next let's switch to this end of the table, the lady

17   at this end of the table; do you know her?

18   A.    Yes.

19   Q.    What's her name?

20   A.    Yolande Viacava.

21   Q.    How long have you known her?

22   A.    As long as she's been at the U.S. Attorney's Office.

23   I believe on best of my recollection, I think she came to

24   the U.S. Attorney's Office in, I'm going to say, 2002.

25   Q.    So you've known her all that time?

KUCHTA - CROSS

```
 1   A.      Yes.
 2   Q.      And what's the nature of your relationship with
 3   Ms. Viacava?
 4   A.      She's -- I've had numerous prosecutions with her.
 5   Q.      And does she have a specialty or an area at the U.S.
 6   Attorney's Office that she mainly assists?
 7           MS. VIACAVA:  Your Honor, at this time the
 8   Government would have to object as to relevance.
 9           THE COURT:  Response?
10           MR. DEROVANESIAN:  Goes to bias of the witness.
11           THE COURT:  Objection's overruled.
12   A.      Yes, Ms. Viacava prosecutes primarily child
13   pornography cases, to my understanding.
14   BY MR. DEROVANESIAN
15   Q.      Now, you went through a number of the cases that you
16   had on your CV.  I randomly pulled some.  Would it surprise
17   you that all the ones I pulled had her listed as the
18   prosecutor?
19   A.      If you randomly pulled them, it wouldn't necessarily
20   surprise me.  I think Ms. Viacava has prosecuted the
21   majority of the cases I've been involved in.
22   Q.      Can you even think of one she didn't prosecute?
23   A.      Yes, Colleen Murphy in Tampa.  She didn't prosecute
24   Stark up in Tampa.  The name escapes me.  It's been a few
25   years ago who the A.U.S.A. was on that.
```

KUCHTA - CROSS

1  Q.      If I may back up, the cases that you handled in Fort

2  Myers, was she the prosecutor in all of those?

3  A.      To the best of my recollection, I'd say yes, or

4  probably 99 percent of those.

5  Q.      So for the duration of her career and pretty much the

6  majority of yours, you've worked together with Ms. Viacava;

7  is that correct?

8  A.      That's correct.

9  Q.      And are you currently -- other than this one, are you

10  currently involved with any case with Ms. Viacava?

11  A.      Yes.

12  Q.      Okay.  How many cases are you working on with

13  Ms. Viacava right now?

14  A.      There's indictments on cases which the persons are

15  fugitives as well as another white collar matter.  So I

16  would, I guess -- trying to think how many are out there.

17  Probably four or five.

18  Q.      And the nature of those cases, I think you indicated

19  one of them --

20  A.      White collar.

21  Q.      They're all white collar, at this point?

22  A.      Yes.

23  Q.      Likewise, have you ever socialized with Ms. Viacava

24  or her family?

25  A.      No.  I mean, I've gone out to lunch with her but

KUCHTA - CROSS

1    never anything -- best of my recollection, never anything

2    after hours.

3    Q.    The gentleman seated in the middle between the two

4    prosecutors, do you know him?

5    A.    Yes.

6    Q.    Who is that?

7    A.    Kevin McCormick, he's a special agent with the FBI

8    assigned to the Naples agency.

9    Q.    Do you know him?

10   A.    Yes.

11   Q.    How long have you known him?

12   A.    As long as Kevin has been in the Naples resident

13   agency.  I believe he came there, to the best of my

14   recollection, probably about 1999, 2000.

15   Q.    You've known him all that time?

16   A.    Yes.

17   Q.    Now, what's your relationship with Mr. McCormick?

18   A.    Working relationship, professional.

19   Q.    You ever socialize with him or his family?

20   A.    I've had lunch with him but I've never been to his

21   house and I don't believe he's ever been to my house.

22   Q.    And the task force that you're on, is Mr. McCormick

23   also on that task force?

24   A.    When we worked Innocent Images cases, Kevin I guess

25   was handling all of this -- I guess you could say he was

KUCHTA - REDIRECT

```
 1   loosely assigned to it because he handled -- he's in charge
 2   of multiple violations in Naples already, anything from bank
 3   robbery to white collar to child pornography and child
 4   exploitation cases.  He didn't come and report to the task
 5   force every day, but he handled the majority of the cases
 6   down in the Naples territory.
 7              MR. DEROVANESIAN:  If I may move on, here -- I
 8   have no further questions.
 9              THE COURT:  All right, thank you.  Is there any
10   redirect?
11              MS. VIACAVA:  One brief moment, Your Honor.
12              (Discussion off record)
13                   REDIRECT EXAMINATION
14   BY MS. VIACAVA
15   Q.     Special Agent Kuchta, you previously testified as to
16   your opinion as to these two videos in this particular case.
17   Did you reach your opinion based on any professional or
18   personal relationship you may have with anyone that is
19   seated at Government's table?
20   A.     No.
21   Q.     What was your opinion based on?
22   A.     It was based on the video and my training and
23   experience.
24   Q.     And what is your opinion of those two videos?  What
25   do they depict?
```

1          MR. DEROVANESIAN:  Objection, asked and answered.

2          THE COURT:  Sustained.

3          MS. VIACAVA:  No further questions, Your Honor.

4          THE COURT:  All right, thank you.  Mr. Kuchta, you

5    may return to your seat, sir.

6          THE WITNESS:  Thank you, ma'am.

7          (Witness excused)

8          THE COURT:  The Government may call its next

9    witness.

10          MS. VIACAVA:  The Government does not have any

11    other witnesses to call, Your Honor.

12          THE COURT:  Are there any other matters the Court

13    needs to take up at this time?

14          MR. DEROVANESIAN:  Your Honor, we would like to

15    again renew all of our motions that we made previously,

16    especially the motion for judgment of acquittal.

17          THE COURT:  Okay.  Response?

18          MS. VIACAVA:  Your Honor, the Government would

19    still indicate that based on the testimony, based on the

20    evidence of this case, the Government has put forth

21    sufficient evidence for the trier of fact to make a

22    determination as to whether or not the contents of those two

23    videos are child pornography.  In addition, the Government

24    has previously, in the prior Rule 29 motion, provided case

25    law across the country of similar cases, similar facts in

 1  which there was a finding that such images, such videos
 2  would depict child pornography.  The Government would ask
 3  that the Court deny this request.
 4       THE COURT:  Final comments from the moving party?
 5       MR. DEROVANESIAN:  Your Honor, we would argue that
 6  the authorities the Government is relying on are not
 7  persuasive and we would ask you to dismiss this case.
 8       THE COURT:  All righty, thank you.  I'm going to
 9  deny the motion for judgment of acquittal.  Counsel, are you
10  all prepared to proceed with closing argument or would you
11  like to submit written closing arguments?
12       MS. VIACAVA:  Your Honor, the Government is
13  prepared to proceed; however, we'll leave to it the
14  discretion of the Court.
15       MR. DEROVANESIAN:  I'm prepared to proceed at this
16  time.
17       THE COURT:  Then let's proceed with closing
18  argument.
19       MS. VIACAVA:  Your Honor, in this particular case,
20  the Government has set forth the evidence in this particular
21  case, the stipulated facts that it was the defendant who
22  possessed the Samsung cellular phone that was manufactured
23  in Korea.  There have been stipulated facts that the
24  defendant is the one who set up the camera to record a
25  minor, a person that he knew to be under the age of 18.

1    Specifically, this minor, based on the evidence of her birth

2    certificate, was 13 years old at the time.  The Government

3    has shown through the evidence that the defendant set up

4    this camera to capture the area from the shower on those two

5    occasions, January 26th and January 27th of 2010.

6            From looking at the video, itself, on both videos

7    you can see it's the defendant who is attempting to conceal

8    the camera.  You can see him placing articles of clothing

9    around it.  You can see him brushing away the lens to make

10   sure it doesn't obstruct the view.  You can see the

11   defendant standing up, looking, peering what appears to be

12   towards the lens of the camera on the cell phone and in

13   fact, on both of those days, the same area of the bathroom

14   was captured.  Didn't capture the sink, didn't capture --

15   the focal point of that video that was set up on that camera

16   was the area right in front of the shower and the shower

17   stall, and sure enough, after the minor goes in to get

18   dressed, takes her -- takes off all her clothes, is nude in

19   the shower, nude to step into the shower, she is -- appeared

20   nude where her pubic area is visible stepping out of the

21   shower as well, before she can get to her towel.  On both of

22   those occasions, that is visible.

23           The Government would argue that based on the

24   defendant positioning the camera, capturing that area, and

25   assuring that it cannot be seen, that the defendant was

1  capturing and what is captured in those videos are

2  lascivious display of the genitals and pubic area of that

3  particular minor.

4        The Government would look at the 11th Circuit

5  pattern jury instructions for possession of child

6  pornography and the Government would argue that the first

7  element, the defendant knowingly possessed an item of child

8  pornography, the Government would argue that that has been

9  proven.  Looking at the definition as to what consists of

10  child pornography, it talks about the sexually explicit

11  conduct and it defines what that means and it talks about

12  the lascivious exhibition of the genitals or pubic area of

13  any person, and it further goes on to define lascivious

14  exhibition to mean indecent exposure of the genitals or the

15  pubic area, usually to incite lust.  Not every exposure is a

16  lascivious exhibition.  It determines -- it mentions the

17  factors that could be considered.

18        Now, all the factors do not have to be met but the

19  factors to be considered, and the Government would argue is

20  found in this particular evidence, is the overall content of

21  the material.  The defendant spends all that time setting up

22  the camera to capture a young girl, girl who is 13 years old

23  that resides in a house with them.  As soon as she's out of

24  the bathroom, within two minutes, he's shutting it off.  She

25  is the only person that was targeted to capture whether the

1  focal point of the visual depiction was on the genitalia or
2  pubic area, the focal point is from the knees up.  What
3  comes into focus on that particular camera, on the cell
4  phone, that can be seen on the video is when she is stepping
5  out, the center part of that right in front of the door area
6  is what is featured.  That is where she is depicted as being
7  completely nude on several occasions.  In fact, in one
8  video, she even steps out another time to check her phone
9  and goes back in.

10         These are also videos that although they were made
11  on January 26th and January 27th, 2010, the defendant still
12  had them on his cellular phone on February 25th, 2010.  Not
13  only was the camera set up to capture this, but the
14  defendant kept these materials and he kept them in a place
15  that was accessible to him.  It was on his cell phone, a
16  place that was portable to him, a place that he could play
17  them.

18         Additionally, another factor is whether the minor
19  was partially clothed or nude.  It shows that she doesn't
20  even have to be completely nude for it to be lascivious
21  display of genitalia or pubic area.  In this case, she was
22  completely nude.  The other factor the Government would
23  argue has been shown here is whether the depiction appears
24  to have been designed to elicit a sexual response in the
25  viewer.  The defendant, Mr. Johnson in this case, spent all

1    that time setting up that camera, took the time to stand in

2    the spot where the young girl was going to be.  He took the

3    time to peer at the camera.  Went over to conceal it

4    further, hid it further.  Made sure the lens was not

5    obstructed.

6              This defendant, by his actions that are shown on

7    the video, he knew where that video was being positioned.

8    He didn't stand by the sink and look at it.  He stood right

9    in front of the shower stall to look at that camera.  He

10   then approaches the cell phone and covers it further.  The

11   Government would argue that on those two days of capture

12   that this defendant -- the only reasonable explanation was

13   that these depictions were designed to elicit a sexual

14   response.  This is a young girl.  He wanted to capture her

15   naked, completely naked, and that is what he did with those

16   two videos and that is what he possessed.

17             THE COURT:  There are other factors in the 11th

18   Circuit's jury instructions which you did not address.  Am I

19   correct in assuming that you did not address them because

20   you acknowledge there was no evidence to support those

21   factors?

22             MS. VIACAVA:  Your Honor, yes.  Looking at the

23   other elements, whether the setting of the depiction appears

24   to be sexually inviting or suggestive, for example, the

25   location or pose associated with sexual activity.  Now Your

1    Honor, there have been numerous cases, the Government has

2    argued, where the individuals have, in fact, used bathrooms

3    to videotape or record minors.  So we would leave that to

4    the discretion of the Court as to whether or not the

5    setting -- it certainly is a setting where the minor is

6    going to be expected to be naked.

7          THE COURT:  But is it associated with sexual

8    activity, though, which is what the instruction says?

9          MS. VIACAVA:  Yes, Your Honor.  The Government

10   would agree that the minor, from looking at the videos as

11   well as looking at the stipulated facts in this particular

12   case, the minor was unaware that she was being videotaped.

13   She was not performing for anyone.  She was not trying to

14   invite or be suggestive.

15          In addition, it also talks about whether the minor

16   appears to be displayed in a natural pose or inappropriate

17   attire.  The Government would agree that a person going into

18   the shower would be expected to be nude.  However, here, she

19   would not be expected to be viewed.  She clearly on the

20   video closes the door, expects that she's going to have

21   privacy, expects that she can disrobe and -- and that door

22   is going to prevent anyone from seeing her.  Unbeknownst to

23   her, she's being recorded.

24          Whether the depiction appears to convey sexual

25   coyness or apparent willingness to engage in sexual

1    activity, the Government would agree that it does not.  This

2    victim, this minor was not aware she was being videotaped.

3    She was not in any way trying to appear or perform for those

4    videos.  The Government would concede that.

5         In addition, the Government has -- would argue

6    that all of those factors do not need to be met.  These are

7    factors that can be considered as to whether or not it's

8    lascivious exhibition of the pubic area.  Those are just

9    some of the factors to be considered.  But there are at

10   least, the Government would argue, four of those factors

11   that have been shown here.

12        In addition, the Government would also point to --

13   the Government briefly mentioned a district court case, a

14   United States versus Helton yesterday.  The Government has

15   located a Tenth Circuit decision on that United States

16   Helton case.  It's a 2008 decision and it is cited as 302

17   Fed. Appx. 842, in which the Tenth Circuit of the United

18   States Court of Appeals reviewed the district court's

19   findings that the images were child pornography.  In this

20   particular case, the facts were that on or about

21   January 3rd, 2007, the defendant's brother and sister-in-law

22   found a camcorder and two videotapes in the defendant's

23   bedroom in his residence in Oklahoma City, Oklahoma, and

24   after reviewing the tapes and discovering the contents, they

25   delivered those tapes to the police, and they talk about the

1    incriminating portions of the tape.  They talk about the

2    videos being approximately 90 minutes long but a majority of

3    it is blank.  They talk about the incriminating portions of

4    it, that the tape shows the defendant placing a camcorder in

5    the bathroom of the residence at approximately the level of

6    his head.  He later is shown retrieving the camcorder and

7    placing it at floor level directly across from the toilet.

8    The defendant was shown positioning his camera to angle

9    upward towards the toilet.  He is also shown placing paper

10   around the camera to secure and conceal it.  Approximately

11   two and one-half minutes of the video depict the 11 year old

12   girl, along with her mother, who had been staying at the

13   defendant's residence in 2005.  It goes on to indicate that

14   the minor is first seated on the toilet facing the hidden

15   camera located below.  That the minor's face and upper body

16   are visible, and that she's wearing a bra.

17           It goes on further to state that the minor stands

18   up and pulls up her underpants.  Her underpants are the

19   center of the focused area.  A portion of the bare midriff

20   and upper legs are visible but the underpants and pubic area

21   comprise the primary image for one and one half to two

22   minutes.  The minor then pulls up her shorts and walks away

23   from the camera view.

24           They go on further to talk about the second

25   videotape which appears that was found in the defendant's

1    bedroom and that a portion of the tape shows the defendant

2    concealing the camcorder in a waste basket in the bathroom

3    and arranging it so as to point upwards.  A later portion

4    shows the defendant entering the bathroom and rearranging

5    the camcorder, adding toilet paper around it to secure it

6    and adjusting it several times.  Among the depictions shown

7    is a minor who is approximately six or seven years old, seen

8    going into the bathroom sitting on the toilet.  Her pubic

9    area and genitals are not exposed.  There is also a 14 year

10   old in the bathroom with her at the time who undresses for

11   the shower and her breasts and buttocks are displayed but

12   her pubic area is not visible.  Those are the facts of this

13   particular Tenth Circuit case.

14          THE COURT:  What was the defendant charged with in

15   that case?

16          MS. VIACAVA:  This defendant was charged with

17   producing child pornography.  They give a discussion where

18   they acknowledge the district court when the Court found the

19   defendant guilty of acknowledging that the defendant's

20   bizarre conduct here was far different from the profoundly

21   unspeakable and destructive types of child pornography

22   usually brought before the court under Section 2251(a).

23          It goes on further to state that the Government's

24   exhibit, the part of the videotape that shows the young girl

25   with her mother in the bathroom, clearly constitutes

1   exhibition of the genitals or pubic area within the meaning

2   of the statute.   The statute does not specify the genitals

3   or pubic area must be fully or partially uncovered in order

4   to constitute an exhibition, and like other sister circuits,

5   we declined to read such a requirement into the statute.

6          Well here, we do have full nudity.   We have it on

7   both of those videos.

8          In addition, the Tenth Circuit spoke about the

9   Eighth Circuit that held a reasonable jury could conclude

10  the images of the minor female at a beach wearing bathing

11  suit bottoms constitute lascivious exhibition of the pubic

12  area because of the way in which the picture was framed.

13  The same holds true here in the Helton case.   The tape that

14  the defendant produced was designed to and succeeded in

15  capturing the image of the minor's minimally clothed

16  genitals or pubic area.   Though covered, the image of the

17  minor's genitals or pubic area the focus of the camera for

18  over one minute.   As such, it easily satisfies the statutory

19  requirement of being exhibition of the genitals or pubic

20  area.

21         It goes on further to discuss the Dost factors and

22  they use that in determining whether or not it was, in fact,

23  a lascivious display or lascivious exhibition of the

24  genitals or pubic area.   The Court held that a fully -- they

25  wholly agreed with the Third Circuit that all six Dost

1    factors need not be present in order to bring the depiction

2    under the prescription of the statute.   The district court

3    found the first Dost factor was present.   The Court afforded

4    the second factor some weight.   First factor being whether

5    the focal point of the visual depiction is on the child's

6    genitalia or pubic area.   We would argue that as we can find

7    in this particular case we would argue that because of where

8    the camera is positioned, where the cell phone or video

9    camera is positioned that is what is designed to elicit is

10   her before she got in the shower, when she came out of the

11   shower.   The clear focus of that is on the shower stall, the

12   doorway area of the shower stall, and the area right in

13   front of that.

14          The Tenth Circuit looked at the court afforded the

15   second factor some weight because it found the setting to be

16   sexually suggestive based on the defendant's staging of the

17   video camera, the second factor being whether the setting of

18   the visual depiction is actually suggestive.   For example,

19   in a place or pose generally associated with sexual

20   activity.   It was because of the defendant's actions of how

21   he concealed it and how he positioned it that the Court gave

22   it some weight.

23          The Tenth Circuit talked about the court concluded

24   the sixth factor was present when analyzed subjectively.

25   The Court determines a subjective analysis was appropriate

1   because such analysis best serves the statutory purpose of

2   prohibiting the sexual exploitation of children.

3         They further go on to say, we agreed with the

4   Ninth Circuit that lasciviousness is not a characteristic of

5   the child photographed but of the exhibition that the

6   photographer sets up for the audience that consists of

7   himself and like minded individuals.  Goes on further to say

8   lascivious exhibition of the genitals or pubic area of a

9   minor necessarily requires only that the material depict

10  some sexually explicit conduct by the minor subject which

11  appeals to the lascivious interests of the intended

12  audience.

13        In this case, again, what was captured, it wasn't

14  the minor in any other room of the house.  It was

15  specifically the bathroom where she was going to be naked

16  for her shower.

17        The depiction of the child is lascivious

18  exhibition of the genitals when the image is intended to

19  elicit a sexual response in the viewer.  They go on further

20  to say that defined in this way our task is simply -- that

21  the court acknowledges the task was simply to determine

22  whether the defendant intended the videotape he produced to

23  elicit a sexual response in the viewer, defined as himself

24  and like minded individuals, and found that clearly he did.

25        It further goes on to state that this person was

1    convicted of producing child pornography, but the court goes

2    on to say the Government's discretion in charging is beyond

3    the purview of their review.  It goes on further to note the

4    charging decision is primarily a matter of discretion for

5    the prosecution and the prosecutorial discretion in charging

6    is nearly absolute.  They found no error and fully agree

7    with the district court's conclusion that the videos in that

8    case were, in fact, child pornography, that it was a

9    lascivious exhibition of the genitals or pubic area.

10           So that is the Tenth Circuit from 2008.  And the

11   Government had previously cited to the Court in the Rule 29

12   motion the most recent case from the Eighth Circuit, the

13   April 5th, 2011, case, United States versus Johnson, which

14   currently is found at 2011 Westlaw 1236442.  Again, that's

15   another circuit that found that similar conduct did amount

16   to lascivious exhibition of the genitals.

17           Just to remind the Court, these were the facts of

18   that case, which is when they had a coach that set up a

19   scale and had the girls going in to weigh themselves and

20   told them to weigh themselves nude, so they walked in there

21   and he had already set up his recording device to capture

22   them while they were naked.  And they found in the Eighth

23   Circuit that a reasonable jury could conclude that those

24   videos of teenage females disrobing and weighing themselves

25   in the nude could not reasonably be compared to innocent

1    family photos, clinical depictions, or works of art.

2            And that's what the Government would argue in this

3    case.  Even the defense expert, Mr. Lawson, indicated that

4    the videos he reviewed did not appear to be clinical

5    depictions.  They could not be compared to art.  They could

6    not be compared to innocent family photos.  In this

7    particular case, this defendant captured this victim while

8    she was naked, this minor while she was naked, and he did it

9    on more than one occasion.  The stipulated facts are he did

10   this at least -- he did this on four occasions.  On

11   February 25th, 2010, when she first -- when she discovered

12   that she was being recorded, what she saw was herself being

13   recorded in the bathroom.  That's when she -- the

14   defendant's cell phone was turned over to law enforcement.

15   She also, and it's contained in the stipulated facts, saw

16   that there was another video that depicted her and she

17   deleted that, and the two remaining are what has been played

18   for this Court to see what the defendant had been capturing.

19           The Government, in this particular case, has gone

20   forward with a possession of child pornography.  It has the

21   same considerations as the cases dealing with production in

22   terms of the lascivious exhibition of the genitals and pubic

23   area.  The Government would argue that that is what those

24   two videos show and that is what the evidence concludes.

25   There's no other -- although the Government does not have to

1   show the purpose for why the defendant did it, one of the

2   factors is whether the depiction appears to have been

3   designed to elicit a sexual response in the viewer and this

4   man, this defendant, took his time to ensure what he was

5   going to capture and who he was going to capture and he kept

6   it.  So not only was it recorded, but it was kept and then

7   he did it again and he still had it on his phone as of

8   January 25th, 2010.

9           The Government would argue that the case has been

10  proven beyond a reasonable doubt, that all the Dost factors

11  may not be met, but the overall content of the material, the

12  focal point of the visual depiction is on the pubic area of

13  the minor and that the minor is, in fact nude, not partially

14  clothed but nude.  And that the depiction appears to be

15  designed to elicit a sexual response in the viewer.

16          The Government would also rely upon some of the

17  previous cases that the Government has argued to this Court

18  at the Rule 29 motion.  The Government would also rely upon

19  United States versus Gool, G-O-O-L, 2008 case from the

20  District Court in Iowa in which the court also found that

21  the defendant pointed the camera so as to capture videotape

22  of the minors as they disrobed, entered, and exited the

23  shower and dressed again.

24          In addition, the Government would rely upon United

25  States versus Culliper, a 2007 case from the District Court

1   of Virginia in which the Court found that the defendant had,

2   in fact, been -- had cameras that he -- the defendant

3   admitted he placed the cameras in the bathrooms and he

4   videotaped activities in the bathrooms and the videotape of

5   the girls showed that they were in various states of

6   undress, including being totally nude, and clearly showed

7   the pubic area, including the pubic hair of each of the

8   girls.  They found that to also be child pornography.

9           So at this point, the only question for the Court

10   to decide, essentially -- because most of these elements

11   have already been admitted by the defendant.  It is clear

12   that he possessed the camera.  It is clear that he is the

13   person that set it up.  He admitted it from the stipulated

14   facts as well as he can be seen in the videos, themselves.

15   It is clear that this phone was manufactured outside the

16   state of Florida, manufactured in Korea, so the material

17   that was used to produce those videos had been shipped or

18   transported in interstate or foreign commerce.

19           The only question left to ask is whether or not

20   the images, the videos, there's been testimony from

21   Mr. Lawson as well as special agent Kuchta, that these are

22   two videos.  The videos consist of multiple still images

23   being placed together.  So although there's only two videos,

24   in order to capture what he captured, it actually comprises

25   multiple images, and that's what he kept.  He kept those two

1   videos.  He captured frame by frame of this young girl

2   disrobing when she thought she had privacy and this young

3   girl clearly being recorded and captured at 13 while she was

4   naked, completely naked.

5          So based on all the evidence presented in this

6   particular case, the Government would ask that you find this

7   defendant guilty of possession of child pornography.  Thank

8   you.

9          THE COURT:  All right, thank you.

10  Mr. DerOvanesian?

11         MR. DEROVANESIAN:  Thank you, Your Honor.  Good

12  morning again.  Well one thing I agree with the Government,

13  Mr. Johnson was clearly in possession of the images in this

14  case and as they were displayed on the cellular phone that

15  the Court had the opportunity to observe.  Also, clearly, he

16  is the one who set up the phone and made those recordings.

17         The images, however, did not capture any sex act.

18  They did not capture any act of bestiality, masturbation,

19  sadistic or masochistic abuse.  And it is our position that

20  the images also did not capture any lascivious exhibition of

21  the genitals or pubic area of the subject young lady.  I'd

22  argue to the Court that reviewing the material fairly, that

23  the focal point is the shower area of the bathroom.  That's

24  what is depicted in those images.  There's no zooming below

25  the waist.  There's no focus on a particular area of the

1   body.  It's a general -- the camera is set up generally to

2   film the area in front of the shower.  There's nothing

3   sexually suggestive about the location.  A bathroom is

4   merely a place where people shower.

5           The young lady is not displayed in an unnatural

6   pose.  Our position is she's not displayed at all.  She

7   doesn't know she's being filmed.  She's not posing for the

8   camera.  There's no display.

9           The attire, there's no inappropriate attire.  Yes,

10  she's unclothed at one point, but she is taking a shower.

11  Most people bathe in the nude.  There's nothing

12  inappropriate about the attire.

13          Sexual coyness or apparent willingness to engage

14  in sex -- again, she's not posed.  She's not doing things

15  for the camera.  She doesn't know she's being filmed.  None

16  of those factors apply.

17          The depiction, our position is it is not designed

18  to elicit sexual response in the viewer.  Nothing to

19  establish that that is the case here.  The client took the

20  videos.  We've stipulated to those facts.  The videos do not

21  depict child pornography, and again, our position is this is

22  a voyeurism case nearly identical to U.S. versus Steen, 634

23  F.3d 822nd.

24          Now, I'd like to take an opportunity briefly to

25  cover some of the testimony that's been presented in this

case.  The first relevant witness after the stipulation was
Marcus Lawson.  I would argue to the Court that the evidence
showed that this gentleman was a career law enforcement
officer.  He worked for United States Customs, FBI, Secret
Service.  He had a distinguished career, and essentially,
based on his testimony and what he described, he was
instrumental in setting up some important prosecutions, not
only that impacted the entire western region of the country,
but a great deal of the country.  He was Mr. Porn for the
west coast working for the Government.  That's what the
evidence established.  This gentleman, through his
testimony, indicated that he had literally viewed millions,
millions of images of child pornography in his public and
private careers.

He left the public sector and then started a
consulting company.  He -- and I think what's important is
when you compare this gentleman's testimony to that of the
Government's expert, I submit that this is important.  This
man is a private consultant.  He can be hired by anyone.  He
indicated that he's not only a consultant for defense
attorneys.  He also is a consultant for prosecutors and
prosecution.  He did indicate -- I think that's important.

Also, he indicated that he viewed the material in
this case.  It was provided to him out there and he saw
everything that was consistent with the material he saw in

1    the courtroom.  What's important is this gentleman indicated

2    under oath that 90 percent of the time, his review and

3    evaluation of the evidence is favorable to the Government;

4    90 percent of the time, which means only 10 percent,

5    obviously, is favorable to the defense.  He viewed the

6    images in this case.  He determined that the images are not

7    child pornography.

8            We showed him the -- the Defense Exhibits A, B,

9    and C, the two art books and the excerpts from the movie,

10   Blue Lagoon.  He explained what was depicted in those

11   images.  He compared them to the Dost factors, and more

12   importantly, he compared them to the images in this case

13   that Mr. Johnson took.

14           I would submit that based on his testimony, he

15   indicated that the images in the art books and in the movie

16   range from being similar to the video that Mr. Johnson took

17   in our case or actually worse than the images that

18   Mr. Johnson took.  He explained his methodology.  He

19   explained the process.  Most importantly, he explained that

20   not only were the images in -- some of the images in those

21   materials worse than what we have in our case,

22   notwithstanding, his testimony was is that neither

23   constitute child pornography, in his expert opinion.

24           He noted that in neither of the materials, that is

25   any of the books or the movie or in the material that

1    Mr. Johnson took, there were no sex acts.  There was no

2    bestiality.  There was no masturbation, sadistic or

3    masochistic abuse.  The one image that I showed him, if I

4    may, the Sally Mann book entitled Immediate Family, there

5    was one image in there, it's called Hay Hook, H-A-Y,

6    H-O-O-K, 1989, I submit the witness had an issue with that

7    one, but he determined that in its entirety, he did not

8    consider that image to be a depiction of child pornography

9    either.

10           But what's important is he compared all of these

11   factors to the evidence in this case and he determined that

12   of all the Dost factors, the only one that clearly applied

13   to the video that Mr. Johnson took was the concept nude.

14           The Government pressed him further on the concept

15   of eliciting a sexual response.  I submit to the Court it

16   had an opportunity to watch Mr. Lawson, consider that,

17   ponder the question and give an honest response.  His honest

18   response was, well, there probably are some people out there

19   that you could find that would find the images to be

20   sexually -- some type of sexual response in relation to

21   them.  That was his honest response.  But we would submit to

22   the Court that that is not the standard in this case.

23           The video in our case shows a young lady

24   undressing, getting into a shower, and getting out.  Nothing

25   more, nothing less.  Additionally, I think this came up

1    primarily during the Government's cross, Mr. Lawson was

2    questioned about voyeurism.  I would submit that what was

3    happening was the Government was trying to muddy the waters

4    regarding this concept and Mr. Lawson, in fact, did explain

5    this concept during his testimony, and this was in lieu of

6    some type of dictionary definition.  He explained to the

7    voyeur, the excitement or thrill is in secretly viewing or

8    recording the person without their knowledge.  There need

9    not be any sexual element in it.

10            Notwithstanding all of these factors,

11    notwithstanding the Government's cross examination, his

12    opinion never wavered, his opinion didn't change.

13            Additionally, what I did, or it was my intention,

14    I believe I did, was in lieu of covering just the Dost

15    factors, I covered the 11th Circuit pattern jury instruction

16    factors that they list for determining whether there is a

17    lascivious exhibition.  And what's interesting to note is

18    that there are actually seven of those.  What they -- in my

19    opinion, what they consist of is the first one refers to the

20    overall content of the material.  That one seems to be added

21    by the pattern jury instructions and the remaining six seem

22    to be essentially straight out of Dost.  But I submit to the

23    Court that all of those were covered regarding material that

24    Mr. Johnson captured and all of those were explained and the

25    witness, in his professional opinion, determined that the

1   material was not child pornography.

2             The next person that testified was the

3   Government's expert.  I would like to point out to the Court

4   that in lieu of hiring someone who has no connection to the

5   agencies involved in this case, this prosecution, or the

6   prosecutors, they just brought in Mr. Kuchta.

7             On the other hand, we brought in someone that

8   works for prosecution, works for defense.  He's an

9   independent consultant.  We didn't bring someone in from our

10  office who we're working on a case with, unlike the

11  Government.  This man has never previously been qualified as

12  an expert, never previously testified as an expert at trial.

13  And I would submit to you that what is most troubling is

14  taking his testimony in light of the representations that

15  were made by the Government at the prior hearing.  It's hard

16  to determine just when this man became involved.  I believe

17  his testimony was that he became involved Wednesday and

18  Thursday of last week, which would have coincided with our

19  hearings that we had in this case, and I recall Ms. Viacava

20  said that the materials, the video was shown to him on

21  Saturday.  I don't know what exactly the situation is here,

22  but I would submit to the Court that the Government has had

23  this case for a long period of time.  If they wanted to

24  present a fair and unbiased opinion regarding a witness,

25  bringing someone into this case, trying to qualify them as

1    an expert when you have worked with that person for your

2    entire career as a prosecutor prosecuting cases, and you

3    still have cases with him and this gentleman knows the case

4    agent in this case, they work for the same agency, I would

5    submit to the Court that all of those factors are important

6    in determining what weight to give to Mr. Kuchta's

7    testimony, if any.  And I would submit to the Court that

8    little or no weight should be given to his testimony.

9            But even if you consider his testimony, I would

10   submit that his testimony is based on two false and

11   erroneous conclusions.  The first one -- actually let me

12   cover them both and then go back.  His conclusions that the

13   images captured in this case are child pornography are based

14   on two theories.  One, the angle of the camera, and two,

15   this dictionary definition of voyeurism.

16           Regarding the angle of the camera, I'm sure it's

17   on everybody's mind.  It was last night that we learned for

18   the first time that notwithstanding the fact that this

19   gentleman wrote a report finding that the angle of the

20   camera was what was determinative here making this one of

21   the reasons that it's child pornography, he had no idea that

22   this was recorded on a cell phone as opposed to any other

23   type of camera.  He had no idea that the cell phone was

24   concealed in a sock -- or at some point he backed up and

25   maybe he remembered seeing the sock, wasn't sure about it.

1  He had no idea that it was concealed in a pile of dirty

2  clothes in the corner, or maybe he did, depending on his

3  testimony and at what point.  I don't know that we got a

4  straight answer regarding any of that.

5              But I submit to the Court he had an opportunity to

6  see the video.  He had an opportunity to see that phone

7  being set up in the bathroom.  I would submit to the Court

8  that what the video shows is that the object is being placed

9  in the corner.  Items are being placed over it to conceal

10 it.  It is obviously set up in the direction of the shower,

11 but anything else that's happening is in an effort to

12 conceal it.

13             The witness was asked, well, did you look at it to

14 see if the lens was adjustable, can you zoom it, can you

15 remote control this in any way?  No, no, no.  Didn't even

16 know it was a cell phone.  Didn't know it was concealed in

17 the corner.  Yet, got no problem writing up a report

18 favorable to his team here.

19             Dictionary definition of voyeurism.  I would

20 submit to the Court that this is just wrong in so many ways.

21 First of all, again, since we are here on a possession case

22 versus a production case, it is an objective determination

23 as to who the materials are appealing to, as far as any type

24 of the elicit -- eliciting a sexual response.

25 Notwithstanding that, Mr. Kuchta is going to the dictionary,

1    looking up voyeurism, finding some mention of the word sex,

2    and then his conclusion is is that if voyeurism involves

3    people and involves sex and you have a group of voyeurs,

4    then this -- the materials that Mr. Johnson took might

5    elicit a sexual response in them.

6         I would submit to the Court that this type of

7    argument is nonsense.  It's not consistent with the law and

8    it's just a fabrication by the Government and by the

9    Government's team to try and help them with this case.

10   Mr. Kuchta has never prosecuted a case like this and he's

11   applied the legal standards known to him, and we got a

12   pretty good idea of that when he quoted that there were just

13   five Dost factors, when in fact everybody knows there are

14   six.  Apparently Mr. Kuchta doesn't know that.

15        And again, he wouldn't know that because all the

16   cases he's prosecuted all involves acts of sex, sex acts.

17   He doesn't have to deal with any of these other factors

18   because he's never prosecuted a case like this.

19        I submit to the Court that when you consider his

20   presentation, consider his testimony, the fact that he's

21   never even seen any of these exhibits with the exception of

22   maybe the sock, hasn't looked at the phone, hasn't seen any

23   of that, I submit to you that he wasn't very well prepared.

24   But clearly, he was presented as part of the team.

25        The other thing that I would submit was

1    fascinating and went tremendously towards his credibility is

2    when I showed him the materials, mentioned the footage from

3    Blue Lagoon that made reference to the two publications,

4    Defense Exhibits A through C.  He seemed to stay away from

5    the image in Blue Lagoon.  I would submit to the Court that

6    finally, he did seem to admit that he could see the children

7    swimming nude.  I would submit to the Court everybody else

8    present could see that the children were clearly swimming

9    nude.  He did not seem comfortable answering that question.

10           Regarding the other images, that was interesting.

11   We originally filed the motion so that we could possess

12   these materials for part of this hearing without being in

13   fear of prosecution.  Some people criticize me as going a

14   little too far.  Maybe it was unnecessary.  After showing

15   the materials to Mr. Kuchta and hearing the response from

16   him, I'm not so sure that it was.

17           I submit to you that in fact if the Government had

18   asked Mr. Kuchta to find that all the demonstrative aids

19   were illegal, too, he would have done that.  Mr. Kuchta, to

20   summarize him and his testimony, I would submit taking one

21   for the team is a good theme to describe him.  They could

22   have gone out and hired an unbiased witness, someone who

23   could come in and analyze the evidence, give them honest,

24   unbiased opinion like we did, but instead of doing that,

25   they brought a member of their prosecution team.

1          Ms. Viacava, during her presentation, made

2    numerous references to the concept of collection.  She kept

3    trying to develop that concept.  Later on I suspect it looks

4    like she kind of abandoned it and didn't go on with it any

5    further.  I would submit to the Court that we did have a

6    collection in this case and an important one, and what it

7    was was the cases that the Government has used all

8    throughout this case, and I would submit to the Court that

9    what those -- those constitute a collection and what they

10   all are is non-precedential, meaning they're unrecorded

11   cases they have based this prosecution on.  If there's any

12   collection in this case, that's a collection, and that's

13   what the Government used.

14          Mr. Badalamenti, on the other hand, used cases

15   such as New York versus Ferber, United States Supreme Court,

16   which stands for the proposition that nudity alone does not

17   render an image to be pornography.  United States versus

18   Williams out of the 11th Circuit, 2006, it's cited in the

19   pattern jury instructions.  We have cases from the First,

20   Third, and Fifth Circuits.  It's not surprising that the

21   Government kept going to unreported, non-precedential cases

22   from all over the place because if they had gone to places

23   like the Fifth Circuit in United States versus Steen or

24   presented that case to the Court or disclosed that it

25   existed, it wouldn't be favorable to them.  It would not

bolster their case.  In Steen, when you have facts nearly
identical to what they're prosecuting, the fact that it came
out in February -- maybe give them the benefit of the doubt.
Maybe after they read the case, they should have dismissed
after the opinion came out, but no, they continue on with
the prosecution and come up with even more worthless cases.

U.S. versus Villard, Third Circuit,
Mr. Badalamenti argued that one as well.  The Court knows
that even though you have a minor child lying on a bed who
is partially erect, the Court talks about that part, the
picture only showed half of the minor and they say that even
though he had an erection, it wasn't the focus of the
picture.  They go on, mere display of pubic area, genitalia,
is not enough.

1st Circuit, U.S. versus Amirault, Mr. Badalamenti
made those arguments.  Again, the pubic area is visible in
the bottom quarter of the photograph.  No zooming in, no --
nothing done to highlight or show that there is any type of
zooming or anything on that case.  But these are real cases
and the Government wants to stick to their collection.

Going to the Government's latest collection,
Helton is another one of the cases similar to the quality
the other ones the Government has relied on in this case.
Right off the bat, it's a production case, and all of her
arguments regarding the audience and who the audience was

1    and what the materials were produced for, none of that is

2    applicable in a possession case, but she continues on with

3    it anyway.  Notwithstanding the quality of the case, or

4    lack, or the fact that it doesn't particularly apply here,

5    immediately she points out distinctions.  The area depicted

6    in that case, factual finding by the court was in the center

7    of the video.  Forgive me, I never felt or thought I would

8    be standing in public arguing such a thing, let alone in a

9    courtroom, but I guess I have to argue the distinction

10   between a shower case and a toilet case.  It appears that

11   that's what this is, is a toilet case.

12        I submit to the Court that if someone is intent on

13   filming the pubic area of a person, that perhaps, I guess

14   I -- it's coming from these cases, I would not think of such

15   a thing, what they seem to be doing is setting a camera up

16   in front of a toilet and facing the toilet.  The theory

17   being that when people sit down on the toilet, that

18   obviously they will be unclothed and the likelihood is that

19   the pubic areas are going to be exposed when you do that.

20   That's a distinction.

21        Most of the cases we see, and this one again she's

22   reading it here in court, is sounds like a toilet case.  And

23   that is totally different than the situation where you have

24   a case like ours in a shower.  Setting up a phone in a

25   shower generally facing the shower is going to capture

1    someone coming in and out of the shower.  It's not zoomed in
2    on the young lady's pubic area.  It's not zoomed in on any
3    part of her body.  It's a general video of the shower.  It's
4    not a quote/unquote toilet case where you would expect the
5    only image you would capture would be a pubic area.  I hate
6    to make that argument, but it is a distinction, and even
7    though we would argue that the case is of little merit or
8    worth, I would argue to the Court that it is the
9    distinction.

10         In considering the evidence in this case, and
11   everything that was presented, we did enter into
12   stipulations and we did make agreements with the Government.
13   There was one thing that we were not asked to stipulate to
14   and that is, was what Mr. Johnson did in this case wrong.
15   Was what Mr. Johnson did, did it constitute a violation of
16   this young lady's privacy rights, and did we think he should
17   be punished for it.  If the Government had offered those as
18   part of the stipulation, we would agree with those as well.

19         As a final matter, I would like to discuss the
20   Dost factors just very briefly.  The Dost factors, as the
21   Government points out and comes from the case law, it's from
22   the jury instructions as well, they don't all have to be
23   met, obviously.  Not every Dost factor has to be established
24   in order to meet the factors.  By the same token, there is
25   no magic number as to how many of them it takes for a

1    conviction.

2           For instance, the fact that the Government could

3    establish one factor, nudity, we would submit that alone is

4    not enough.  The Supreme Court backs us on that.  The fact

5    that the expert witness indicated that, yes, there might be

6    some people out there that might find this, a sexual

7    response to this, the fact that our expert said that, that's

8    not the standard.  The standard is, is would generally the

9    population reach that conclusion.  I would submit to the

10   Court that they would not.  They would conclude by looking

11   at those, what is depicted is a young lady going in and out

12   of a shower, and I would submit that even if two factors are

13   met, which they are not -- I would submit only one is met

14   and it was our expert's conclusion that two is not enough.

15   Three, four may not be enough.

16          Finally, considering the overall content of the

17   material, I would submit that it's exactly as we indicated.

18   It's a young lady taking a shower and getting out.  Focal

19   point of the visual depiction, it's not on her genitalia or

20   pubic area.  It's a general shot of the shower.

21          Suggestive setting, sexually inviting or

22   suggestive, not that way at all.  It's a shower.  There's

23   nothing sexually suggestive about it.  No testimony from our

24   expert or Mr. Kuchta that there's anything sexually inviting

25   about that.

1    Appears displayed in an unnatural pose or
2    inappropriate attire, there was testimony regarding this.
3    The testimony was that someone taking a shower is usually
4    nude and that there's nothing unnatural about that.
5    Partially clothed or nude?  Yes, she was nude.
6    That's the one factor that Mr. Lawson confirmed that applies
7    in this case.  And again, whether the depiction appears to
8    convey sexual coyness or apparent willingness to engage in
9    sexual activity doesn't apply here.  She doesn't know she's
10   being filmed.  She's not playing to the camera.  She's not
11   doing summersaults naked in front of a video camera for a
12   movie.  She's not posing naked for -- to be published in an
13   art book.  So none of that applies here, although it clearly
14   applied in some of the materials that we used with the
15   expert.
16   Finally, Your Honor, I would submit to the Court
17   that when you take into consideration all of the evidence in
18   this case, the meaningful cases that are out there -- and
19   there are meaningful cases out there and we cited them to
20   the Court -- and that you consider the evidence here, we
21   would argue to the Court that the Government's proof did not
22   rise to a level of proof beyond a reasonable doubt and we
23   would ask you -- and again, we're not -- we're not saying
24   that Mr. Johnson's a great guy.  We're not saying that
25   taking these pictures of this young lady was a good thing or

1    anything that was proper.  We're not saying that we didn't

2    find it offensive.  What we are saying, Your Honor, is it is

3    not child pornography.  Thank you.

4            THE COURT:  All right, Ms. Viacava?

5            MS. VIACAVA:  Your Honor, what the Government

6    would argue that the evidence has shown and what is relevant

7    in this particular case is what this defendant, Mr. Johnson,

8    did and that is that he knowingly possessed child

9    pornography between the dates of January 26th, 2010, and

10   February 25th, 2010.  He knowingly had videotape depicting a

11   13 year old as she was featured completely nude in these

12   videos.  It depicted her, captured her, and he had that and

13   kept it.

14           In this particular case, what is relevant is the

15   fact that Mr. Johnson, the defendant in this case, set up

16   his cellular phone in a room that he knew that this minor

17   would be entering, that he knew that she had to undress,

18   that she would be naked before she got into that shower.  He

19   knew that she would be completely naked when she got out.

20   He set up that particular cell phone to capture the area of

21   the shower stall, the door of the shower, and the area in

22   front of the shower.  And he collected these two videos,

23   kept them.

24           He had two other ones.  One the stipulated facts

25   indicate the minor deleted.  The other one that she found

1    recording her on February 25th, 2010.  Mr. Johnson was

2    keeping a collection of these videos on his phone of the

3    same minor featured naked in the bathroom, that showed her

4    pubic area.  That is what is relevant in this particular

5    case.

6            The Court was able to see those videos on the

7    computer monitor as well as on the cell phone.  Regardless

8    of whether these videos were played on the computer monitor

9    or on the cell phone, itself, it was visible on both of

10    those formats that this minor was captured where her pubic

11    area was visible.  That is what this defendant did.  That

12    was the choice that he made and those were his particular

13    actions.

14            Now, defense counsel talked about Mr. Lawson's

15    testimony.  Mr. Lawson's testimony, he agreed that the minor

16    was unaware she was being recorded, from looking at the

17    videotapes, and that's what he did in this case.  He

18    testified that he looked at the video, the videos that had

19    been provided.  They were sent to him in another state so he

20    had access to them.  He reviewed the same materials that

21    Special Agent John Kuchta reviewed, and from looking at

22    those videos, Mr. Lawson offered his testimony.  And in that

23    testimony, he indicated that he was able to see the minor

24    nude, that he was able to see her pubic area in those

25    videos.  He agreed with that.

1    Now, when he went through the Dost factors, he did

2    acknowledge that the minor was nude.  The factor that he

3    would not offer his opinion on was whether the depiction

4    appears to be designed to elicit sexual response in the

5    viewer, and the Government would suggest to the Court that

6    that is something that the trier of fact can decide.  The

7    trier of fact, in this case the Court, can look at those

8    videos to determine whether or not the depiction appears to

9    be designed to elicit a sexual response in the viewer.

10    THE COURT:  Let me ask you, Mr. DerOvanesian

11    argues that because this is a possession case, that the --

12    that last Dost factor is from an objective standpoint as

13    opposed to a subjective standpoint or for a production

14    charge.  Do you agree with that?

15    MS. VIACAVA:  Your Honor, I -- I do not agree with

16    that.  I think that the Court can look at the evidence as a

17    whole, can look at the -- as it says, the overall content of

18    the material.  Therefore, the Court can consider that it was

19    the defendant in this case.  The Government has made a

20    charging decision to charge him with possession of child

21    pornography, and in this particular case, the Court, unlike

22    what may be seen in other cases where it's unclear where the

23    materials necessarily came from, the Court can look at the

24    entire videos and see that it is the defendant that is

25    setting up and establishing the focal point of that cell

1    phone.  It is the defendant who sets it up, who captures

2    this particular minor, who repeatedly captures this minor,

3    this same 13 year old and he captures her in a position

4    where she is going to be nude and he does so on January 26th

5    and January 27th of 2010, and he keeps those videos.

6         MR. DEROVANESIAN:  Your Honor, to the extent that

7    the Government is asking the Court to apply the incorrect

8    standard, we object.

9         THE COURT:  And that's my concern.  This last

10   prong, quite honestly, has caused the courts a great deal of

11   confusion, as I have learned a lot about child pornography

12   in the last few weeks getting ready for this case.  And the

13   courts admitted in their opinions that this last prong is

14   quite confusing, and so that was my question.  I understand

15   what the evidence shows.  My question is whether we're

16   dealing with an objective standard or whether we're dealing

17   with a subjective standard, and if it differs based upon

18   whether the charge is a charge of possession versus a charge

19   of production.

20        MS. VIACAVA:  Your Honor, the Government would

21   argue that one of the factors to be considered is it

22   indicates sexual response to the viewer.  In this case, the

23   viewer would be the person possessing it, which is the

24   defendant in this case.

25        THE COURT:  That's subjective -- it's not clear to

```
 1   me that that's what it means.  The viewer could be the
 2   viewer in general, versus just the person who in this case
 3   would be Mr. Johnson, the individual who made the video.
 4   And it's unclear in the case law.
 5              MS. VIACAVA:  As well as the individual -- he's
 6   the individual who possessed it, which is what he's being
 7   charged with.
 8              THE COURT:  Right.
 9              MS. VIACAVA:  The Government would argue that
10   looking at the Dost factors, that is something that the
11   Court can consider.  The Court doesn't have to find all the
12   factors, but keeping a videotape that features the same
13   item -- even Mr. Lawson acknowledged that people that
14   collect child pornography, they like to have a series.  He
15   also acknowledged this would be new, these would be new
16   materials, wouldn't be something that would be located on
17   the internet.  This was something that Mr. Johnson was able
18   to set up and record and to keep.
19              So you have a situation where this defendant was
20   able to capture a minor that he knew, a 13 year old, while
21   she was naked, repeatedly, and he kept it on the cell phone
22   where it was portable to him.  The Government would argue
23   that looking at the content of it, looking at the entire
24   video, that it does appear to be designed to elicit a sexual
25   response in the viewer.  It's a hidden camera.  Therefore,
```

1   the minor is walking in.  Unbeknownst to her she is going

2   about what she would normally do to get undressed, and that

3   is what is being captured in this particular video.

4           It's the same Dost factors in terms of lascivious

5   exhibition of the genitals or pubic area, regardless of

6   whether it is production of child pornography or possession

7   of child pornography.  In this case, it would still be --

8   what still qualifies is sexually explicit conduct, still

9   applies the lascivious exhibition of the genitals and/or

10  pubic area of the person as being sufficient, and that is

11  one of the factors the Court should consider.

12          In this case, it is even more clear what the

13  intent was because you can actually see that it is the

14  defendant who is setting up the camera to capture what he

15  wants.  It is the defendant who does that and keeps it, and

16  has possession of it a month after those videos were taken,

17  approximately.

18          The Government would also argue that the materials

19  in this particular case is what the Court should consider

20  rather than just the demonstrative aids that Mr. Lawson

21  provided.  In this particular case, there is -- Mr. Lawson

22  acknowledged it's not a clinical study of a minor.  It's not

23  capturing a family moment of a first bath, or anything of

24  that nature.  It's not art.  There's no story line; there's

25  no plot.  The purpose of that video is to capture this

1    minor.

2           What is clear, we know that the minor is 13 years

3    old.  We know that the defendant knew that the participant

4    captured in the video was a minor.  It is clear that the

5    defendant went back to collect this video and that the

6    defendant kept this video on his cellular phone.

7           It's also clear that because of the repeated

8    nature of collecting these videos that the intent was to

9    capture this minor and that he knew that this was child

10   pornography.  That it was done to -- it was designed to

11   elicit a sexual response in the viewer.  He chose the room

12   where she was going to be naked.  It's not the kitchen; it's

13   not her bedroom.  It's not a place where she might just lay

14   down to rest.  He chose the room in the house where she was

15   going to be naked, and that is what the video was set up to

16   capture on that cell phone, and that is what's relevant in

17   this particular case.

18           One moment, please, Your Honor.

19           (Discussion off record)

20           MS. VIACAVA:  Your Honor, in this particular case,

21   the Government would argue that the evidence in this case,

22   the videos, and that is what the stipulated facts

23   anticipated, stipulates that the Court can look at the

24   videos in their entireties is what has been agreed upon.

25   The Government would argue that looking at those videotapes

1    from the cell phone, the defendant's cell phone in their
2    entireties, does in fact meet several of the standards for
3    the sexually explicit conduct, meaning lascivious exhibition
4    of the genitals or pubic area.  That is -- that is
5    essentially the only question that is left.  Everything else
6    has been agreed to.  It's just a matter of whether or not
7    what this defendant captured on that video and possessed on
8    those videos was the lascivious exhibition of the genitals
9    or pubic area, and because that is what is visible, from the
10   knees up of this particular minor as she was climbing in and
11   out of that shower, the Government would argue that that has
12   been proven beyond a reasonable doubt.  She is nude.
13          The overall content, which is what the standard
14   jury instructions indicate, the overall content of the
15   material, the focal point of the visual depiction is on the
16   minor's pubic area.  She wasn't captured off to the side.
17   She wasn't captured -- it was set up so that she would be
18   seen at that particular spot, that particular location, and
19   it was done so repeatedly.  And the Government would argue
20   that looking at the actions of the defendant, the choices he
21   made of setting up that cell phone, of keeping it on his
22   cell phone, of capturing that particular minor repeatedly,
23   that these videotapes do appear to be designed to elicit a
24   sexual response in the viewer.  In this case, the viewer
25   would be the defendant.

1          He had new material, material that could not be

2     found elsewhere.  He had his series.  He had this particular

3     minor.  He was able to keep these videos of her, his own

4     collection.  That is what the Government would argue the

5     evidence has shown beyond a reasonable doubt, and we would

6     ask that you find this defendant guilty of what he did, of

7     these materials.  Thank you.

8               THE COURT:  Thank you.

9               MR. DEROVANESIAN:  Your Honor, may I respond

10    briefly to the objective/subjective?

11              THE COURT:  To the question I asked, yes.

12              MR. DEROVANESIAN:  Your Honor, I -- well, as a

13    preliminary matter, our position is that it's irrelevant

14    because the Government hasn't proven either beyond a

15    reasonable doubt.  But in relation to her statement or

16    comments to the Court, I find it interesting, Page 127 of

17    the discovery we were provided with apparently is some type

18    of report that Agent Kuchta wrote and in there, he has this

19    statement:  The relevant actual inquiry is not whether the

20    depiction -- the pictures appeal to the defendant's sexual

21    interest but whether on their face they appear to be of a

22    sexual nature.  This is in Mr. Kuchta's report, and

23    shockingly, he says that this is what United States versus

24    Helton, the case that she just mentioned to the Court,

25    that's what this case concludes.

1          It's interesting that she would stand there and --

2     when you asked whether it's objective or subjective and she

3     says we are not conceding that.  Mr. Kuchta says that's what

4     Helton holds.  And I apologize, I have not had an

5     opportunity to read that.  I don't know that it holds that

6     but that's what Mr. Kuchta put in his report.  But again, we

7     would argue that the Government's proven neither beyond a

8     reasonable doubt.  Thank you, Judge.

9          THE COURT:  Ms. Viacava do you wish to respond?

10         MS. VIACAVA:  Your Honor, in United States versus

11    Helton, 2008 case that was previously cited to the Court,

12    the Government did read to the Court that it indicated the

13    Tenth Circuit found our task is simply to determine whether

14    the defendant intended to videotape -- intended the

15    videotape he produced to elicit sexual response in the

16    viewer, defined as himself and like minded individuals.

17    Clearly, he did not, was what they found -- I'm sorry,

18    clearly he did, was what they found.

19         THE COURT:  So they said himself and like minded

20    individuals?

21         MS. VIACAVA:  Yes, Your Honor.  That was an

22    individual that was charged with producing the images.

23    Would the Court like the cite again?

24         THE COURT:  No, I have the case.  Madam Clerk, do

25    we have all of the evidence?  Counsel, do you all want to

1    check and make sure the evidence is here?

2           MR. DEROVANESIAN:  You want us to do it now?

3           THE COURT:  Yes.

4           (Pause in place)

5           MS. VIACAVA:  Your Honor, defense counsel has torn

6    open Exhibit Number 4.  Would the Court like the Government

7    to provide some new packaging to make sure it stays inside

8    or would that be sufficient?

9           THE COURT:  No, just tape the sides back.  I think

10   the clerk has some tape.  I'm going to look at the sock

11   anyway, so there's no need to completely conceal it.

12          MS. VIACAVA:  I'm just going to tape the sides.

13   The top will still be open.

14          (Pause in place)

15          DEPUTY CLERK:  Yes, ma'am.

16          THE COURT:  Mr. DerOvanesian, with regard to the

17   demonstrative aids, are you going to substitute the

18   paperclipped pages or do you wish for the clerk to maintain

19   the entire books and the video?

20          MR. DEROVANESIAN:  In light of the matters raised

21   prior to trial, we would be more comfortable if the Court

22   maintains or the clerk maintains custody of those materials

23   because I think the protection order only related to this

24   trial.

25          THE COURT:  All right.  Is there anything else?

```
 1              All right, the Court is going to take this matter
 2   under advisement and issue a written opinion.  If there's
 3   nothing else, we are adjourned.
 4              COURT SECURITY OFFICER:  All rise.
 5              (Proceedings concluded at 11:25 a.m.)
 6
 7                            CERTIFICATE
 8   I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND
 9   ACCURATE TRANSCRIPT FROM THE ORIGINAL STENOGRAPHIC RECORD IN
10   THE ABOVE-ENTITLED MATTER.
11
12       Dated this 2nd day of February, 2012.
13
14                        /s/ R. Joy Stancel
                          _____
15                          R. JOY STANCEL, RMR-CRR
                          FEDERAL OFFICIAL COURT REPORTER
16
17
18
19
20
21
22
23
24
25
```